**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

BGC PATNERS, INC., *et al*,

                Plaintiffs,

    v.

AVISION YOUNG (CANADA), INC., *et al,*

                Defendants.

Case No. 2:15-cv-00531-RFB-GWF

**<u>ORDER</u>**

## I.      INTRODUCTION

Before the Court is Defendants' Motion to Dismiss the Amended Complaint. ECF No. 66. For the reasons stated below, the Motion is granted in part and denied in part.

## II.     BACKGROUND

The original Complaint was filed in state court on February 27, 2015. ECF No. 1. The case was removed on March 23, 2015. ECF No. 1. The Court denied Plaintiff's Motion to Remand on March 31, 2016, and issued the corresponding written order on July 7, 2016. ECF Nos. 45, 59. The First Amended Complaint was filed on August 8, 2016. ECF No. 65. The instant Motion to Dismiss was filed on October 7, 2016. ECF No. 66. The Response was filed on December 13, 2016 and the Reply on January 12, 2016. ECF Nos. 72, 73. In the Response and at the hearing Plaintiffs withdrew claims 10, 11, and 13, for breach of fiduciary duty and unjust enrichment. Ten claims remain.

III.     **LEGAL STANDARD**

A.  **Motion to Dismiss**

In order to state a claim upon which relief can be granted, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss for failure to state a claim, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Security Servs., Inc., 706 F.3d 1017, 1019 (9th Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).


IV.     **ALLEGED FACTS**

The Court incorporates by reference the facts as pled in the complaint and provides the following timeline and summary of alleged facts:

A.  **Plaintiff's Business and Acquisition of Grubb & Ellis**

Plaintiffs purchased all rights and interest in the claims asserted in the Complaint from Grubb & Ellis pursuant to the Parties' April 5, 2012 Asset Purchase Agreement ("APA") that was approved by the bankruptcy court.

BGC Partners is a leading global brokerage company primarily servicing the wholesale financial and property markets. Effective April 5, 2012, BGC Partners expanded its real estate brokerage business by acquiring, through its indirect subsidiary, G&E Acquisition Company, LLC, substantially all of the assets of Grubb & Ellis and its subsidiaries (including Grubb & Ellis Affiliates), including a beneficial interest in and right to acquire the assets of Grubb & Ellis and its subsidiaries. These assets included, among others, contracts, business opportunities, and leads to provide management, leasing, sales and financial services, as well as the commissions and other receivables, claims, causes of action, and other rights of recovery.

Previously, on February 20, 2012 (the "Petition Date"), Grubb & Ellis and its subsidiaries filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The purchase of substantially all of the assets of Grubb & Ellis by BGC Partners was conducted in accordance with the provisions set forth in Section 363 of the Bankruptcy Code.

Pursuant to a Second Amended and Restated Asset Purchase Agreement and a Transition Services Supplement to the Asset Purchase Agreement between Grubb & Ellis and BGC Partners, each dated April 13, 2012, BGC Partners purchased the beneficial rights associated with those executory contracts to which Grubb & Ellis was a party, as well as all contracts for related claims, including all beneficial rights under and any claims based on or arising in connection with Grubb & Ellis's Affiliate Agreement with the Nevada Group. Specifically, with respect to its operations in Reno, Nevada, on April 1, 2010, Grubb & Ellis Affiliates entered into a "Commercial Real Estate Brokerage Affiliation Agreement" (the "Nevada Agreement") with the Nevada Group.

**B. Defendant's Alleged Unlawful Scheme and Conspiracy to Plunder Plaintiff's Real Estate Brokerage Assets**

In June 2008, Mark Rose – who had resigned as Chief Executive Officer of Grubb & Ellis only months earlier – became Chief Executive Officer of Avison Young. Avison Young had no significant real estate brokerage or other services in the United States at the time. In 2009, under Rose's new leadership, Avison Young embarked upon a self-described "aggressive growth and expansion strategy" and began acquiring real estate brokerage operations in the U.S. market and opening others with brokers from its competitors. It opened its first U.S. office in Chicago in 2009, followed by additional offices in, among other places, Washington, D.C., Atlanta, Boston, Dallas, Houston, Los Angeles, Reno, New York City, and Pittsburgh. Defendants have carried out their aggressive expansion strategy through unlawful means and to Plaintiffs' detriment, including targeting and stealing the operations, personnel, offices, and affiliates of Rose's former company for his new company, Avison Young. This also includes the alleged wrongful conversion of assets, such as commissions and trade secrets related to the Nevada Group. This scheme was inspired and devised by Rose, and directed and implemented by Pinjuv, Kupiec, Avison Young, AY-USA and AY-Nevada, through its directors, officers and agents.

## C. Defendants Steal Plaintiff's Nevada Affiliate

By way of background, Grubb & Ellis, through its subsidiary, Grubb & Ellis Affiliates, had contractual arrangements with a number of established real estate brokerage companies across the United States to provide real estate brokerage services under Grubb & Ellis's service and trademarks. Defendants tortiously conspired with the Nevada Group and others, to terminate the Nevada Group's contract with Grubb & Ellis Affiliates. These putative terminations occurred during the period when the "automatic stay" in bankruptcy was in effect and, as such, were illegal under the Bankruptcy Code.

The Nevada Agreement provided, among other things, that the Nevada Group would participate, as an affiliate of Grubb & Ellis Affiliates, in cooperative marketing and referral programs. The parties agreed that, during the term of the Nevada Agreement, the Nevada Group received the right to use certain Grubb & Ellis services and trademarks in the conduct of its brokerage business. As a Grubb & Ellis affiliate, the Nevada Group also obtained access to confidential and proprietary information in certain databases which contained client and customer information pursuant to the Nevada Agreement. The Nevada Agreement was for a definite period of time – three years, until April 1, 2013 – and during that period of time, was terminable only for cause. If the Nevada Group terminated without cause at the end of the term, it was obligated to provide written notice to Grubb & Ellis Affiliates not less than one hundred fifty (150) calendar days in advance of the April 1, 2013 expiration date.

The Nevada Agreement contained provisions regarding confidentiality and also required the Nevada Group to execute, which it did, a standard Confidentiality Agreement. The Nevada Agreement specifically provided that the Nevada Group could not compete or perform in competition with the business interest of Plaintiffs during the term of the Nevada Agreement.

By letter dated March 1, 2012, without providing the requisite 150-day advance notice, the President of the Nevada Group, John Pinjuv, notified Grubb & Ellis Affiliates of the Nevada Group's intent not to renew the Nevada Agreement at the end of its present term and, in addition, that it would be "ceasing its operations effective March 5, 2012." The termination provided by the Nevada Group was not for cause pursuant to the Nevada Agreement. This termination of the

Nevada Agreement was wrongful because the plain terms of that agreement provide that it would not expire until April 1, 2013. Additionally, at this time the bankruptcy court's automatic stay was still in effect and barred the Nevada Group's termination of the Nevada Agreement. On March 5, 2012, Avison Young issued a Press Release stating that it was opening a new office in Reno, at the same address previously occupied by the Nevada Group, with Pinjuv serving as its Managing Director.

The Nevada Group was offered incentives by Avison Young to induce the Nevada Group to breach its contract with Grubb & Ellis and to disclose trade secrets. The incentives offered to the Nevada Group far exceeded industry standards. Rose, Kupiec, Pinjuv, Avison Young, AY-USA and AY-Nevada were aware of the Nevada Group's ongoing obligations under the Nevada Agreement and also were aware or should have been aware that the Nevada Group's purported termination of the Nevada Agreement was barred by the "automatic stay" provision of the Bankruptcy Code. Rose, Avison Young, AY-USA, and AY-Nevada also were aware, or should have been aware, that their knowing and fraudulent receipt of assets belonging to the bankruptcy estate constituted a criminal violation of 18 U.S.C. § 152(1) and (5). Avison Young on March 5, 2012 publicly boasted that "[p]rior to joining Avison Young, [Pinjuv] served as President of Grubb & Ellis in Reno, specializing in investment properties in the Northern Nevada area."

**D. Defendant's Wrongful Inducement of Grubb & Ellis Employees to Join AY-Nevada**

Defendants, as commercial brokerage entities and professionals within the industry, knew that confidential information about clients, their contact information, and their preferences constituted trade secrets and knew that individual brokers and employees have a duty of confidentiality with respect to this information. Grubb & Ellis also had an office in Las Vegas. Grubb & Ellis had contractual arrangements with individual licensed real estate brokers who are licensed to perform brokerage services in Nevada, either as employees or as independent contractors, in the Las Vegas office.

In late 2010, one year prior to his departure from Grubb & Ellis's Las Vegas office in November 2011, Kupiec was engaged in communications with Avison Young representatives in

which he improperly provided confidential and proprietary information about Grubb & Ellis's Las Vegas operations, as well as Grubb & Ellis's operations in Nevada generally, to Avison Young. Specifically, Kupiec directly communicated to Avison Young and identified which Grubb & Ellis affiliates and brokers should be targeted and recruited by Avison Young, including a direction that Avison Young would need to assist in that recruitment because he had a one-year direct non-solicitation agreement. Rose communicated directly with Kupiec on these topics as well.

While still employed by Grubb & Ellis, Kupiec advised Avison Young representatives which Las Vegas brokers Avison Young should target. Kupiec left Grubb & Ellis at the end of 2011 and within six months of his departure, the Nevada Group breached its affiliate agreement and brokers and employees at Grubb & Ellis's Las Vegas office departed. Defendants have engaged in a scheme to induce brokers working for Grubb & Ellis not only to terminate their brokerage agreements, but also to steal trade secrets and to conceal business opportunities from the firm when departing. The compensation packages offered by Avison Young to former Grubb & Ellis brokers and employees were designed to induce them to breach their contracts with Grubb & Ellis and to disclose trade secrets. Many of the brokers and employees induced by Defendants' unlawful scheme were key employees of Grubb & Ellis. Plaintiffs purchased and assumed the Nevada Agreement from Grubb & Ellis in the bankruptcy proceedings.

## V.  DISCUSSION

### A.  Plaintiffs' Standing

Defendants argue that Plaintiffs lack standing to pursue their claims because Debtor G&E, the alleged predecessor in interest, rejected the underlying "Nevada Agreement," precluding assignment to Plaintiffs.

#### 1. Legal Standard

##### a.  Executory Contracts

"An executory contract is one on which performance remains due to some extent on both sides. More precisely, a contract is executory if the obligations of both parties are so unperformed

that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." <u>In re Robert L Helms Construction & Development Co., Inc.</u>, 139 F.3d 702, 705 (9th Cir. 1998) (internal citations and quotation marks omitted). "We agree with the district court and hold that when the debtor secures rejection of a non-assumed executory contract under section 365(g)(1), the date of breach is the day immediately prior to the filing of the bankruptcy petition." <u>In re Aslan</u>, 909 F.2d 367, 371 (9th Cir. 1990).

"Section 365 of the Bankruptcy Code "gives a trustee in bankruptcy the authority either to reject or to assume executory contracts and unexpired leases. Ordinarily, a trustee may take either of these actions without the consent of the other party to the contract or lease and notwithstanding a provision in the applicable agreement that purports to restrict assignment. Once a contract has been assumed, the trustee can assign it." <u>In re CFLC, Inc.</u>, 89 F.3d 673, 676 (9th Cir. 1996).

"(2) The trustee may assign an executory contract or unexpired lease of the debtor only if: (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. §365(f).

### b.  Property of the Estate

"(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541(a)(1). The estate's property also includes "Any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. §541(a)(7). Debtors and a bankruptcy estate are distinct legal entities. 11 U.S.C. §541(a)(7) applies to property of the *estate*. <u>See</u> <u>In re Doemling</u>, 127 B.R. 954, 955 (W.D. PA 1991) (finding that a post-petition tort inflicted upon the debtors could not constitute acquired property *of the estate* within the meaning of 11 U.S.C. §541(a)(7)).

As explained by the <u>Doemling</u> court, "The distinction between the property of the individual debtor, as opposed to the property of the estate, finds further support in section 1306 of the Bankruptcy Code. 11 U.S.C. § 1306. Section 1306 applies only to bankruptcy proceedings *of*

*individuals* and provides in pertinent part: 'property of the estate includes, in addition to the property specified in section 541 of this title . . . all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under Chapter 7 or 11 of this title, whichever occurs first.' 11 U.S.C. § 1306(a)(1). Section 1306 thus implicitly acknowledges that the debtor is separate from the estate and may acquire property interests independent of the estate." In re Doemling, 127 B.R. at 955 n. 1 (emphasis added).

Property under 11 U.S.C. §541(a)(1) includes "everything of value the bankrupt may possess in alienable or leviable form when he files his petition," including anything that "is sufficiently rooted in the pre-bankruptcy past and so little disentangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as property." Segal v. Rochelle, 382 U.S. 375, 380 (1966). To be property of the estate, an interest must be "more than a hope or expectation" but must constitute "a legal or equitable interest . . . *as of the commencement of the case*." In re Schmitz, 270 F.3d 1254, 1256-57 (9th Cir. 2001) (emphasis in original) (finding that fishing rights established by regulations adopted post-petition did not constitute property of the estate).

### 2. Discussion

Defendants argue that as Plaintiffs' standing depends entirely upon the assumption of rights pursuant to the Asset Purchase Agreement, those rights must exist and have been validly transferred for Plaintiffs to have a right to sue. Defendants argue that Plaintiffs cannot have purchased and assumed the Nevada Agreement in the bankruptcy proceeding, as alleged, because the bankruptcy estate rejected the agreement as part of the Notice of Rejection effective January 31, 2013. Defendants argue that in order to assume rights under the Agreement, the debtor needed to have first assumed the Agreement, and then assigned it to Plaintiffs. Because this did not occur, and in fact, cannot have occurred because the contract was rejected, BGC has no rights under the contract. Moreover, Defendants argue that the Debtors' rejection of the contract constituted a material breach, eliminating any allegedly assigned interest.

Plaintiffs argue that the misconduct that gives rise to the contractual claims began in 2008-2009 and had matured into causes of action before the APA was entered into. They were then transferred to BGC "not as an assigned contract but as *existing* claims." (emphasis in original, Resp. Mot. at 11). Plaintiffs in their Response had argued that a post-petition breach of contract by a non-debtor, which occurs before the debtor's deadline to assume or reject a contract, gives rise to a cognizable and assignable cause of action for breach even when the contract is later rejected. However, at the hearing on June 9, 2017, Plaintiffs' counsel declined to argue any legal basis for a right to sue for claims that accrued post-petition; instead arguing that allegations of post-petition misconduct provide support for claims that had fully accrued prior to the filing of the petition.

The Court does not find a legal basis for standing for any claims that may have accrued after the filing of the petition. Because the rejection of the Nevada Agreement as an executory contract constituted a material breach by the Plaintiffs backdated to just before the petition, <u>In re Aslan</u>, 909 F.2d at 371, Plaintiffs cannot sue for any alleged post-petition breach by the Defendants. However, this does not mean that Plaintiffs cannot assert claims under the Nevada Agreement or other contracts the rights to which were acquired in the APA. Where Plaintiffs have adequately alleged a material breach prior to the petition date, such contracts do not constitute executory contracts at all; they cannot be contracts in which "the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." <u>In re Robert L Helms Construction & Development Co., Inc.</u>, 139 F.3d 702, 705 (9th Cir. 1998) (internal citations and quotation marks omitted). These are not the kinds of potentially burdensome prospective obligations the bankruptcy code seeks to alleviate, but rather fully accrued claims that have become property of the estate and may be transferred pursuant to state law.

Because the Amended Complaint alleges post-petition tort and contract violations against the debtor, Grubb & Ellis, rather than against the bankruptcy estate, any such claims that had not fully accrued prior to the petition were not property of the estate, and could not have been transferred pursuant to the APA. Therefore, in reviewing the claims below, the Court first

considers whether Plaintiffs have plausibly alleged that the claim accrued prior to the bankruptcy petition.

Defendants had also argued that pursuant to the terms of the APA, Grubb & Ellis had not validly transferred "executory contracts." Because the Court does not find that Plaintiffs have standing to pursue claims under any such executory contracts that had not fully accrued prior to the petition date, the Court need not reach this question.

## B. Violation of the Nevada Uniform Trade Secrets Act ("NUTSA")

Count IX asserts a violation of the Nevada Uniform Trade Secrets Act against all Defendants.

### 1. Legal Standard

"Generally, the elements required for pleading a cause of action for misappropriation of trade secrets include: (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose." Kaldi v. Farmers Ins. Exchange, 21 P.3d 16, 23 (Nev. 2001).

To establish that the information in question is a trade secret, a Plaintiff must show that the asserted trade secret (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain economic value from its disclosure or use; and (2) is a subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Misappropriation of a trade secret includes: disclosure or use of a trade secret of another without express or implied consent by a person who, at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Nevada Revised Statutes ("NRS") §600A.030(2)(c). When misappropriation of a trade secret is based on disclosure, the disclosure is

wrongful when it is made without the consent or permission of the trade secret owner and when the disclosing party was under a duty to maintain the secrecy of the information. NRS 600A.030(2)(c).

"The determination of whether corporate information, such as customer and pricing information, is a trade secret is a question for the finder of fact." Frantz v. Johnson, 999 P.2d 351, 358 (Nev. 2000).

### 2. Discussion

As a preliminary matter, the Court finds that Plaintiffs have plausibly alleged claims that had fully accrued prior to the petition date. Plaintiffs allege, "One year prior to his departure from Grubb & Ellis's Las Vegas office, [Defendant Joseph] Kupiec was engaged in communications with [Defendant] Avison Young['s] representatives in which he improperly provided confidential and proprietary information about Grubb & Ellis's Las Vegas operations, as well as Grubb & Ellis's operations in Nevada generally, to Avison Young. Specifically, Kupiec directly communicated to Avison Young and identified which Grubb & Ellis affiliates and brokers should be targeted and recruited by Avison Young, including a direction that Avison Young would need to assist in that recruitment because he had a one-year direct non-solicitation agreement. [Defendant Mark] Rose communicated directly with Kupiec on these topics as well."

Plaintiffs allege that the trade secrets included "names of customers . . . detailed information of commercial value about specific customer data, preferences about properties and locations, purchasing histories, lease renewal dates, and on- going, developing leads that were obtained through cultivation of hard-won, longstanding relationships with third-party customers and potential customers."

The Complaint alleges that John Pinjuv was the managing director of the Nevada Group, who authored the letter of intent not to renew the Nevada Agreement on March 1, 2012, and became the Managing Director of AY Reno a few days later. The Complaint further alleges that "Defendants (or some of them) have engaged in a scheme to induce brokers working for Grubb &

Ellis not only to terminate their brokerage agreements, but also to steal trade secrets and to conceal business opportunities from the firm when departing."

The Amended Complaint asserts that the alleged conspiracy that included the theft of trade secrets began "in 2009" after Mark Rose left Grubb & Ellis, joined AY, and embarked upon a "aggressive expansion strategy . . . including by targeting and stealing the operations, personnel, offices, and affiliates of Rose's former company for his new company, Avison Young."

Construed in the light most favorable to the Plaintiffs, these allegations plausibly allege theft of trade secrets by all of the defendants *prior to the filing of the Grubb & Ellis bankruptcy petition* in February 2012. The Amended Complaint directly alleges coordination among Kupiec, Rose, and AY to divulge protected secrets prior to the petition date. Moreover, the Amended Complaint alleges that just a few weeks after the petition, Pinjuv announced that the Nevada Group would be breaking the Nevada Agreement and ceasing operations on March 5, 2012. On March 5, 2012, AY announced that it would be opening a new office in Reno, using the same address previously occupied by the Nevada Group, with Pinjuv as managing director. This timeline raises a strong inference of pre-petition conduct enabling the hasty transition.

Defendants further argue that the allegations as to trade secrets lack the requisite specificity. Defendant cites no binding authority in asserting that Plaintiffs must identify customers by name or list specific incentives offered to entice brokers. Among other relevant facts, Plaintiffs allege collusion among the brokers, Kupiec, and the AY-Defendants to induce brokers, bound by unambiguous contracts to protect valuable secrets, including detailed client information developed through long-term cultivation, to renege on those contracts, shift employers, and divulge their secrets, which they then did. These allegations, viewed in the light most favorable to Plaintiffs, and viewed in light of the information asymmetry inherent in such claims, adequately plead a violation of the Trade Secrets Act. See Kaldi, 21 P.3d at 23.

### C. NUTSA Preemption

Defendants argue that counts 1-8, and 10-13, all claims other than the Nevada Trade Secrets Act claim, are preempted by the Nevada Trade Secrets Act claim.

### 1. Legal Standard

Nevada law provides: "1. Except as otherwise provided in subsection 2, this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret. 2. This chapter does not affect: (a) Contractual remedies, whether or not based upon misappropriation of a trade secret; (b) Other civil remedies that are not based upon misappropriation of a trade secret; or (c) Except as otherwise provided in NRS 600A.035, criminal sanctions, whether or not based upon misappropriation of a trade secret." NRS §600A.090.

"In light of the plain language of NRS 600A.090 and the holding in Hutchison, we conclude that the district court erred in relying on numerous tort and restitutionary causes of action that were explicitly excluded by statute, as they all related to a misappropriation of a trade secret. Specifically, the district court erred in awarding damages based on the following causes of action: (1) misappropriation of confidential information, (2) breach of fiduciary duty, (3) intentional interference with contractual relations, (4) intentional interference with prospective advantage, (5) the tort of breach of the covenant of good faith and fair dealing,4 (6) civil conspiracy, and (7) unjust enrichment. These causes of action would normally be precluded by NRS 600A.090 because they arose from a single factual episode, namely misappropriation of bidding and pricing information." Frantz v. Johnson, 999 P.2d 351, 465 (Nev. 2000).

"[W]e do not agree that the UTSA provides a blanket preemption to all claims that arise from a factual circumstance possibly involving a trade secret. There may be future instances where a plaintiff will be able to assert tort claims, including intentional interference with prospective advantage and intentional interference with existing contract, that do not depend on the information at issue being deemed a trade secret, and thus are not precluded by the UTSA." Id. at n.3.

**2. Discussion**

As a preliminary matter, pursuant to the express terms of the statute, "contractual remedies" are not preempted by the statute. Thus claims 3 and 4 for breach of contract are not preempted. As laid out below, the Court will grant the motion to dismiss claim 2 for Nevada RICO violations and

- 13 -

claims 5-7 for tortious breach of the implied covenant and claim 8 for conspiracy. The remaining claims are (1) Tortious interference with contractual relationship; and (12) Conversion.

### a. Claim 1: Tortious Interference

In this claim, Plaintiffs allege, "Defendants maliciously induced the Nevada Group to breach the Nevada Agreement, without justification, by causing the Nevada Group to (a) terminate the Nevada Agreement with Grubb & Ellis Affiliates in violation of the 'automatic stay,' (b) improperly terminate the Nevada Agreement prior to the agreement's April 1, 2013 end date and without providing the requisite 150-day advance notice, (d) [sic] violate the non-competition provisions of the agreement, and (e) improperly disclose trade secrets and confidential and proprietary information in violation of the Nevada Agreement and Confidentiality Agreement incorporated therein."

The allegations in (a) and (b) cannot state a claim, as they necessarily accrued after the filing of the petition. The allegations in (e) are preempted as they "depend on the information at issue being deemed a trade secret," Frantz v. Johnson, 999 P.2d at 465 n.3, and amount to "civil remedies for misappropriation of trade secrets." NRS 600A.090. There remains only (d), "violate the non-competition provisions of *the agreement*" (emphasis added). The Amended Complaint elaborates: "By setting up a competing office serving the same clients in the exact same real estate market, the Defendants further maliciously induced the Nevada Group to breach the Nevada Agreement's non-competition provisions which prevented the Nevada affiliate from competing with Grubb & Ellis during the term of the Nevada Agreement, i.e., until April 1, 2013." The Amended Complaint makes clear that (d) refers to the allegedly unlawful competition that occurred *after the petition*, namely the total non-compliance with the affiliate agreement and the subsequent direct competition by working with and being subsumed by AY Nevada. As such, this claim is dismissed as Plaintiff's lack standing, and the claim is preempted.

### b. Claim 12: Conversion

Count XII, Conversion, alleges that "Defendants' theft of the Nevada Group has resulted in Defendants' unauthorized assumption and control of contract rights, business opportunities and trade secrets which belong to the Plaintiffs."

Conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights." It is "an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge. Whether a conversion has occurred is ... a question of fact for the jury." <u>M.C. Multi-Family Dev., L.L.C. v. Crestdale Associates, Ltd.</u>, 193 P.3d 536, 543 (Nev. 2008).

In <u>M.C. Multi-Family Dev.</u>, the Nevada Supreme Court applied the Ninth Circuit's test in <u>Kremen v. Cohen</u>, 337 F.3d 1024, 1030 (9th Cir. 2003), to determine whether a property right exists for purposes of a conversion claim. "[A] property right exists when (1) there is an interest capable of precise definition, (2) the interest is capable of exclusive possession or control, and (3) the putative owner has established a legitimate claim to exclusivity. Applying this test, the court in <u>Kremen</u> explained that property is a broad concept encompassing every intangible benefit and prerogative susceptible of possession or disposition. Under <u>Kremen</u>, such rights included the right to use of an Internet website domain name." <u>Id.</u> (internal citations and quotation marks omitted).

To the extent that it is based on the conversion of trade secrets, this claim is preempted under NUTSA. The question remains whether the Amended Complaint has adequately pled conversion of "contract rights" and "business opportunities." The only potential pre-petition allegation to which this might relate are the efforts to induce brokers to leave Grubb & Ellis for Avison Young. Conversion means exercising dominion over a presently-existing property right of another, to the exclusion of the other's enjoyment of that right—it should not be understood to encompass benefit from the breach of a contract, for which lies a remedy in contract or interference with contract. Subsequent to a breach and termination of employment, neither the contract nor the brokers themselves constituted "personal property" of Grubb & Ellis that could be converted. As such, the only remaining substance of the conversion claim relates to trade secrets, and is preempted under the NUTSA.

**D. Tortious Breach of the Implied Covenant**

**1. Legal Standard**

"Although every contract contains an implied covenant of good faith and fair dealing, an action in tort for breach of the covenant arises only "in rare and exceptional cases" when there is a special relationship between the victim and tortfeasor." Insurance Company of the West v. Gibson Tile Company, Inc. 134 P.3d 698, 702 (Nev. 2012). "A special relationship is "characterized by elements of public interest, adhesion, and fiduciary responsibility." Id. Examples of special relationships include those between insurers and insureds, partners of partnerships, and franchisees and franchisers. Each of these relationships shares "a special element of reliance" common to partnership, insurance, and franchise agreements. We have recognized that in these situations involving an element of reliance, there is a need to "protect the weak from the insults of the stronger" that is not adequately met by ordinary contract damages." Id. The Nevada Supreme Court does not appear to have spoken on whether or not real estate broker and client constitutes such a special relationship.

In addition, we have extended the tort remedy to certain situations in which one party holds "vastly superior bargaining power." Id. Examples include termination of an at-will salespersons employment contract. Aluevich v. Harrah's, 6660 P.2d 986, 989 (Nev. 1983) (citing Fortune v. National Cash Register Company, 364 N.E.2d 1251 (Mass. 1977)). A warehouseman's lien applied to a woman using a storage service by a large company that refused to delay selling her goods and furnishings. Mitchell v. Bailey & Selover, Inc, 605, P. 2d 1138 (Nev. 1980).

"To establish aiding and abetting in the civil context, a plaintiff must show (1) the primary violator breached a duty that injured the plaintiff, (2) the alleged aider and abettor "was aware of its role in promoting [the breach] at the time it provided assistance," and (3) the alleged aider and abetter "knowingly and substantially assisted" the primary violator in committing the breach. Terrell v. Central Washington Asphalt, Inc., 168 F. Supp. 3d 1302, 1314 (D. Nev. 2016) (citing Dow Chem. Co. v. Mahlum, 114 Nev. 1468, 970 P.2d 98, 112 (1998). overruled in part on other grounds by GES, Inc. v. Corbitt, 117 Nev. 265, 21 P.3d 11, 15 (2001)).

### 2. Discussion

Defendants argue first that Plaintiffs have failed to allege a special relationship sufficient to support a claim for tortious breach. The Complaint describes The Nevada Group as "an affiliate" of Grub & Ellis, and describes the relationship as one in which Grub & Ellis provided services and permitted use of its trademark. As such, Plaintiffs have plausibly alleged a relationship sufficiently akin to the "franchiser-franchisee" relationship the Nevada Supreme Court has clearly identified as one of the special relationships that may support a claim for tortious breach. However, Plaintiffs have alleged no such special relationship with Kupiec. The Court is not persuaded that the relationship of "entrustment" involving trade secrets is of the type the Nevada Supreme Court identified containing "elements of public interest, adhesion, and fiduciary responsibility," nor one of great power imbalance, such that tort liability would be warranted. Such a theory would render almost any management or executive relationship with an employer company sufficient to permit a tortious breach claim. Therefore, Count VI is dismissed.

As to Count VII, Defendants argue that without underlying liability there can be no aiding and abetting liability, and that the facts as pled are insufficient. As only the Nevada Group is potentially liable, and this claim is pled only against Kupiec and the Nevada Group, the relevant question is whether Kupiec aided and abetted the Nevada Group's alleged breach. Plaintiffs have stated a plausible claim for Kupiec's aiding and abetting liability. Plaintiffs assert that Kupiec was instrumental in orchestrating the alleged conspiracy to intentionally induce breaches of a contract plausibly characterized by the requisite special relationship.

As stated above, liability will extend only to those alleged breaches that occurred prior to the filing of the bankruptcy petition in February 2012. Thus the claims will only proceed if the Nevada Group's breach and Kupiec's aiding and abetting occurred prior to that date. Count V alleges, "The Nevada Group breached that duty by engaging in direct competition with Plaintiffs *by joining Avison Young* and by disclosing Plaintiffs' trade secrets to Avison Young[.]" Thus the Amended Complaint makes clear that Plaintiffs are asserting a violation based on the postposition complete break with the affiliate agreement and subsequent joining of Avison Young, as well as the preempted trade secret violation. Therefore, Counts V through VII are dismissed.

## E.  RICO

Defendants argue that Plaintiffs have failed to plead sufficient specific facts to state a claim for violation of the Nevada RICO Act (Count II).

### 1. Legal Standard

"[W]e . . . have a present concern that civil RICO actions be pleaded with sufficient specificity because of the very serious consequences attached to the allegations of criminal conduct that are the essence of this kind of law suit. Not only is a civil RICO defendant accused of committing a criminal offense—which carries with it the potential for considerable social stigma— such a defendant is also confronted with the possibility of an adverse treble damages judgment." Hale v. Burkhardt, 764 P.2d 866, 869 (Nev. 1988).

"Because the present civil RICO action, despite its fundamentally civil nature, (1) involves pleading the commission of racketeering-related crimes and (2) permits the levy of serious punitive consequences, the same degree of specificity is called for as in a criminal indictment or information. A civil RICO pleading must, in that portion of the pleading which describes the criminal acts that the defendant is charged to have committed, contain a sufficiently "plain, concise and definite" statement of the essential facts such that it would provide a person of ordinary understanding with notice of the charges" Id. "This means the complaint should provide information as to "when, where [and] how" the underlying criminal acts occurred." Cummings v. Charter Hosp. of Las Vegas Inc., 896 P.2d 1137, 1141 (Nev. 1995).

### 2. Discussion

Plaintiffs' RICO claim alleges the following:

Defendants, in coordinating and implementing their wrongful actions to achieve the theft of Plaintiffs' Nevada affiliate, Plaintiffs' broker agreements and its related commissions, business, business opportunities and trade secrets, engaged in an "enterprise" as defined by NRS § 207.380. The actions taken by the Defendants, in the course of stealing the Nevada Group and related assets, from a period of, at the latest, October 10, 2010, through the present date, constitute more than two "predicate acts" as defined by NRS § 207.30. Specifically, Defendants' predicate acts include, but are not limited to: (a) Theft of monies

owed pursuant to the Nevada Agreement; (b) Theft of multiple business deals Plaintiff had in progress; (c) Theft of trade secrets; and (d) Theft of broker relationships.

Defendants argue that these claims are not pled with the required specificity, as they do not allege "when, where, and how the underlying acts occurred. Defendants further argue that even if the claim is pled with sufficient specificity, the claims of "theft" amount to a reiteration of the allegations of tortious conduct and contract valuations that do not amount to predicate "crimes" as required by NRS 207.360. Plaintiffs respond by reiterating the allegations in the RICO section of the complaint, which amount to bare recitals of the general accusations and citations, without provide sufficient details to constitute incidents of particular crimes. The Court finds that Plaintiffs' allegations do not amount to "definite" statements of the particular facts of the predicate "crimes" of "theft." The fact that none of the allegations of particular predicate crimes include any indication of "when" they occurred is sufficient to merit dismissal.

### F. Breach of Contract

Defendants' only argument as to the breach of contract claims is that Plaintiffs lack standing to sue. Therefore, the Court asks only whether breach plausibly occurred prior to the bankruptcy petition date of February 20, 2012.

Count III of the Amended Complaint, Breach of Contract – Defendant Nevada Group, alleges, "The Nevada Group breached the Nevada Agreement by improperly terminating the agreement without providing the requisite notice and prior to the expiration of the term of the Nevada Agreement, by refusing to perform under the Nevada Agreement for the remainder of the Nevada Agreement's term, by joining Avison Young to engage in direct competition with the Plaintiffs in breach of the non-competition clause in the Nevada Agreement, and by disclosing Plaintiffs' trade secrets to Avison Young in violation of the Nevada Agreement and the Confidentiality Agreement." As with the tortious breach claim, all of the alleged misconduct in this claim with the exception of the trade secret violation occurred after the bankruptcy petition, and relates directly to the complete break with the affiliate agreement that occurred in March of 2012. However, contract claims cannot be preempted. As noted above, the Amended Complaint

plausibly alleges trade secret violations, incorporating contractual violations, preceding the bankruptcy petition. Therefore, the claim may proceed on this ground.

Count IV alleges breach of contract against Defendant Kupiec, specifically that "Kupiec breached his contractual obligation to Plaintiffs by, before and after joining AY-Las Vegas in November 2011, soliciting Plaintiffs' Las Vegas brokers, and inducing them to terminate their agreements with the Plaintiffs in order to join Avison Young and by providing confidential and proprietary information to Avison Young while still employed by Grubb & Ellis. Kupiec engaged in direct communications with Avison Young regarding the recruitment of Grubb & Ellis brokers. Plaintiffs have plausibly alleged that Kupiec breached his contract with regard to both proprietary information and the recruitment of brokers prior to the February 20, 2012 bankruptcy petition.

### G. Conspiracy

"An actionable conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." Hilton Hotels Corp. v. Butch Lewis Productions, Inc., 862 P.2d 1207, 1210 (Nev. 1993). "The gist of a civil conspiracy is not the unlawful agreement but the damage resulting from that agreement or its execution. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." Eikelberger v. Tolotti, 96 Nev. 525, 528 n.1 (Nev. 1980).

Plaintiffs allege that Defendants entered into a conspiracy to unlawfully take Grubb & Ellis's commissions, personnel, offices, business, trade secrets, and business opportunities: "The unlawful scheme and conspiracy described herein was inspired and devised by Rose and Kupiec, and directed and implemented by Avison Young and AY-USA, through its directors, officers and agents and carried out the scheme and conspiracy under Avison Young's direction and control . . . [The] conspiracy and overt acts in furtherance of their unlawful scheme have included, among other things, tortiously inducing the Nevada Group to breach its contract in order to join Avison Young; and inducing and assisting larceny by the Nevada Group by rewarding them – with full

knowledge or recklessness to the consequences – for disclosing and stealing business opportunities and trade secrets that belonged to Grubb & Ellis."

A conspiracy claim may be preempted under the NUTSA. See Frantz, 999 P.2d at 465. Here again, the operative inquiry is whether Plaintiffs have adequately pled claims not rooted in trade secrets that fully accrued prior to the petition date. The only claim proceeding that is not rooted in trade secrets is the claim against Joseph Kupiec for breach of contract based upon inducing brokers to leave Grubb & Ellis. While the Nevada Supreme Court has not directly addressed the issue, the Court finds that it would not permit co-conspirator liability based only upon underlying contract violations. To do so would effectively permit transforming contract claims into tort claims with tort damages, without meeting the requirements of a tortious breach of the implied covenant of good faith and fair dealing. See Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 461 (Cal. 1994) (declining to permit a claim for conspiracy to interfere with contract).

## VI. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that [66] Motion to Dismiss is granted in part and denied in part as follows: Counts III, IV, and IX, for breach of contract against Defendant Nevada Group, breach of contract against Defendant Kupiec, and violation of the Nevada Trade Secrets Act against all Defendants, respectively, may proceed. All other claims are dismissed.

DATED: June 19, 2018.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**