UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| NEWMARK GROUP, INC., G&E ACQUISITION COMPANY, LLC and BGC REAL ESTATE OF NEVADA, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AVISON YOUNG (CANADA) INC., et al.,<br><br>Defendants. | Case No.: 2:15-cv-00531-RFB-GWF<br><br>**ORDER**<br><br>**Re: Defendants' Motion to Compel (ECF No. 182) and Motion to Stay (ECF No. 183)** |

This matter is before the Court on Defendants' Motion to Compel Amended Answer to Defendants' Interrogatory No. 3 (ECF No. 182) and Defendants' Motion to Stay Discovery (ECF No. 183), filed on September 14, 2018. Defendants Nevada Commercial Group and John Pinjuv filed a Joinder (ECF No. 185) on September 19, 2018. Plaintiffs filed their Opposition (ECF No. 201) on October 5, 2018 and Defendants filed their Reply (ECF No. 208) on October 12, 2018. The Court conducted a hearing in this matter on October 24, 2018.

**BACKGROUND**

Plaintiffs allege that Grubb & Ellis Company was one of the oldest and largest real estate brokerage firms in the United States. *First Amended Complaint* (ECF No. 65), at ¶ 1. Grubb & Ellis filed for bankruptcy protection on February 20, 2012, and Plaintiffs purchased all of its commissions, contract rights, and assets through the bankruptcy proceedings. *Id.* at ¶¶ 23-28.

Grubb & Ellis operated its brokerages either directly or through affiliates licensed to provide real estate brokerage services in particular states. *Id.* at ¶ 9. Grubb & Ellis's president, Mark Rose, left the company in 2008 to join Defendant Avison & Young which was a Canadian

1

real estate brokerage firm that was seeking to expand its operations into the United States. *Id.* at ¶¶ 1, 2. After Defendant Rose joined Avison & Young, it allegedly began an aggressive hiring campaign in the United States in which it tortiously and illegally looted Grubb & Ellis's commissions, personnel, offices, business, trade secrets, and business opportunities. The scheme continued unabated even after Grubb & Ellis filed for bankruptcy. *Id.* at ¶¶ 2, 24, 29-32. As part of the alleged scheme, Defendants induced Grubb & Ellis's Nevada affiliate, Nevada Commercial Group, to breach its affiliate agreement and become an affiliate of Defendants. *Id.* at ¶¶ 34-44. Defendants also conspired with Joseph Kupiec, the manager-director of Grubb & Ellis's Las Vegas office, to induce Grubb & Ellis's brokers and employees to terminate their agreements and "take and use Business Opportunities and trade secrets belonging to Grubb & Ellis." Mr. Kupiec subsequently became the managing director of Defendants' Las Vegas affiliate and provided Grubb & Ellis's confidential and proprietary information to Defendants. *Id.* at 45-55. Defendants also induced brokers working for Grubb & Ellis to terminate their contracts and steal trade secrets and to conceal business opportunities from the firm when departing. *Id.* at ¶ 53.

Plaintiffs' first amended complaint alleged causes of action for (1) tortious interference with contractual relations; (2) violations of the Nevada RICO statute, Nevada Revised Statute (NRS) § 207.470, et seq.; (3) breach of contract against Defendants Nevada Group, Pinjuv, and Kupiec; (4) tortious breach of the covenant of good faith and fair dealing against Defendants Nevada Group, Pinjuv, and Kupiec; (5) aiding and abetting breach of the covenant of good faith and fair dealing against Nevada Group and Kupiec; (6) conspiracy; (7) theft of trade secrets in violation of NRS § 600A.010 et seq.; (8) breach of fiduciary duty by Defendants Pinjuv and Kupiec; (9) aiding and abetting breach of fiduciary duty; (10) conversion; and (11) unjust enrichment. On June 20, 2018, the Court denied Defendants' motion to dismiss Plaintiffs' claim for theft (misappropriation) of trade secrets pursuant to NRS § 600A.010 et seq, and Plaintiffs'

breach of contract claims against Defendants Nevada Group, Pinjuv and Kupiec. The Court dismissed all of the other claims.[1]

On July 24, 2018, Defendants served their first set of interrogatories on Plaintiffs. Defendants' Interrogatory No. 3 states as follows:

> Identify and describe in detail each specific "trade secret" that You allege the AY-Defendants misappropriated in Count IX of the Amended Complaint.

Plaintiffs answered Interrogatory No. 3 on August 23, 2018 as follows:

> Subject to and without waiving their General Objections, Plaintiffs state that the confidential information and trade secrets, as alleged in the Amended Complaint, include, but are not limited to: Grubb & Ellis confidential employment contracts; Grubb & Ellis confidential Independent Contractor Agreements; Grubb & Ellis's compensation structure, including commission splits and related data; Grubb & Ellis's compensation for specific brokers, including benefit offerings; confidential client contact information; confidential client contact lists; Grubb & Ellis client proposals; reports identifying client transactions in the pipeline; confidential term sheets provided to clients disclosing sensitive financial data; Grubb & Ellis business plans detailing overall strategy and setting forth specific goals; confidential Grubb & Ellis market research disclosing potential business opportunities; Grubb & Ellis's response to Requests for Proposal for specific clients; Grubb & Ellis confidential comparison of existing and proposed lease terms for various clients; Grubb & Ellis Exclusive Agency Agreements; Grubb & Ellis spreadsheets, including data on existing clients and their needs and preferences; Grubb & Ellis revenue reports; spreadsheets identifying Grubb & Ellis client deals; Grubb & Ellis confidential customer satisfaction survey; Grubb & Ellis confidential employee goals and objectives, including compensation data and financial targets; and Grubb & Ellis spreadsheets disclosing production/revenue data. The volume of material improperly stolen by the Defendants is extraordinary.
>
> Plaintiffs state that many of the documents responsive to this interrogatory are in Defendants' possession, custody, and control. NCG, Grubb & Ellis' affiliate, maintained its own server or servers but had access to Grubb & Ellis' trade secrets and confidential information pursuant to the affiliate agreement and

---

[1] On September 19, 2018, Plaintiffs filed a motion for leave to file a second amended complaint in which they seek to allege noncontractual claims for (1) tortious interference with contractual relations that includes inducing and assisting Defendant Nevada Group to unlawfully take and improperly disclose confidential information; (2) conspiracy to "loot" Grubb & Ellis's confidential information; (3) breach of fiduciary duty by disclosing Grubb & Ellis's confidential information; and (4) aiding and abetting breach of fiduciary duty by causing others to disclose Grubb & Ellis's confidential information. *Motion* (ECF No. 186), *Exhibit 1, Proposed Second Amended Complaint*, at ¶¶ 73, 103, 120, and 125.

exhibits thereto. NCG had access to Grubb & Ellis' eNet system and G2 database, both of which contained such material. Plaintiffs further state that numerous documents in Defendants' possession, including but not limited to many of the above referenced examples, also constitute Grubb & Ellis's confidential and proprietary information as that term is defined in the Nevada Brokers' offer letters, the affiliate agreement, the Grubb & Ellis employee handbook, and the Grubb & Ellis Salesperson Policies and Procedures Manual. Plaintiffs reserve the right to supplement their response, as their investigation continues.

*Motion to Compel* (ECF No. 182), *Exhibits 3* and *4*.

Defendants argue that Plaintiffs' answer to Interrogatory No. 3 does not adequately identify and describe the trade secrets they allege have been misappropriated by Defendants. They also argue that many, if not all, of the documents listed in the answer are not protected trade secrets. Defendants further argue that the Court should stay their duty to respond to Plaintiffs' discovery requests until Plaintiffs describe the alleged misappropriated trade secrets with "reasonable particularity." Plaintiffs argue that they have identified the alleged trade secrets with reasonable particularity. However, even if the answer does not describe the trade secrets with reasonable particularity, Plaintiffs argue that discovery from Defendants should not be stayed until they provide a more detailed answer to Interrogatory No. 3.

## **DISCUSSION**

NRS § 600A.030.5 defines a "trade secret" as follows:

> "Trade secret" means information, including without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction or code that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

To qualify as a trade secret, information must be "novel" in the sense that it must not be readily ascertainable from another source. *Robbins, Geller, Rudman & Dowd v. State*, 328 P.3d

4

905, 911 (Wash.App. 2014). A key factor in determining whether information has "independent economic value" is the effort and expense that was expended in developing the information. The allegedly unique, innovative, or novel information must be described with specificity. Conclusory declarations that fail to provide concrete examples are insufficient to support the existence of a trade secret. *Id.*

Whether corporate information such as customer and pricing information is a trade secret, is a question of fact. *Frantz v. Johnson*, 116 Nev. 455, 999 P.2d 351, 358 (2000) (citing *Woodward Insur., Inc. v. White*, 437 N.E.2d 59, 67 (Ind. 1982)). Factors to be considered, include: (1) the extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly acquired by others; (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee's knowledge of customers' buying habits and other customer data and whether this information is known by the employer's competitors. *Id.* at 358-59. These factors are substantially similar to those set forth in Comment B to the Restatement of Torts § 757 (1939). Although not controlling, the Restatement factors provide guidance in determining whether information is a trade secret under the Uniform Trade Secrets Act. *USA Power, LLC v. Pacificorp.*, 235 P.3d 749, 760 (Utah 2010); *Enterprise Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1065, 1069 n. 6 (Ariz.App. 1999).[2]

"A customer list may be entitled to trade secret protection when it represents a selective accumulation of detailed, valuable information about customers---such as their particular needs, preferences, or characteristics---that naturally 'would not occur to persons in the trade or business.'" *Calisi v. Unified Financial Services, LLC*, 302 P.3d 628, 631 (Ariz.App. 2013) (citing *Enterprise Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064, 1070 (Ariz.App. 1999)). Trade secret protection may also exist if the claimant shows that it expended substantial efforts to identify and cultivate its customer base such that it would be difficult for a competitor to

---

[2] According to Plaintiffs' answer to Interrogatory No. 3, they claim more than just customer or pricing lists as trade secrets. The same general factors and principles apply in determining whether other types of information qualify as trade secrets.

5

acquire or duplicate the same information. *Id.* at 632. A related factor is whether the customer information derives independent economic value from its secrecy, and gives the holder of the list a demonstrable competitive advantage over others in the industry. *Id.* The fact that marketing companies are willing to pay money for the customer list demonstrates its independent economic value. *Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.*, 725 So.2d 902, 910 (Miss. 1998).

Under the second prong of the definition of trade secret, courts consider "the extent to which the claimant divulged its customer list externally and internally, i.e., to people outside of its business as well as to its own employees." *Calisi*, 302 P.3d at 632. While an employer does not relinquish trade secret protection by disclosure to employees on a necessary basis or by limited publication for a restricted purpose, a claimant who takes only scant precautions in safeguarding alleged trade secrets will not receive protection. *Id.* (citing *Enterprise Leasing Co.*, 3 P.3d at 1070).

Designating information as "confidential" or "proprietary" does not establish that it is a trade secret. While there is substantial overlap between confidential information and trade secrets, they are not synonymous. *Calisi*, 302 P.3d at 634 (citing *Enterprise Leasing Co.*, 197 Ariz. at 150, 3 P.3d at 1070). Secrecy, in the sense of a trade secret, is not limited solely to confidentiality, but also requires that the information is not generally known or readily ascertainable by independent investigation. *Trilogy Software, Inc. v. Callidus Software, Inc.,* 143 S.W.3d 452, 467 (Tex.Ct.App. 2004). In *MP Med. Inc. v. Wegman,* 213 P.3d 931, 939 (Wash.App. 2009), the plaintiff relied on the confidentiality provisions in its agreements with its former employee to argue that its customer list was a trade secret. The court stated, however, that "[l]abeling information as a trade secret or as confidential information does not conclusively establish that the information fits this description."

Plaintiffs begin their answer to Interrogatory No. 3 by stating that "*the confidential information and trade secrets*, as alleged in the Amended Complaint include, but are not limited to: . . ." (emphasis added) They then list a variety of "confidential" or "trade secret" documents, but do not attempt to distinguish between those that are merely confidential and those which are protected trade secrets. The distinction between confidential information and trade secrets takes

on added significance now that Plaintiffs seek to amend their complaint to allege tort claims for the wrongful disclosure of Plaintiff's confidential information.[3]  Some courts, perhaps a majority, hold that the Uniform Trade Secrets Act preempts not only noncontractual claims for misappropriation of trade secrets, but also noncontractual claims for misuse of confidential information that does not rise to the level of a trade secret.  *Blueearth Biofuels v. Hawaiian Elec. Co.*, 235 P.3d 310, 319-23 (Hawai'i 2010); and *CDC Restoration v. Tradesmen Contractors*, 274 P.3d 317, 328-330 (Utah App. 2012).  The rationale underlying these decisions is that the Uniform Trade Secrets Act "is meant to replace tort claims for unauthorized use of confidential information with a single statutory cause of action."  *Blueearth*, 235 P.3d at 320.  Other courts hold that the Uniform Trade Secrets Act does not preempt noncontractual claims for the misuse of confidential information that does not amount to a trade secret.  *Orca Communications Unlimited, LLC v. Noder*, 337 P.3d 545, 547-49 (Ariz. 2014); and *Miller UK Ltd. v. Caterpillar Inc.*, 859 F.Supp.3d 941 (N.D.Ill. 2012) (interpreting Illinois law).  These decisions are based on a construction of the plain language of the preemption provision.

It is important under either line of cases to distinguish between trade secrets and confidential information.  As the Arizona Supreme Court explained in *Orca Communications*, 337 P.2d at 548, the procedures and remedies for a statutory claim for misappropriation of trade secrets are different from those available in a tort action for misuse of confidential information.  These differences include whether certain issues are decided by the court or by the jury, the burden of proof required for recovery of exemplary or punitive damages, and limitations placed on such awards.  The prevailing party in an action under the Uniform Trade Secrets Act is entitled to an award of attorney's fees, which may not be available in a common law action.  Similar differences exist between the Nevada Uniform Trade Secrets Act and potential causes of action under Nevada common law or other statutory provisions.  Interrogatory No. 3 is directed at identifying and describing Plaintiffs' alleged trade secrets.  Therefore, in answering this interrogatory, Plaintiffs may not conflate trade secrets with confidential information.

---

[3] The proposed second amended complaint also seeks to allege tort claims relating to the disclosure of Plaintiff's trade secrets.  The Court has already held that such claims are preempted by NRS § 600A.090.

Court decisions are also divided on the issue of whether discovery from the defendant should be stayed until the plaintiff describes the alleged misappropriated trade secrets with reasonable particularity. In *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676 (N.D. Ga. 2007), the defendants allegedly misappropriated plaintiff's product design and manufacturing secrets for use in a competing business. The defendants served an interrogatory on plaintiff which asked it to "identify with particularity each trade secret or item of confidential or proprietary information" that was allegedly misappropriated. The plaintiff, in turn, sought production of defendant's customer lists, a description of defendants' trade secrets, and documents relating to defendants' advertising, marketing or promotion of their services. *Id.* at n. 2. The defendants argued that plaintiff should be required to identify its trade secrets with reasonable particularity before they were required to respond to its discovery requests.

The court stated that at least three policies have been identified which support allowing the trade secret plaintiff to take discovery prior to identifying its claimed trade secrets. First, a plaintiff has a broad right to discovery under the Federal Rules of Civil Procedure. Secondly, the trade secret plaintiff, particularly if it is a company that has hundreds or thousands of trade secrets, may not know what trade secrets have been misappropriated until it receives discovery on how defendant is operating. Third, if the trade secret plaintiff is forced to identify the trade secrets at issue without knowing which have been misappropriated, it is placed in somewhat of a "Catch–22," because satisfying the requirement for detailed disclosure of the trade secrets without knowing what the defendant is doing can be very difficult. If the list is too general, it will encompass material that the defendant will be able to show cannot be a trade secret. If it is too specific, it may miss what the defendant is doing. *Id.*, 244 F.R.D. at 680 (citing Kevin R. Casey, *Identification of Trade Secrets during Discovery: Timing and Specificity,* 24 AIPLA Q.J. 191, 202 (1996)).

In contrast, courts have identified at least four other policies that support staying trade secret discovery from the defendant until the plaintiff has sufficiently described the trade secrets at issue. First, if discovery on the defendant's trade secrets were automatically permitted, lawsuits might regularly be filed as "fishing expeditions" to discover the trade secrets of a

8

competitor. Second, until the trade secret plaintiff has identified the secrets at issue with some specificity, there is no way to know whether the information sought from defendant is relevant. Requiring the plaintiff to first identify its trade secrets helps the court determine the outer permissible bounds of discovery and prevents needless exposure of the defendant's trade secrets. Third, it is difficult, if not impossible, for the defendant to mount a defense until it has some indication of the trade secrets allegedly misappropriated. Often, a trade secret defendant will defend the claim by showing that it does not use the claimed secret or that the information is, in fact, not secret. Fourth, requiring the plaintiff to identify its claimed trade secrets prior to engaging in discovery ensures that it will not mold its cause of action around the discovery it receives. *Id.* at 680-81. The determination whether the plaintiff should be required to describe its alleged trade secrets before defendant is required to respond to discovery is fact-dependent and requires a balancing of the foregoing policy considerations. *Id.* at 681 (citing *Microwave Research Corp. v. Sanders Assocs., Inc.*, 110 F.R.D 669, 672 (D.Mass. 1986)).

The court in *DeRubeis* required the trade secret plaintiff to describe the alleged misappropriated trade secrets with "reasonable particularity," which meant providing a description of the trade secrets such that the defendant (1) is put on notice of the nature of plaintiff's claims; and (2) can discern the relevance of any requested discovery regarding its trade secrets. *DeRubeis*, 244 F.R.D. at 681. The court also found that a balancing of the factors favored staying discovery from the defendant until plaintiff described the trade secrets at issue with reasonable particularity. *Id.* at 681-82.

In *Switch Communications Group v. Ballard*, 2012 WL 2342929 (D.Nev. June 19, 2012), this court followed *DeRubeis* in requiring the plaintiff to describe the alleged misappropriated trade secrets with reasonable particularity before defendant was required to respond to plaintiff's discovery requests. The factual circumstances in *Ballard*, like those in *DeRubeis*, involved the defendant's alleged misappropriation of plaintiff's scientific or engineering designs which defendant used to construct a competing computer data center. The plaintiff claimed that the designs for its computer data center involved novel or unique combinations of various concepts, elements or components. In its answer to defendant's interrogatory, however, plaintiff only

listed various components, but did not describe how they were combined to create a design that was novel and secret. The court therefore stated: "In order to meet its burden of describing its alleged trade secrets with reasonable particularity, Switch must specifically describe what particular combination of components renders each of its designs novel or unique, how the components are combined, and how they operate in unique combination." *Id.* at *5.

In *BioD, LLC v. Amnio Technologies*, 2014 WL 2864658, at *5 (D.Ariz. Aug 6, 2014), the court stated that a plaintiff does not satisfy the requirement of reasonable particularity by providing a list of general categories and types of information that allegedly comprise its trade secrets. In requiring the plaintiff to describe the alleged trade secrets with reasonable particularity before defendant were required to respond to trade secret discovery, the court stated:

> Plaintiffs must explain how the combination of much of what appears to be generally known information can constitute a trade secret. It is simply not sufficient for plaintiffs to identify a trade secret as a "method" without some explanation of why that "method" could be considered a legally protectable trade secret. Plaintiffs must provide some basis for their contention that their methods and processes are unique and thus legally protectable. Contrary to their contention, plaintiffs are not being asked to prove their trade secret claim prior to being able to take discovery. But, they must provide enough detail about their alleged trade secrets to at least suggest that the alleged trade secrets might be legally protectable.

2014 WL 2864658, at *6.

In *St. Jude Medical S.C., Inc. v. Janssen-Counotte*, 305 F.R.D. 630 (D. Ore. 2015), defendant allegedly downloaded plaintiff's confidential business information, including strategic planning information, before she resigned and went to work for a competing company, Biotronik. The plaintiff sued the defendant in federal court in Texas and sought a temporary restraining order and preliminary injunction to prevent her from working for Biotronik. The court denied the motions because plaintiff had not presented sufficient evidence to prove that defendant had misappropriated its trade secrets. Plaintiff thereupon served a subpoena on Biotronik to obtain documents relating to defendant's communications with Biotronik, documents and information that defendant had allegedly provided to Biotronik, and documents relating to Biotronik's strategic plans, sales revenue, new customers, etc.

The court noted that one of plaintiff's objectives in seeking to subpoenaed materials was to obtain evidence to support its claim that defendant had misappropriated its trade secrets and was using them for the benefit of her new employer. *Id.*, 305 F.R.D. at 636. In overruling Biotronik's objection that plaintiff should first be required to describe the alleged misappropriated trade secrets, the court discussed the policy consideration set forth in *DeRubeis*, and stated as follows:

> Applying these considerations here, St. Jude S.C. need not identify its trade secrets at issue with any greater particularity before it may take discovery from Biotronik, Inc. and its European affiliates to determine what precisely Defendant Janssen took and whether she is using it improperly for the benefit of her new employer. First, Plaintiff has a broad right to discovery, and the federal court in the underlying case has not chosen to limit Plaintiff's ability to commence discovery, notwithstanding that court's comments about Plaintiff's allegations of the trade secrets it alleges have been stolen. Second, Plaintiff appears to have numerous trade secrets but, to quote *BioD,* "no way of knowing what trade secrets have been misappropriated until it receives discovery on how the defendant is operating." *Id.* at *5. Finally, requiring St. Jude S.C. to identify its trade secrets without first knowing which have been misappropriated by Janssen and placed into use at Biotronik, Inc. or its European affiliates would place Plaintiff, again to quote *BioD,* "in somewhat of a 'Catch–22.'" *Id.*

305 F.R.D. at 641.

Unlike the circumstances in *St. Jude*, this is not a case in which Plaintiffs only recently became aware that employees or former employees misappropriated their trade secrets which they are attempting to use to compete against Plaintiffs. Plaintiffs filed their original complaint in this action on February 27, 2015. In that complaint they alleged that Defendants, in combination with other employees or former employees of Grubb & Ellis, began misappropriating its trade secrets and confidential information as early as 2012. Plaintiffs should be able to identify with reasonable particularity the trade secrets they believe Defendants misappropriated in their efforts to poach Grubb & Ellis's brokerage business. As evidenced by their answer to Interrogatory No. 3, Plaintiffs possess the Grubb & Ellis documents that contain its alleged trade secrets. Plaintiffs presumably have access to former Grubb & Ellis employees

who did not go over to Defendants, and who can provide information to support Plaintiffs' contentions that various types of information were trade secrets.

Plaintiffs' answer to Interrogatory No. 3 does not describe the alleged misappropriated trade secrets with reasonable particularity. Instead, it provides a list of categories of documents or information that could be trade secrets or confidential information. It may be somewhat difficult to describe each alleged trade secret in full and complete detail. Plaintiffs can, however, identify the specific documents or information they claim are trade secrets and provide a summary of the facts which support their contention that the items are trade secrets. Further discovery will obviously be necessary to explore the basis for Plaintiffs' trade secret contentions. The Court will, therefore, grant Defendants' motion to compel Plaintiff's to amend their answer to Interrogatory No. 3.

The Court will also stay Defendants' obligation to respond to Plaintiffs' discovery requests which seek disclosure of Defendants' trade secrets until Plaintiffs have amended their answer to Interrogatory No. 3. The Court, however, does not stay Defendants' obligation to respond to discovery requests that ask them to identify or produce all documents removed by Defendants, or those acting in concert with them, from Grubb & Ellis's offices, servers or electronic storage devices, or other documents not relating to claims involving misappropriation of trade secrets. Discovery regarding such documents or information does not implicate the policy considerations identified in *DeRubeis* and the other cases discussed above. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Compel Amended Answer to Defendants' Interrogatory No. 3 (ECF No. 182) and Defendants' Motion to Stay Discovery (ECF No. 183) are **granted** in accordance with the foregoing provisions of this order.

**IT IS FURTHER ORDERED** that Plaintiffs shall serve an amended answer to

. . .

. . .

. . .

. . .

. . .

Interrogatory No. 3 within 30 days of the filing of this order, unless the time for response is further extended by stipulation of the parties or order of the Court.

DATED this 9th day of November, 2018.

_____
**GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE**