UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

NEWMARK GROUP, INC., G&E
ACQUISITION COMPANY, LLC and BGC
REAL ESTATE OF NEVADA, LLC

Plaintiffs,

v.

AVISON YOUNG (CANADA) INC.;
AVISON YOUNG (USA) INC.; AVISON
YOUNG-NEVADA, LLC, MARK ROSE,
THE NEVADA COMMERCIAL GROUP,
JOHN PINJUV, and JOSEPH KUPIEC; DOES
1 through 5; and ROE BUSINESS ENTITIES
6 through 10,

Defendants.

Case No. 2:15-cv-00531-RFB-EJY

**ORDER**

Before the Court is Plaintiffs' Motion for Protective Order (ECF No. 298), Defendants' Opposition to Motion for Protective Order (ECF No. 305), Plaintiffs' Reply in Support of Motion for Protective Order (ECF No. 307), Plaintiffs' Supplemental Brief in Support of Motion for Protective Order Regarding Goodwin Procter Materials (ECF No. 379), and Defendants' Supplemental Brief in Support of Opposition to Plaintiffs' Motion for Protective Order (ECF No. 380). The Court ordered supplemental briefing at the conclusion of the May 20, 2020 hearing (ECF No. 373 at 100-109), and held a second hearing on June 10, 2020. The second hearing addressed issues raised in Plaintiffs' Motion for Protective Order as well as in response to the issues addressed in the supplemental briefing. ECF No. 394.

I.      **BACKGROUND**

A.      <u>NATURE OF THE DISPUTE</u>.

The majority of facts underlying the dispute between Plaintiffs and Defendants are well known to the parties and the Court. These facts are not repeated in detail here. In sum, however, this case is one of several filed by Plaintiffs around the country alleging a scheme by Defendants to steal people and supposed highly valuable assets of the Grubb & Ellis Company ("Grubb & Ellis").

1

There is no dispute that Grubb & Ellis filed for Chapter 11 bankruptcy and that the law firm of Goodwin Procter ("Goodwin") represented BGC Partners Inc. ("BGC") when it acquired substantially all of Grubb & Ellis' assets from the bankruptcy estate.  This Order addresses the dispute regarding whether, in the course of that acquisition, Goodwin also represented an entity affiliated with BGC known as Cantor Fitzgerald & Company ("CF&Co.").

B.      THE SCOPE OF PLAINTIFFS' ORIGINAL REQUEST AND THE COURT'S ORDER REGARDING ADDITIONAL BRIEFING.

Plaintiffs' Motion for Protective Order (the "Motion") summarizes Plaintiffs' argument as follows: (1) "Plaintiffs seek protection from having to produce privileged materials in this case"; and (2) "Plaintiffs' seek an order prohibiting the disclosure or use of any Goodwin Procter attorney client materials that were produced in the Illinois case, over Plaintiffs' objections, here in Nevada."[1] ECF No. 298 at 3.  The second argument includes the request for an order prohibiting the use of any information or deposition testimony derived from or based on the Goodwin A-C Materials.  ECF No. 298 at 3-4.  Plaintiffs concludes its summary by stating that "[i]t is essential for the Court to grant Plaintiffs' requested … protective order to ensure that, while the issue remains pending in Illinois, it is not further exacerbated in this case."  *Id*. at 4.  Plaintiffs' "Conclusion" restates the request for an order prohibiting Plaintiffs, through discovery, from obtaining any Goodwin A-C Materials, disclosing any Goodwin A-C Materials or using Goodwin A-C materials.  *Id*. at 13.

In Opposition to Plaintiffs' Motion, Defendants argue judicial estoppel, waiver, and that the court in Illinois, where Plaintiffs filed a separate but substantially related action, "ruled correctly" that communications between Goodwin and BGC's affiliated entity, CF&Co., were not privileged.[2] ECF No. 305 at 2-4.  Defendants also argue that if this Court grants Plaintiffs' Motion "it would place this case in limbo."  *Id*. at 4.

On Reply in Support of their Motion, Plaintiffs' state that they "seek a protective order to stop any further dissemination of these privileged communications absent a finding by the Illinois

---

[1]      The attorney-client material, whether produced in the Illinois case or sought in this case, are defined for further reference as the "A-C Materials."

[2]      Below is a discussion of the relationship between and among entities that Plaintiffs claim had an attorney-client relationship with Goodwin.

Appellate Court upholding the trial court's decision.  It is a prophylactic motion."  ECF No. 307 at 2.  Plaintiffs also state that "if the Illinois Appellate Court affirms the trial court's decision [regarding the attorney client privilege between Goodwin and CF&Co.], then Defendants will suffer no harm here because they will be able to use all the Illinois discovery relating to the privileged communications." *Id*. at 3.  Because Defendants ask the Court to grant a period of discovery before the Court issues a decision regarding the attorney-client privilege between Goodwin and CF&Co., the Court notes that Plaintiffs also point out that "Defendants … have taken discovery using the protected communications at several supplemental depositions in the Illinois matter … [and that] [t]hose depositions were conducted for the express purpose of inquiring about the Goodwin … communications, which deal with the Grubb & Ellis asset purchase and are not specific to any single jurisdiction." *Id*. at 13.  Plaintiffs reiterate that if the Illinois appellate court upholds the finding by the Illinois trial court that there is no privilege between Goodwin and CF&Co., "then Defendants have the ability to use the Illinois depositions and documents here." *Id*.

At the first hearing, held on May 20, 2020, the Court made clear that its decision regarding whether the documents at issue are privileged in this case and in this Court is not determined by Illinois law or any order issued by an Illinois court.  ECF No. 373 at 23 and 100 (the Illinois "decisions … are only informative and are in no way binding, and overreliance on those decisions … is misguided by both parties").  Mr. Goldkind, appearing for Defendants at the May 20, 2020 hearing, stated that he understood the Court's position. *Id*. at 27-28 ("I do not want to belabor by any means the point that you raised with respect to Illinois.").  At the conclusion of the May 20, 2020 hearing, the Court further made clear that while it had read and understood the decision of the Illinois court regarding production of Goodman A-C Materials, that decision did not answer three broad questions on which the Court needed additional briefing in order to make a determination regarding Plaintiffs' Motion. *Id*. at 100.  Those questions included: (1) what law applies to "whether the documents at issue are privileged"; (2) whether/when communications between and among a parent entity, a wholly owned subsidiary entity, a non-wholly-owned subsidiary, and counsel is privileged; and, (3) whether CF&Co. was retained by Plaintiffs as a consultant, and what role CF&Co. played during the consultancy as such retention might relate to whether communications

3

between and among CF&Co., BGC, and Goodwin were privileged. *Id*. at 100-101. At the conclusion of the hearing, the Court asked the parties if they had any questions on the subject matters to be addressed in the supplemental briefs, and both counsel said no. *Id*. at 108. The Court also stated that if the parties needed any clarification they should start with the transcript, but that the Court was happy to answer any questions that might arise. *Id*.

After supplemental briefing and exhibits were submitted to the Court, and toward the close of the second hearing on June 10, 2020, at which the parties discussed the above questions and reasonable iterations of those questions for well in excess of any hour, Defendants stated that they "understood" that the motion to be decided by the Court was only a "motion to stay" as that was the "relief plaintiffs asked for." ECF No. 394 at 70. Defendants stated that they have not had time to conduct discovery when "all of a sudden in legal time" the Court was addressing "a final honing … on this [privilege] issue as opposed to a stay of some sort." *Id*. The Court stated it was "perplexed" by Defendants' position given the questions asked and addressed in supplemental briefing as they were not questions that would "relate to a stay." *Id*. at 71. The Court nevertheless stated it "would take into consideration whether" Defendants have had sufficient opportunity to conduct discovery that directly relates to the Court's decision on the attorney-client privilege issue. *Id*.

The Court remains perplexed by Defendants' position, but also understands that Plaintiffs' Motion and Reply concede that, if the Illinois court upholds the trial court's determination regarding an attorney-client privilege between Goodwin and CF&Co., the documents and information produced in Illinois may be used in this case. However, Plaintiffs sought a prophylactic order from the Court, not limited to a stay. Plaintiffs never used the word "stay," albeit they did state they sought to "stop any further dissemination of these privileged communications absent a finding by the Illinois Appellate Court upholding the trial court's decision." ECF No. 307 at 2. The word "prophylactic," as defined by FindLaw, is "designed or tending to prevent harm or wrong." https://dictionary.findlaw.com/definition/prophylactic.html. Among other definitions, the Merriam Webster on line definition of prophylactic is "tending to prevent or ward off." https://www.merriam-webster.com/dictionary/prophylactic. The Court, on May 20, 2020, having clearly rejected the notion that a decision by the Illinois court is binding on this Court (ECF No. 373

at 23), and having requested supplemental briefing on the issue of privilege, rejects Defendants'
contention on June 10, 2020, that "all of a sudden in legal time" the Court was addressing "a final
honing … on this [the privilege] issue as opposed to a stay of some sort."  However, the Court
addresses below whether Defendants' request for discovery is appropriate.

C.    THE CORPORATE STRUCTURE AT ISSUE AND DEFENDANTS' REQUEST
       FOR DISCOVERY.

1.    **The Corporate Structure and the Parties' Arguments Related Thereto**.

There is no dispute that BGC is partially owned by public stockholders or that BGC is a
holding company which, according to the 2011 and 2012 10-Ks filed with the Securities and
Exchange Commission ("SEC") discussed during the June 10, 2020 hearing, operated through two
operating partnerships that, in turn, wer controlled by BGC Holdings.  ECF No. 394 at 15, 16, 34,
36-38; BGC Annual Report (SEC Form 10-K) (March 15, 2012) at 30; BGC Annual Report (SEC
Form 10-K) (March 16, 2011) at 33.  The limited partnership interest of BGC Holdings were held
by Cantor Fitzgerald, L.P. ("CFLP") [and] the founding/working partners" such that CFLP and the
CFLP founding members control BGC Holdings.  ECF No 394 at 17; BGC 2011 10-K at 30; BGC
2012 10-K at 33.  In addition, CFLP has voting control over BGC.  ECF No. 394 at 17, ECF Nos.
383-1 (Declaration of Stephen M. Merkel "Merkel Dec.")) ¶ 12; 383-2 (Declaration of Andrew A.
Weidhaas ("Weidhaas Dec.")) ¶ 7.

On January 17, 2019, Howard Lutnik was deposed by current defense counsel albeit not in
the course of this action.  Mr. Lutnik is identified by counsel for Plaintiffs as the president of BGC,
CFLP and "hold[ing] similar positions within most of the related company within the [CFLP]
structure."  ECF No. 394 at 17.  These facts do not appear to be in dispute.  At the January 2019
deposition of Mr. Lutnick, he was asked by a member of the current defense counsel team, "What
was Cantor Fitzgerald's role in the Grubb & Ellis acquisition?"  ECF No. 390 at 8.  Mr. Lutnik
initially responded: "Financial advisor and investment banker."  *Id*.  After objections and a bit of
discussion, Mr. Lutnick further explained:

So there are a variety of companies within Cantor Fitzgerald–with the Cantor
Fitzgerald name which are different things.  Cantor Fitzgerald & Company is a

1   broker-dealer and it has an investment banking arm, and an advisory arm that acted
2   as the advisor to BGC on this [the Grubb & Ellis] transaction.

3   *Id.* at 9-10.  Mr. Lutnick then stated that CF&Co. and BGC are affiliates and share the same ultimate

4   parent.  *Id.* at 10.  When asked by defense counsel what entity is the common ultimate parent of

5   CF&Co., Mr. Lutnick stated:

6   So Cantor Fitzgerald LP has a controlling—has a voting—a majority of the voting
    interest of BGC, and it has a majority of the voting interest in Cantor Fitzgerald &
7   Company, but they have different—Cantor Fitzgerald & Company and BGC
    Partners have different shareholders, and so, therefore, they have different
8   stakeholders, but they share a common control entity.

9   *Id.* at 11; *see also* Weidhaas Dec. ¶ 7.  When asked if he (Mr. Lutnick) holds a majority shareholder

10  interest in CFLP, Mr. Lutnick responded, "Directly and indirectly, yes."  *Id.*  Thus, while it is

11  undisputed that CFLP is BGC's ultimate parent entity, BGC is not a wholly owned subsidiary of

12  CFLP.  There is also no dispute that CF&Co. is a wholly owned subsidiary of CFLP.  Plaintiffs state,

13  and there appears to be no disagreement that, CFLP, BGC, and CF&Co., fall within a single

14  corporate structure where, again, CFLP is the ultimate parent entity.

15          Nonetheless, the dispute arises because Defendants contend that New York law does not

16  recognize an attorney-client relationship that occurs between and among Goodwin, CF&Co., and

17  BGC based solely on the fact that CF&Co. is a subsidiary of CFLP and because, as stated during

18  oral argument by defense counsel, "New York courts would be inclined not to expand the attorney

19  client privilege to, in this case, apply to affiliates who are not wholly-owned subsidiaries of the same

20  parent, who don't have what New York considers an identical nature of legal interest."  ECF No.

21  394 at 33.  That is, Defendants argue that, because CF&Co. was "an advisor on the [Grubb & Ellis]

22  transaction to BGC" they did not share "a common legal interest" with BGC.  *Id.*  Interestingly,

23  while counsel at oral argument stated CF&Co. was an advisor to BGC on the Grubb & Ellis

24  transaction (*id.*), Defendants' Supplemental Brief argues the opposite—that is "CF&Co. was *not* an

25  agent *or adviser to BGC* or Cantor Fitzgerald L.P."  ECF No. 382 at 8 (emphasis added).  Defendants

26  state that "Plaintiffs have never once argued that CF&Co. was ***retained by Goodwin Procter*** or was

27  necessary or indispensable to its provision of legal advice, let alone offered any competent evidence

28  to that effect."  *Id.* (Emphasis in original.)  Ultimately, Defendants state that BGC and CF&Co. do

not operate as a single entity and because CF&Co. is wholly owned by CFLP, but BGC has public ownership, "the companies are not considered the same under all of the case law that addresses the attorney-client privilege within corporations and the corporate structure." ECF No. 394 at 37; *see also id.* at 39.

### 2.    Defendants' Request For Discovery.

Plaintiffs argue that Defendants have deposed Mr. Lutnick and several additional individuals employed by CF&Co. in related litigation, including Milton Chacon and Evan Denner, with Mr. Denner being identified as head of merchant banking for CF&Co. ECF No. 394 at 62-64. Defendants respond that while individuals have been deposed, they have not been deposed on issues directly related to the issue before this Court regarding whether there was an attorney-client relationship and, therefore, a privilege that extended not merely between Goodwin and BGC, but also between Goodwin and CF&Co. *Id.* at 64-65.

As discussed below, the Court finds there is substantial evidence in the record that Goodwin and CF&Co. believed and operated under an attorney-client relationship, as analyzed under New York law, throughout the time that Goodwin was also representing BGC during its acquisition of Grubb & Ellis. There is also substantial evidence in the record that BGC and CF&Co. believed they were jointly represented or co-clients of Goodwin, and that their communications were protected. However, the Court finds no evidence presented demonstrating that depositions were taken with respect to these specific issues.

Thus, as more fully explained below, the Court grants Plaintiffs' Motion for Protective Order. The Court does not, at this juncture, determine whether there was, in fact, an attorney-client relationship between Goodwin and CF&Co. or joint representation among Goodwin, BGC, and CF&Co., such that all communications involving these three entities otherwise qualifying for protection under an attorney-client privilege were, in fact, privileged. These issues were not presented by Plaintiffs in their Motion. Plaintiffs' Motion only asked the Court to enter a protective order so that documents and information disclosed, over objection, in the Illinois case cannot be used in this case until and unless the Illinois Appellate Court upholds the Illinois trial court decision.

1    Nevertheless, as stated, an analysis of the issues raised by the Court on May 20, 2020, shed

2    substantial light on whether, in this case, a protective order should be entered.[3]

3    **II.    PRELIMINARY ISSUES**

4         A.    <u>CHOICE OF LAW</u>.

5         In order to proceed with a decision regarding whether to grant Plaintiffs' Motion seeking a

6    protective order, the Court must first determine what law applies to consideration of whether the

7    Goodwin A-C Materials and communications between Goodwin and CF&Co. are potentially

8    privileged. The claims raised by Plaintiffs are state law claims. *See* ECF No. 379 at 3. However,

9    there is no dispute that the Court's jurisdiction in this case arises from the underlying bankruptcy

10   proceedings and not as the result of diversity. Thus, while Nevada state law applies the rule of

11   decision for Plaintiffs' claims, the Ninth Circuit holds that "[i]n federal question cases with exclusive

12   jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state,

13   choice of law rules." *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th

14   Cir. 1995) (internal citations omitted); *see also In re Mayer*, BAP No. ID-10-1299-JuMkH, 2011

15   WL 3299053, at *3 (9th Cir. May 24, 2011). Federal choice of law rules are based on the

16   Restatement (Second) of Conflict of Laws. *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th

17   Cir. 2001).

18        Here, unlike *Lindsay*, it does not appear that the Court is exercising "exclusive" jurisdiction.

19   If the Court is not exercising exclusive jurisdiction, Nevada choice of law applies pursuant to Fed.

20   R. Evid. 501. However, whether federal or Nevada choice of law rules apply is of no consequence.

21   Nevada law, like federal law, also looks to the Restatement (Second) of Conflicts of Law for choice

22   of law rules. *In re Mayer*, 2011 WL 3299053, at *3 (finding a false conflict when federal and state

23   law look to the Restatement (Second) of Conflicts of Law for the choice of law rules); *Progressive*

24   *Gulf Ins. Co. v. Faehnrich*, 752 F.3d 746, 750-51 (9th Cir. 2014) (Nevada generally follows the

25   Restatement (Second) of Conflict of Laws in answering choice-of-law questions that arise in

26   contracts); *Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark*,

27

28   ---
     [3]      As discussed below, if the ultimate issues of privilege and joint representation is presented to the Court, then
     some discovery may be warranted before the issue is decided.

134 P.3d 111, 116 (Nev. 2006) (Nevada recently adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 145 for tort actions, unless a more specific section of the Restatement applies); *see also Name Intelligence, Inc. v. McKinnon*, Case No. 2:10–cv–01202–RCJ–GWF, 2013 WL 1793953, at *3 (D. Nev. Apr. 26, 2013) (Nevada recently adopted the "most significant relationship" test to determine choice of law and Nevada determines choice of law by cause of action as a whole) (internal citations omitted).

Thus, turning to the Restatement (Second) of Conflicts of Law, Section 139 applies the "most significant relationship" test when determining what law applies to a claim of privilege.[4]  When deciding which state has the most significant relationship, Comment e to Section 139 provides the following guidance: "The state which has the most significant relationship with a communication will usually be the state where the communication took place, which, as used in the rule of this Section, is the state where an oral interchange between persons occurred, where a written statement was received or where an inspection was made of a person or thing.  … If there was such a prior relationship between the parties, the state of most significant relationship will be that where the relationship was centered unless the state where the communication took place has substantial contacts with the parties and the transaction."[5]

Here, Plaintiffs argue in their Supplemental Brief that Nevada privilege law applies. ECF No. 379 at 3-8.  However, Plaintiffs previously told the Court that:

> [t]here is no dispute that New York has the most significant relationship with the Goodwin Procter materials at issue in this motion.  And unlike Illinois, there is no indication that Nevada has a strong public policy that would require applying Nevada privilege law to this situation.  Therefore, substantive New York privilege law applies to the question whether Goodwin Procter materials are protected by the attorney-client privilege.

---

[4]    This section of the Restatement states as follows: "(1) Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.  (2) Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect."

[5]    Defendants also correctly point out that, in Nevada, the most significant relationship to a privileged communication is the state in which the legal advice was needed and acted upon.  *Sierra Dev. Co. v. Chartwell Advisory Grp., Ltd.*, Case No. 3:13-cv-0602-RTB-VPC, 2016 WL 4107680, at *1 (D. Nev. Aug. 1, 2016).

ECF No. 298 at 6 n.5.  The Court agrees with Plaintiffs' initial representation.  New York has the most significant relationship to the communications at issue and, thus, New York attorney-client privilege law applies to the analysis of the Goodwin–CF&Co. relationship and whether Goodwin, BGC, and CF&Co.'s communications were protected by a joint representation agreement.

This conclusion is supported by the allegations in Plaintiffs' Second Amended Complaint, which include that: "BGC is a Delaware Corporation with its principal place of business at 499 Park Avenue, New York, New York …[;] BGC, through its indirect subsidiary, [Plaintiff] G&E Acquisition Company, LLC, is the purchaser of and successor in interest to certain assets, contract rights, and causes of action of Grubb & Ellis … [and Plaintiff] G&E Acquisition Company, LLC is a Delaware Limited Liability Company with its principal place of business at 499 Park Avenue, New York, New York"; "Plaintiff Newmark is a New York Corporation with its principal place of business at 125 Park Avenue, New York, New York"; and Plaintiff BGC Real Estate of Nevada LLC "is a subsidiary of BGC with a principal place of business at 499 Park Avenue, New York, New York, 10022."  ECF No. 222 ¶¶ 6, 9, and 10.  Plaintiffs also admit that "[t]he Goodwin Procter communications primarily involve outside attorneys, in-house attorneys, and business personnel based in New York."  ECF No. 379 at 7.  Further, the Engagement Letter at issue came from a New York, New York address and was sent to a New York, New York address.  In addition, Defendants point out that Goodwin and BGC had a prior relationship arising from BGC's acquisition of its subsidiary Newmark, Goodwin and CFLP had a prior relationship (ECF No. 383-2, Ex. 3), and the communications pertaining to BGC's acquisition of Grubb & Ellis occurred through a bankruptcy proceeding in the Southern District of New York.  ECF No. 299-2.  Plaintiffs' admissions, together with the objective facts available to the Court, support the conclusion that the state that has the most significant relationship with the communications at issue is New York and, as such, New York law applies to the issues addressed in this Order.

The Court finds there is no basis for applying Nevada attorney-client privilege law or rules pertaining to joint representations in this dispute.  The overwhelming evidence demonstrates that New York has the most significant relationship with the Goodwin A-C communications at issue and New York law applies to the instant dispute before the Court.

B.    THE COURT REITERATES ITS FINDING ON THE ISSUES OF JUDICIAL ESTOPPEL AND WAIVER OF PRIVILEGE RAISED BY DEFENDANTS IN THEIR OPPOSITION TO PLAINTIFFS' MOTION.

### 1.    Judicial Estoppel

As stated during the hearing on May 20, 2020, judicial estoppel, an issue raised by Defendants, has no bearing on this case.  ECF No. 373 at 103.  Judicial estoppel is an equitable doctrine that prevents a party from benefitting by taking one position, but later seeking to benefit by taking a clearly inconsistent position in a subsequent proceeding.  *Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2nd Cir. 2014) *citing New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001).  Several factors go into a determination of whether judicial estoppel applies.  *Id. citing New Hampshire*, 532 U.S. at 750-751.  "First, a party's later position must be clearly inconsistent with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  ...  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Id*.  This inquiry is not inflexible: "[B]ecause the doctrine is primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain."  *Id.* (internal citation and quote marks omitted).

In this case, Defendants contend that Plaintiffs must be estopped "from seeking to bar use of documents produced in the Illinois case" because Plaintiffs successfully prevailed on the Illinois state court to change the protective order entered by that court such that documents produced in the Illinois case could be used in this action.  ECF No. 305 at 1 and 9.  Defendants contend that Plaintiffs' present position is directly contrary to the position taken in Illinois because Plaintiffs now seek to prevent the use of documents in this case that they were required to produce by the court in Illinois.

The April 27, 2017 protective order entered by the Illinois court (ECF No. 305-6) states in the last paragraph that the parties entered into "a separate Protective Order dated April 25, 2017" governing confidential information "and recourse for the inadvertent production of confidential

11

and/or privileged information." *Id*. at 14.  Defendants also attach Plaintiffs' motion practice with respect to reconsideration of the April 27, 2017 protective order.  ECF No. 305-14.  Plaintiffs' motion practice does argue for use of documents produced in Illinois in other cases involving the same subject matter;  however, Plaintiffs' argument was that the original restrictions on use adopted by the Illinois court would prevent Plaintiffs from shedding "light on Defendants' scheme in other jurisdictions … ."  ECF No. 305-14 at 5.  Plaintiffs also contended that use of documents produced in the Illinois case "will help illustrate the coordinated nature of the Defendants' attack … ." *Id*. at 6.  Nowhere in Plaintiffs' argument is there a suggestion that the alteration they seek should extend to the sharing of documents over which Plaintiffs assert an attorney-client privilege.  *See* 305-14 generally.  A June 20, 2018 protective order subsequently entered by the Illinois court contains a provision regarding "[t]he inadvertent production of any privileged material, shall be without prejudice to any claim that such material or information is protected by the attorney-client privilege … ."  ECF No. 298-2 at 9.  If the parties disagree over application of the privilege, no use of such materials shall occur absent a court order. *Id.*

There is no evidence, and Defendants' Opposition points to none, demonstrating Plaintiffs ever argued that documents they contended in the Illinois action, and continue to argue in this action, are protected by the attorney-client privilege should be disclosed to Defendants, used by Defendants for any purpose or, when required to be disclosed by the Illinois court, such privilege was voluntarily waived.  *See* ECF Nos. 305 and 380 generally.  In fact, as stated by Plaintiffs, "[t]he fact that Illinois and Nevada protective orders correctly allow the use of *nonprivileged* materials across jurisdictions does not, in any way, undermine Plaintiffs' right … to seek protection from cross-jurisdictional use of privileged materials."  ECF No. 307 at 9.

With this backdrop, this Court applies the three factors courts generally considered when deciding if judicial estoppel bars inconsistent positions of a party.  First, the Court finds that Plaintiffs' position in the Illinois case is not inconsistent with its position in the instant litigation.  There is no evidence that Plaintiffs ever took the position during the Illinois proceedings that documents over which they claim an attorney-client privilege should be produced, used or otherwise available to Defendants pursuant to the protective orders entered in the Illinois action.  In fact, what

evidence there is, is to the contrary.  ECF Nos. 305-1, 305-2, and 305-5.  Second, while Plaintiffs did take the general position that documents produced in the Illinois case should be useable in the Nevada action, Plaintiffs' argument in favor of the change to the protective order that would allow such use did not touch on or in any manner implicate attorney-client privileged documents (or those documents over which a privilege is claimed, but denied by the Illinois court).  Hence, Plaintiffs did not persuade the Illinois court to allow the cross-jurisdictional use of attorney-client privileged documents and, thus, they are not now taking a contrary position.  Because Plaintiffs are not asserting an inconsistent position, they cannot be said to derive an unfair advantage or an unfair detriment on Defendants.

Not one of the elements of judicial estoppel is met in this case.  Judicial integrity is not implicated by allowing Plaintiffs' Motion to proceed.  For these reasons, Plaintiffs are not judicially estopped from arguing their Motion for Protective Order before this Court.

**2.   Waiver**.

Defendants next argue that Plaintiffs waived the attorney-client privilege by producing documents the court in Illinois ordered to be produced over Plaintiffs' clear objection.  ECF No. 305 at 1 and 11.  Defendants contend that New York law does not recognize the doctrine of limited waiver unless waiver was inadvertent (*id*. at 1) and that "Plaintiffs could have withheld the documents and taken an appeal from" the Illinois court order requiring production of the documents over which privilege is claimed.  *Id*. at 11.  Defendants claim that Plaintiffs cannot cite a single case that would uphold the attorney-client "privilege in these circumstances."  *Id*.

Plaintiffs point out that the case upon which Defendants rely, *Nowlin v. New York*, 1 A.D.3d 172 (N.Y. App. Div. 2003), is a criminal case involving a motion to quash a subpoena of documents previously produced to the government.  *Id*. at 172-73.  Further, the *Nowlin* decision did not discuss, hint or otherwise allude to any objection to the original production of documents to the government, that resulted in waiver.  *Id*.

The U.S. District Court for the Southern District of New York plainly states that "[i]f a party withholds a document from disclosure on the basis of privilege and, on motion of its adversary, the Court holds that the document is not privileged, the resulting disclosure of the document will not be

deemed a waiver of privilege for purposes of other lawsuits." *Rattner v. Netburn*, Case No. 88 CIV.2080 (GLG), 1989 WL 223059, at \*9 (S.D.N.Y. June 20, 1989) *citing Shields v. Strum, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989); *Cf. Transamerica Computer Co. v. IBM Corp.*, 573 F.2d 646, 651 (9th Cir. 1978); *see also Teachers Ins. And Annuity Ass'n of America v. Shamrock Broadcasting Company, Inc.*, 521 F.Supp.638, 641 (S.D.N.Y. 1981) ("disclosure is not a waiver if it is compelled by court order . . . ." *citing Transamerica v. IBM*, 573 F.2d 646, 651 (9th Cir. 1978) (Waterman, J.)); *abrogated on other grounds by Bowne of New York City v. Ambase Corp.*, 161 F.R.D. 258, 264-65 (S.D.N.Y. 1995). *See also Duplan Corp. v. Deering Milliken*, 397 F.Supp. 1146 (D.S.C.1975)).

Here, there is no doubt that the disclosure of the Goodwin A-C Materials to Defendants was compelled by the Circuit Court of Cook County, Illinois on October 2, 2019, in part as a sanction and in part because the court found there was insufficient evidence to conclude there was an attorney-client relationship between Goodwin and CF&Co.  ECF No. 305-2 at 51-53.  It is undisputed that the Illinois court entered this order over Plaintiffs' objection.  Thus, whether the compelled production is not a waiver for all purposes (as suggested by the decision in *Teachers Ins.*) or is "not … deemed a waiver of privilege for purposes of other lawsuits" (as stated by the decision in *Rattner*), the end result is the same.  Under New York law, Plaintiffs' production of the Goodwin A-C Materials in the Illinois case did not waive Plaintiffs' right to assert the attorney-client privilege over the same documents (or additional/different documents) before this Court.

**III.  EVIDENCE OF AN ATTORNEY-CLIENT RELATIONSHIP AND PRIVILEGE BETWEEN GOODWIN AND CF&CO**.

A.  THE ATTORNEY-CLIENT PRIVILEGE UNDER NEW YORK LAW.

"The attorney-client privilege protects 'communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, Case No. 14-md-2542 (VSB)(HBP), 2019 WL 6736132, at \*4 (S.D.N.Y. Jul. 22, 2019) (citing *ACLU v. Nat'l Sec. Agen.*, Case No. 17-cv-3399, 2019 WL 2295077, at \*6 (2d Cir. May 30, 2019).  The attorney-client privilege "exists to ensure that one seeking legal advice will be able to confide fully

and freely in his attorney, secure in the knowledge that his confidences will not later be exposed to public view to his embarrassment or legal detriment." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 623 (N.Y. Ct. App. 2016) (internal citation omitted).  The entity or individual asserting the privilege "has the burden of establishing that the information was a communication between client and counsel, … intended to be and was kept confidential, and … was made in order to assist in obtaining or providing legal advice or services to the client." *Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, 252 F.R.D. 163, 168 (S.D.N.Y. 2008).

Establishing the attorney-client relationship, that is, meeting the burden necessary to demonstrate the privilege exist, requires the introduction of competent evidence, such as "the admission of affidavits, deposition testimony or other admissible evidence." *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 472 (S.D.N.Y. 2003) (internal citations omitted); *see also Matter of Stenovich v. Wachtell, Lipton, Rosen & Katz*, 195 Misc.2d 99, 106-07 (Sup. Ct. N.Y. County 2003) (reviewing evidentiary submissions including affidavits and a privilege log to determine whether documents were for business or legal advice).  "In determining the existence of an attorney-client relationship, a court must look to the actions of the parties to ascertain the existence of such a relationship" *Wei Cheng Chang v Pi*, 288 A.D.2d 378, 380 (N.Y. Sup. Ct. App. Div. 2001) *citing McLenithan v McLenithan*, 273 A.D.2d 757, 758-59 (N.Y. Sup. Ct., App. Div. 2000).  Moreover, "formality is not essential to the formation of an attorney-client relationship." *McLenithan*, 273 A.D.2d at 258.  Under New York law "an attorney-client relationship may exist in the absence of a retainer or fee." *Gardner v Jacon*, 148 A.D. 2d 794, 795 (N.Y. Sup. Ct. App. Div. 1989) (citation omitted).

B.     THE GOODWIN – CF&CO. RELATIONSHIP.

1.     **The Evidence and Arguments**.

Plaintiffs submit the declarations and affidavits of Stephen M. Merkel ("Merkel"), Executive Managing Director of Cantor Fitzgerald Securities ("CFS"), a position held from 2010 through 2012. ECF No. 383-1 (Merkel Dec.) ¶¶ 3-4.  Merkel is also General Counsel for CFLP, BGC, Chief Legal Officer for Newmark Group, Inc., and, in his capacity as Executive Director and General Counsel, states that he provides legal services to CFS and its related companies.  *Id*. ¶¶ 5 and 6.  Merkel

confirms that CFLP is the ultimate parent of CF&Co. and CFS for whom he works, and holds the majority voting power in BGC.  *Id.* ¶¶ 10-12.  In Merkel's September 23, 2019 Affidavit, he states that in 2011 and 2012 he "was involved with and oversaw the provision of legal services in connection with BGC's acquisition of certain of Grubb & Ellis Company's … assets."  ECF No. 383-1, Ex. 1 ¶ 8.  In Merkel's Supplemental Affidavit, dated November 1, 2019, he confirms that he, along with other in-house counsel, "represented [CF&Co.] in connection with the acquisition of the assets of Grubb and Ellis" and that BGC and CF&Co. collectively used in-house counsel to provide legal services in connection with the Grubb & Ellis acquisition.  ECF No. 383-1, Ex. 2 ¶¶ 7-8.

Plaintiffs also submit the Declaration of Andrew Weidhaas ("Weidhaas") to which he attaches two prior affidavits (that he incorporates), the Engagement Letter between Goodwin and CFLP, a May 31, 2012 email chain, and Goodwin invoices.  ECF No. 383-2, and Exs. 1-5 thereto. Weidhaas is a partner at Goodwin and states that, in 2010, Goodwin was hired by CFLP to represent CFLP in the formation and capitalization of a commercial real estate venture.  ECF No. 383-2 ¶ 11. Weidhaas testifies, through his declaration, that the March 2010 Engagement letter memorializing Goodwin's representation of CFLP, albeit unsigned, accurately represents Goodwin's retention by CFLP.  *Id.* ¶ 13.[6]  Weidhaas and his partner Robert Insolia, who is currently Goodwin's Chairman, "were primarily responsible for handling the Goodwin … engagement for CFLP."  *Id.*  ¶¶ 14, 15. Weidhaas states, as is confirmed by the terms of the Engagement Letter, that Goodwin represented CFLP with respect to a transaction having nothing to do with Grubb & Ellis, but that if Cantor Fitzgerald "later ask[s] us to take on additional assignments, the terms of this [E]ngagement [L]etter will cover such later engagements unless Cantor Fitzgerald and Goodwin Procter reach a separate agreement ... ."  *Id.* ¶¶ 16, 17; ECF No. 383-2, Ex. 3 at 1.  Other pertinent terms of the Engagement Letter include:

- Goodwin Procter has not been retained to represent any "subsidiary or other entity affiliated with" CFLP;[7]

---

[6]   The Engagement Letter is unsigned, but this is not at issue as neither party discusses this fact in any of their briefs.

[7]   This is a fact upon which Defendants focus.

- Unless Goodwin Procter is engaged to provide additional legal services or we otherwise agree in writing our lawyer/client relationship will terminate upon the earlier of the completing of the specific services that you have engaged us to perform … or twelve months without our performing any legal services for you.  If you later engage us to perform further or additional services, the lawyer/client relationship will be reestablished, subject to these and any supplemental terms on which we may at that time; and,

- The Standard Engagement Terms complement this letter and are incorporated in this letter by reference so that this letter and the Standard Engagement Terms together constitute the agreement between Cantor Fitzgerald and Goodwin ...

ECF No. 383-2, Ex. 3 at 15, 17, and 18.

Weidhaas states: "In 2011 and 2012, Goodwin Procter was retained to represent both BGC and CF&Co. in connection with BGC's purchase of Grubb & Ellis … ."  ECF No. 383-2 ¶ 21; *see also* 383-2, Ex. 2 (Sept. 19, 2019 Aff. of Weidhaas) ¶¶ 4, 7 (Goodwin served as counsel to CF&Co. in connection with the Grubb & Ellis asset purchase; Goodwin "jointly represented BGC and" CF&Co.); ECF No. 383-2, Ex. 1 (Sept. 30, 2019 Suppl. Aff. of Weidhaas) ¶ 6 (Goodwin represented BGC and CF&Co. in connection with the Grubb & Ellis transaction "based on the terms of the March 2010 Engagement Letter").  This engagement occurred after Weidhaas was contacted by Merkel who Weidhaas identifies as "one of the in-house attorneys for the Cantor Fitzgerald group of companies." ECF No. 383-2 ¶ 24.  Goodwin was previously retained to work with BGC and CF&Co. when BGC acquired Newmark & Co, a company described as similar to Grubb & Ellis, under the terms of the March 2010 Engagement Letter.  *Id*. ¶¶ 25-27.  Weidhass states that it is "common practice to rely on a prior written engagement letter to subsequently represent an entity related to the entity that is the subject of the prior letter, as was the case with respect to Goodwin Procter's representation of CF&Co. and BGC in relation to its representation of CFLP." *Id*. ¶ 28.

Goodwin also opened one main matter number under the client number for CFLP to which it billed work related to the BGC acquisition of Grubb & Ellis.  *Id*. ¶ 29; ECF No. 383-2, Ex. 1 (Sept. 30, 2019 Weidhaas Aff.) ¶ 9.  Related work was billed under the same CFLP client number; although there were two tangential matter names.  ECF No. 383-2 ¶ 30; ECF No. 383-2, Exs. 4 and 5.  Weidhaas, one of the primary Goodwin partners managing the representation of BGC and CF&Co., worked with in-house counsel and business employees for both BGC and CF&Co. "to effectuate the

Grubb & Ellis Transaction." ECF No. 383-2 ¶¶ 34, 35.  Weidhaas understood that BGC and CF&Co. were working under the CFLP umbrella, and that the team of Goodwin attorneys he oversaw working on the Grubb & Ellis engagement operated as if there was no "distinction with respect to which entity" Goodwin was advising because the entities "were under common control of the same parent entity, CFLP."  *Id.* ¶¶ 35, 36.  For this reason, Goodwin "did not bifurcate its advice to either BGC or CF&Co., or to the entities' individual representatives, but rather provided joint legal representation to both entities … ."  *Id.* ¶ 37; *see also* ECF No. 383-2, Ex. 2 (Sept. 19, 2019 Weidhaas Aff.) ¶ 7 ("Goodwin … jointly represented BGC and [CF&Co.].)  The invoices reflecting work on the Grubb & Ellis engagement were all sent to CFLP.  ECF No. 383-2 ¶ 38; 383-2, Ex. 5.

Plaintiffs also submit the Declaration of Charles Edelman ("Edelman"), Head of Mergers & Acquisitions and Financial Restructuring for CF&Co.  ECF No. 383-3.  Edelman's responsibilities include "providing financial advisory services on mergers, acquisitions, and other strategic transactions … ."  *Id.* ¶ 2.  Edelman confirms that, in August 2010, BGC engaged CF&Co. as its financial advisor "in connection with potential third-party strategic transactions" memorialized in an August 6, 2010 Letter Agreement describing the services to be provided.  *Id.* ¶¶ 4, 7; Ex. 1.  In addition to the work described in the Letter Agreement, Edelman states that "CF&Co agree[d] to be available to meet with BGC's Board of Directors to discuss any proposed transaction and its financial implications and to render an opinion … as to the fairness, from a financial point of view, to BGC or its stockholders … ."  *Id.* ¶ 8.

Edelman goes on to declare:

- CF&Co. advised BGC in 2011 and 2012 regarding its acquisition of Grubb & Ellis (*id.* ¶¶ 9, 12);

- CF&Co. worked with Goodwin, which "provided legal advice with respect to" the Grubb & Ellis acquisition by BGC, including with respect to the "363 Sale" in the bankruptcy court.[8]  Goodwin also prepared Edelman and other investment bankers for testimony in the bankruptcy court.  (*id.* ¶ 13);

- He "understood and expected that meetings and communications between CF&Co., BGC, and Goodwin… were to be held in the strictest confidence."  (*id.* ¶ 14);

- On August 8, 2012, Edelman submitted an invoice to BGC that references "delivery of in-court testimony on behalf of BGC."  *Id.* ¶ 15; *Id.* Ex. 2.

---

[8]     A 363 Sale refers to the sale of an organization's assets under Section 363 of the US Bankruptcy Code.

Finally, also offered by Plaintiffs are email chains, some of which evidence requests from CF&Co. to Goodwin seeking legal advice. ECF No. 383-4 at 13 and 16.

In contrast to the above, Defendants argue that the Engagement Letter between CFLP and Goodwin "is an agreement where Goodwin … says it will not represent any of CFLP's affiliates or subsidiaries." ECF 394 at 31. While "[h]ypothetically … [there] could be an attorney-client relationship, … here [there] is an actual agreement to represent only one of the entities. And BGC was represented by Goodwin in the bankruptcy because Goodwin appeared on behalf of BGC. But at no point did Goodwin agree to represent CF&Co." *Id.* at 32; *see also id.* at 42 (Defendants reiterating that "CF&Co. … did not retain Goodwin); *id.* at 44 (the Engagement Letter says "Goodwin has not been retained to represent any … subsidiary or other entity affiliated with Cantor Fitzgerald and no such relationship is created by this agreement"); *id.* (the Engagement Letter allows for CFLP to later engage Goodwin, "not CF&Co."). Defendants state that CFLP is the only company Goodwin ever billed (*id.* at 45) and argue that Goodwin was working "on behalf of BGC at that point for representing -- I think in the bankruptcy -- and Goodwin Procter appeared on behalf of BGC in the bankruptcy. So[,] there is contemporaneous evidence that Goodwin Procter intended to represent both BGC and CFLP, but there's no contemporaneous evidence that Goodwin Procter agreed to represent CF&Co." *Id.* Defendants also argue that evidence "submitted months after this privilege dispute … began is not as compelling as the evidence that existed at the time that the relationship between CFLP and Goodwin … was created. *Id.* at 32-33.

The Court advised Defendants at the time of the June 10, 2020 hearing that they had a "hard argument" regarding an attorney-client relationship between CF&Co. and Goodwin. The Court advised that (1) it disagreed with Defendants' view of the billing history because logic strongly supports the conclusion that if CFLP did not believe Goodwin represented CF&Co., CFLP would not have paid Goodwin's bills for work done by Goodwin for CF&Co.,[9] (2) irrespective of the terms of the Engagement Letter, testimony from Goodwin and CF&Co. state they had an attorney-client relationship, (3) the Engagement Letter addresses potential future representations the language of

---

[9]     That CFLP paid all of Goodwin's bills is not contested. This fact is nonetheless supported by ECF No. 383-2 (May 29, 2020 Weidhaas Dec. ¶ 30), Ex. 4 thereto; ECF No. 394 at 54.

which does not necessarily preclude future representations of subsidiaries (*e.g.* the Standard Engagement Terms incorporated into the Engagement letter state "the scope of the engagement may change if you ask us to provide different services"), and (4) Defendants do not dispute Goodwin represented BGC, *not* a wholly owned subsidiary of CFLP despite the lack of a separate agreement with Goodwin, but want the Court to conclude that CF&Co., which *is* wholly owned by CFLP, could not be represented by Goodwin because of the terms of the Engagement Letter between Goodwin and CFLP.  ECF Nos. 298-5 at 1; 394 at 42-45.

### 2.    The Analysis.

Under New York law, a written engagement is not required to create an attorney-client relationship.  *McLenithan*, 273 A.D.2d at 258; *Gardner*, 148 A.D. 2d at 795.[10]  Thus, even in the absence of a separate retainer agreement between Goodwin and CF&Co., Plaintiffs may establish the attorney-client relationship through introduction of competent evidence including affidavits and documents demonstrating the existence of this relationship.  *Gulf Islands*, 215 F.R.D. at 472; *Matter of Stenovich*, 195 Misc.2d at 106-07.  Looking at the actions of the parties, as the Court must under New York law, the Court finds that the evidence presented to date supports Plaintiffs' position that Goodwin and CF&Co. had an attorney-client relationship for purposes of Goodwin providing legal services to CF&Co. relating to BGC's acquisition of Grubb & Ellis.  The facts before the Court demonstrate that, irrespective of the terms of the Engagement Letter with which Defendants take issue, the Standard Engagement Terms allow "the scope of the engagement" to change if Goodwin is asked "to provide different services."  Weidhaas testifies in his affidavit that he was contacted by Merkel (the General Counsel and Chief Legal Officer for CFLP who oversaw legal services in

---

[10]     *Cf. Cohen v. Handelman,* 62 Misc.2d 801, 312 N.Y.S.2d 866, 873 (Civil Cty of N.Y. 1970) ("'To establish this relation of attorney and client, it is not necessary that the attorney should have appeared as attorney in legal proceedings. Where it appears that an attorney is consulted to extricate a person from his difficulties, and that the relation[ship] commenced because of the position held by the attorney, and the attorney undertakes to act for the person consulting him, the relation[ship] of attorney and client exists.'" (quoting *Sheehan v. Erbe*, 103 A.D. 7, 9, 92 N.Y.S. 862, 863-64 (1st Dept.1905))).  *See also Ritchie v. Gano*, Case No. 7 Civ. 7269(VM)(JCF), 2008 WL 4178152, at *5 (S.D.N.Y Sept. 8, 2008) ("It is important to note that "[f]ormality is not an essential element in the employment of an attorney."  *Kubin v. Miller*, 801 F.Supp. 1101, 1115 (S.D.N.Y. 1992) (quoting *People v. Ellis*, 91 Misc.2d 28, 35, 397 N.Y.S.2d 541, 545 (N.Y.Sup.Ct. 1977)).  Rather, "[i]n order to determine whether an attorney-client relationship exists, it is necessary to look at the words and actions of the parties."  *Id.*; *accord Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F.Supp. 360, 366 (S.D.N.Y. 1992) (noting that "since the initial arrangements for representation are often informal ... it is necessary to look at the words and actions of the parties").

connection with BCG's acquisition of Grubb & Ellis assets) for purposes of representation.  Edelman testified that CF&Co. worked with Goodwin attorneys who provided legal advice with respect to the Grubb & Ellis acquisition by BGC, and that Goodwin lawyers prepared him and other investment bankers for testimony in the bankruptcy court.  Edelmen also testified that he believed CF&Co.'s communications with Goodwin to be confidential.  Weidhaas testified that Goodwin had only one client number for CFLP under which all matters were billed; that Goodwin opened only one main matter number for the BGC acquisition of Grubb & Ellis (although there were two other tangential matters also opened); all bills were sent to CFLP only; Goodwin was specifically retained to represent BGC and CF&Co. in connection with BGC's purchase of Grubb & Ellis; Goodwin represented BGC without a separate engagement letter when it acquired Newmark; and, that it was "common practice" for Goodwin "to rely on a prior written engagement letter to subsequently represent an entity related to the entity … as was the case with respect to Goodwin Procter's representation of CF&Co. and BGC in relation to its representation of CFLP."

Defendants' focus on the terms of the Engagement Letter, leaves out any discussion of the Standard Engagement Terms.  Defendants do not discuss whether Goodwin and CF&Co. *behaved* as if either the Engagement Letter (incorporating the Standard Terms) covered the engagement or that the representation was formed irrespective of the terms in the Engagement Letter.  There is no persuasive argument by Defendants in opposition to the fact that CFLP paid all of Goodwin's bills under one client number for CFLP, including all time spent by Goodwin on the Grubb & Ellis transaction.

Defendants' current argument that Goodwin could not represent CF&Co. because of a potential future conflict is unsupported in this case.  First, the Engagement Letter states that if a conflict arises Goodwin will act in accordance with the "pertinent ethics rules by making any necessary disclosures and seeking any needed consents or conflict waivers" or, if needed, by "terminating this representation."  ECF No. 383-2, Ex. 3 at 16.  Defendants present no evidence of actual conflict and do not argue that an actual conflict existed.  Instead, Defendants argue that "there is a possibility that eventually their [BGC and CF&Co.'s] interest could diverge."  ECF No. 394 at 42.  Defendants also argued that they are sure there is some way a lawyer could structure an

engagement to withdraw on behalf of one party in the event that interests diverge, "but that isn't the scenario here." *Id.* But, the Engagement Letter addressed conflicts and withdrawal of representation, the basis for which never occurred. Given that written engagement agreements are not required under New York law, and if the Court assumes, *arguendo*, that the Engagement Letter in this case did not apply to CF&Co.'s engagement of Goodwin, then the failure to have written conflict provisions also cannot be said to preclude a finding of an attorney-client relationship.

All of the above weighs heavily in favor of finding that Goodwin and CF&Co. understood and operated as if they had an attorney-client relationship with respect to requesting and receiving legal advice relating to BGC's acquisition of Grubb & Ellis. This evidence provides a sound basis for granting Plaintiffs' Motion for Protective Order in this proceeding precluding the disclosure or use of the A-C Materials Plaintiffs were ordered to produce by the Illinois court. However, because a review of Plaintiffs' Motion confirms that Plaintiffs did not ask this Court to consider and issue a decision on whether Goodwin and CF&Co. had an attorney-client relationship, the Court does not reach a decision on this issue.

## IV.  WAS THERE JOINT REPRESENTATION OF BGC AND CF&CO. BY GOODWIN SUCH THAT THE COMMUNICATIONS AMONG THE THREE ARE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.

New York case law explains that the proponent of the privilege has the burden to demonstrate the privilege has not been waived, which can be demonstrated "based on competent evidence, usually through affidavits, deposition testimony or other admissible evidence." *Allied Irish Bank*, 252 F.R.D. at 169 (internal citation omitted). In *Ambac*, the Court recognized that the attorney-client privilege must be "narrowly construed" because the privilege "is in obvious tension with the policy of this State favoring liberal discovery." *Id.*, 27 N.Y.3d at 624 (internal citation and quotation marks omitted). Thus, if the Court assumes an attorney-client privilege between Goodwin and CF&Co., there is no doubt that CF&Co. has the burden of demonstrating that its communications with Goodwin, which included BGC, did not waive the privilege. To this end, the parties vehemently disagree about whether BGC and CF&Co. were joint or co-clients of Goodwin such that their communications were protected by attorney-client privilege (so long as such communications otherwise meet the definition of privileged communications).

22

The Court in *Ambac*, on which Defendants heavily rely, states that waiver of the attorney-client privilege may occur when communications are made in the presence of third parties; however, there are exceptions to this waiver rule such as "where the presence of such third part[y] is deemed necessary to enable the attorney-client communication and the client has a reasonable expectation of confidentiality … [or] when one attorney represents multiple clients concerning a matter of common interest … ." 27 N.Y. 3d at 624-25 (internal citations omitted).  In the latter circumstance "any confidential communications exchanged among [the multiple clients] … are privileged against the outside world." *Id*. at 625 (internal citations omitted).

The court differentiates between joint clients "or [the] co-client setting," where the clients have a common interest (cases not involving pending or actual litigations) and the "common interest doctrine," which applies only to communications made during pending or anticipated litigation. *Id*. at 628 and 630-31.  As stated by the court in Ambac, in the "joint client or co-client setting, … the clients indisputably share a complete alignment of interests in order for the attorney, ethically, to present both parties.  Accordingly, there is no question that the clients share a common identity and all joint communications will be in furtherance of that joint representation." 27 N.Y.3d at 631. However, when "clients retain separate attorneys to represent them on a matter of common interest[, i]t is less likely that the positions of separately-represented clients will be aligned" so that an attorney retained to represent one client will "act as attorney for all" clients. *Id*. (internal citation omitted).

The joint or co-client relationship is probably most clearly stated by the U.S. Court of Appeals for the Third Circuit discussion in *In re Teleglobe Communications Corp.*, 493 F.3d 345 (3rd Cir. 2007).  In *Teleglobe*, the Court discussed "two oft-confused privileges:  (1) the co-client (or joint-client) privilege, which applies when multiple clients hire the same counsel to represent them on a matter of common interest, and (2) the community-of-interest (or common-interest) privilege, which comes into play when clients with separate attorneys share otherwise privileged information in order to coordinate their legal activities." *Id*. at 359 (internal citations omitted).  With respect to the joint or co-client privilege, the Third Circuit states: "clients of the same lawyer who share a common interest are not necessarily co-clients.  Whether individuals have jointtly consulted a lawyer or have merely entered concurrent but separate representations is determined by the

understanding of the parties and the lawyer in light of the circumstances." *Id. citing* Restatement (Third) of the Law of Governing Lawyers § 75 cmt. c. (omitting internal cross-references). The Third Circuit states that a joint or co-client relationship does not have to be in writing, "so long as the parties understand the limitations" and that "[t]he keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully … any testimony from the parties and their attorneys on those areas." *Id.* at 363 (internal citations omitted).

In 2016, the U.S. District Court for the Southern District of New York confirmed the joint or co-client common interest rule as well as the separate common interest doctrine applicable solely to litigation. What the court refers to as the common interest "rule requires a showing that (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought must have been designed to further that interest." *AU New Haven, LLC v. YKK Corporation*, 15-CV-03411(GHW) (SN), 2016 WL 6820383, at *3 (S.D.N.Y. Nov. 18, 2016) (internal citations and quotation marks omitted). The court makes clear that "[p]arties may … share such an interest even if they are *not* engaged in ongoing litigation." *Id. citing Schaeffler v. United States*, 806 F.3d 34, 40-41 (2d Cir. 2015) (emphasis added). In *Schaeffler* the Second Circuit explained:

> While the privilege is generally waived by voluntary disclosure of the communication to another party, the privilege is not waived by disclosure of communications to a party that is engaged in a "common legal enterprise" with the holder of the privilege. Under *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989), such disclosures remain privileged "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel ... in the course of an ongoing common enterprise ... [and] multiple clients share a common interest about a legal matter." *Id.* at 243 (internal citations and quotation marks omitted). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." *Id.* at 243 (citing Daniel J. Capra, The Attorney–Client Privilege In Common Representations, 20 Trial Law. Q., Summer 1989, at 21).
>
> Parties may share a "common legal interest" *even if they are not parties in ongoing litigation. Id.* The common-interest-rule serves to "protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.* at 243. "*[I]t is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply*[.]" *Id.* at 244 (citations omitted). However, "[o]nly those communications made in the course of an ongoing common enterprise

24

and intended to further the enterprise are protected." *Id.* at 243.  The dispositive issue is, therefore, whether the Consortium's common interest with appellants was of a sufficient legal character to prevent a waiver by the sharing of those communications.

*Id.* (emphasis added).

However, "entities that are under common ownership must still demonstrate that this rule applies … by making a showing that a common attorney was representing both corporate entities *or* that they otherwise shared a common legal interest." *AU New Haven*, 2016 WL 6820383, at *3 *citing Gulf Islands*, 215 F.R.D. at 473 (emphasis added).[11]  As stated in *In re Keurig*, *supra*, a corporate entity "may not rely on inter-relatedness alone to demonstrate attorney-client privilege.  The more recent decisions in *Gulf Islands* and *AU New Haven* … represent a trend toward requiring more from corporate entities than simple affiliation to meet their burden of establishing that documents shared with related corporate entities remain privileged." 2019 WL 6736132, at *8.  The court in *Keurig* further states: "Thus, in order to maintain the attorney-client privilege over … documents, Keurig must demonstrate that 'a common attorney was representing both corporate entities *or* that they otherwise shared a common legal interest.'" *Id. citing AU New Haven*, 2016 WL 6820383, at *3.[12]

Relying on *Matter of Stenovich v. Wachtell, Lipton, Rosen & Katz*, 195 Misc.2d 99, 756 N.Y.2d 367 (2003), Defendants argue that "financial advisors to a transaction" are not "within the privilege to the two companies engaged in" a transaction "because they . . . didn't share a common legal interest."  ECF No. 394 at 33.  The facts of *Stenovich* substantially differ from the facts here.

---

[11]   The decision in *Gulf Islands* is distinguishable from the case at bar because, although an entity related to the defendant had an interest in the dispute, "[e]ach corporation had its own attorney" and there was nothing before the court that suggested the related entity needed legal advice from defendant's counsel. 215 F.R.D. at 472.  Nonetheless, the court in *Gulf Islands* explained that "[w]hile cases have upheld assertions of the common interest rule for related companies, they have done so only upon a showing that *a common attorney was representing both corporate entities or* that the two corporations shared a common legal interest." *Id*. at 473 (internal citations and quote marks omitted) (emphasis added).  Further, although there are cases that "state the broad proposition that disclosure of attorney-client privilege information to an affiliated company does not waive the privilege—thereby obviating the need to invoke the common interest rule . . .[,] in such cases no waiver was found because the entities *were represented by a common attorney . . . or* a shared common legal interest." *Id*. at 474 (internal citations omitted) (emphasis added).

[12]   This trend undermines the 1999 decision in *Music Sales Corp. v. Morris*, Case No. 98CIV.9002(SAS)(FM), 1999 WL 974025, at *7 (S.D.N.Y. Oct. 26, 1999) (unrelated corporations may claim attorney-client privilege for communications shared with each other only if "they have a substantial identity of interest[ …; whereas, c]orporations which are related through common ownership or control … need not meet this strict standard.") (citations omitted).

Specifically, Stenovich was a class representative in a breach of fiduciary duty case filed in Utah state court against several officers and directors of First Security Corporation. *Matter of Stenovich*, 195 Misc.2d at 100.[13]  The law firm of Wachtell Lipton was First Security's counsel during the time the events at issue occurred. *Id*. at 101.  The Utah court granted Stenovich's motion seeking an order from the Supreme Court, State of New York, to issue subpoenas for documents from Wachtell, which the court in New York approved. *Id*.  Wachtell then produced a privilege log listing 640 documents falling into several categories ultimately analyzed by the court. *Id*. at 101 and 105.

When the court discussed the attorney-client privilege, it made clear that communications concerning business advice or negotiations of a commercial relationship are not covered by the privilege (although the fact the business advice is "given does not automatically waive the privilege where the advice given is predominately legal … in nature."). *Id*. a 106.  Thereafter, discussing the "common interest privilege" and its requirement that parties claiming such a privilege must be facing pending or threatened litigation, the court analyzed whether Wachtell waived the privilege when it shared documents with outside entities including JP Morgan and Goldman Sachs. *Id*. at 108-09. The court found, as confirmed by defendant's affidavit, that "the common interest with respect to JP Morgan and Goldman Sachs was exclusively of a commercial nature and did not concern rendering legal advice in pending or reasonably anticipated litigation," that JP Morgan and Goldman Sachs were consulted solely for "their business acumen and reputation in the financial industry," and that neither of these third parties were named as defendants; so, no common interest privilege attaching to pending or threatened litigation applied. *Id*. at 109.

Wachtell also asserted an "agency privilege" with respect to documents provided to various third parties. *Id*. at 110.  The Court stated that "communications made to counsel by one serving as an agent of either attorney or client to facilitate communications will be privileged. … The scope of the privilege is not defined by the third parties' employment or function, it depends on whether the client had an expectation of confidentiality under the circumstances." *Id*. at 110 (internal citations omitted).  Wachtell argued that the services of the third parties were necessary for Wachtell to carry out its responsibilities to its client, but the court found that Wachtell did not "contend that it

---

[13]     The N.Y.2d jump cites are not available for this case.

instructed the third parties not to disclose communications," which was an independent basis for waiver of the privilege. *Id.* at 110-111.

Nowhere in the *Stenovich* decision does the court discuss or state, as Defendants contend, that a financial advisor on a transaction cannot have a common legal interest or that a financial advisor cannot, as a matter of New York law, be a joint or co-client on a transactional matter. In fact, joint or co-client representation is not addressed in *Stenovich* at all, and the failure of Wachtell to establish a attorney-client privilege was fact specific.[14]

Here, as explained in *In re Teleglobe*, and as clearly recognized by New York courts in *Schaeffler*, *Ambac*, *AU New Haven*, and *In re Keurig*, whether the joint or co-client relationship exists between and among Goodwin, BCG, and CF&Co. is a fact specific inquiry. There is no bright line rule the Court can apply that would allow it, if this issue were before the Court on a motion, to decide whether the application of such a relationship is appropriate here as the factual basis for such a contention is not fully developed.[15] However, there are enough facts supporting the conclusion that a joint or co-client relationship between and among BGC, CF&Co., and Goodwin exists to support granting Plaintiffs' Motion for a Protective Order.

## V.    CONCLUSION AND ORDER

Plaintiffs have presented a sufficient argument and evidence in favor of the protective order they seek. The Court finds no basis upon which to conclude that granting this request will upend the litigation pending in Nevada, as Defendants claim.

Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Protective Order (ECF No. 298) is GRANTED. No materials produced in the Illinois matter in compliance with the Illinois court's October 2, 2019 order pertaining to documents over which Plaintiffs claim an attorney-client

---

[14]    Defendants' reliance on *Allied Irish Bank* is also misplaced. *Allied* discusses, among other issues unrelated to this matter, that the "common interest" doctrine must be related to communications where litigation is pending or imminent. 252 F.R.D. at 171. This is an issue with which the parties do not disagree. The joint or co-clients relationships to which the attorney-client privilege may extend in the civil setting outside of litigation is not discussed in *Allied*.

[15]    The Court does not express an outcome on any future motion filed by any party. The issues of the attorney-client relationship and joint or co-client privilege remain to be, if at all, presented. The parties should note, however, that if presented, the Court is inclined to allow Defendants to conduct limited discovery through depositions regarding the specific facts relating to the formation of an attorney-client relationship between Goodwin and CF&Co. and whether a joint or co-client privilege applies to communications between and among Goodwin, BGC and CF&Co.

privilege may be used at this time in the present litigation.  No information or deposition testimony derived therefrom may be introduced or used in the present litigation at this time.  The parties shall notify this Court within five Court days of the Illinois Appellate Court's decision regarding the October 2, 2019 Circuit Court Order, providing the outcome and otherwise advising the Court of how they intend to move forward.

Dated this 14th day of September, 2020.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE