UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

BGC PARTNERS, INC. et al.,

             Plaintiff,

v.

AVISON YOUNG, INC., et al.,

             Defendant.

Case No. 2:15-cv-00531-RFB-EJY

**ORDER**

## I.   INTRODUCTION

Before the Court for consideration are the parties' cross-motions for summary judgment, ECF Nos. 624, 629, 637; Defendants' Motion to Exclude Plaintiff's Expert Testimony; and Plaintiffs' Motion to Exclude Portions of Defendants' Expert Testimony. ECF Nos. 644, 654. For the following reasons, the Court grants in part and denies in part each Defendants' motions for summary judgment. The Court denies Plaintiffs' Motion for Summary Judgment in its entirety. The Court denies both motions to exclude expert testimony.

## II.   RELEVANT PROCEDURAL BACKGROUND

The Court only summarizes the procedural history that is relevant to the instant dispositive motions. Plaintiffs commenced this case by filing the original complaint in the Eighth Judicial

District Court for Clark County, Nevada on February 27, 2015. Defendants removed the case to federal court on March 23, 2015. On April 20, 2015, Plaintiffs filed a Motion to Remand the case to state court. On March 31, 2016, the Court denied Plaintiff's Motion to Remand and issued a written order on July 20, 2016. Plaintiffs filed their First Amended Complaint on August 8, 2016. Defendants filed a Motion to Dismiss on October 7, 2016. The Court held a hearing on the Motion to Dismiss on June 9, 2017. On June 6, 2018, the Court issued an order granting in part and denying in part the motion. Plaintiffs filed their Second Amended Complaint on January 25, 2019. On November 29, 2021, the Court gave Plaintiffs leave to file their Third Amended Complaint, which they filed on December 2, 2021. After a lengthy period of fact discovery, including many disputes between the parties, discovery finally concluded in early 2023. On March 29, 2023, the parties filed their respective motions for summary judgment. The motions were fully briefed on June 16, 2023. The parties filed their motions to exclude expert testimony on April 12, 2023, and April 28, 2023. These motions were fully briefed on July 14, 2023. On February 15, 2024, the Court held a hearing on all the pending motions. This order follows.

## I.   LEGAL STANDARD

### a.   Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322(1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th

Cir. 2017) (citations omitted).

## II.   FACTUAL BACKGROUND

### a. Undisputed Facts

The Court finds the following facts to be undisputed. Grubbs and Ellis ("G&E") was one of the oldest and largest commercial real estate brokerages in the United States. On February 20, 2012, G&E and its subsidiaries filed for Chapter 11 bankruptcy. On April 13, 2012, BGC Partners Inc. ("BGC") purchased substantially all of G&E's assets through an asset-purchase agreement ("APA"), under which BGC acquired G&E's "right, title and interest in, to and under the Acquired Assets existing as of the Closing regardless of whether any of such Acquired Assets existed before, on or after the commencement of the Chapter 11 Case." On December 13, 2017, BGC transferred all of its interests in certain assets to Newmark Group Inc., including all of its interests in the claims that are the subject of this litigation. The United States Federal Bankruptcy Court for the Southern District of New York approved this sale under 11 U.S.C. § 363 on March 27, 2012.

Avison Young Canada ("AY Canada") is one of Canada's largest real estate brokerage firms. Avison Young USA ("AY-USA") and Avison Young Nevada ("AY-Nevada") are affiliates of AY Canada. Mark Rose, who left G&E in 2008 to join AY after serving as G&E's Chief Executive Officer, is AY's chairman and CEO. Joseph Kupiec was the Managing Director of Las Vegas Commercial Brokerage from 2002 to July 1, 2010, at which time Las Vegas Commercial Brokerage because a wholly owned subsidiary of G&E. On June 29, 2010, Kupiec signed an employment agreement to become the Executive Vice President and Managing Director of G&E Las Vegas. Kupiec resigned from G&E on November 14, 2011, and joined AY as Principal and Managing Director of AY-Las Vegas. Earl Webb was AY's President of U.S. operations.

Kimberly Krugman was senior legal counsel at G&E prior to joining AY. Hiren Thakar was G&E's Vice President for Planning and Strategy prior to joining AY. Lyndal Hanna was G&E's Vice President of Information Technology. Barton Hyde, Debra Sinclair, and Dave Dworkin were all G&E employees who later joined AY. Dworkin joined AY on March 2, 2012. Sinclair joined AY on March 19, 2012. Hyde joined in August 2012.

Kupiec's employment agreement with G&E contained a non-solicitation agreement, which

prohibited him, "for a period of one year following his date of termination," from "soliciting (directly) for employment any employees or independent contracts of G&E." The agreement also prohibited Kupiec from "disclos[ing] to any person or entity, or use, other than in connection with Company's business, any confidential information that you develop or otherwise acquire in the course of your employment with [G&E]." Pursuant to the agreement, Kupiec was also required "upon termination," to "deliver to [G&E] any and all confidential information about G&E and/or its clients that [he] possessed," as well as "any and all [G&E] property." Kupiec informed Rose of the solicitation provisions in his employment contract. Krugman's G&E employment agreement contained substantially similar provisions.

In August 2010, Kupiec provided Rose with historical revenues, expenses, and EBITDA for G&E's Las Vegas office. On October 8, 2010, Kupiec sent Webb a memorandum outlining a start-up plan for an AY office in Las Vegas. The plan identified eleven G&E brokers that Kupiec intended to recruit. Upon Webb's request, Kupiec also provided the broker revenue production numbers for these individuals. On October 26, 2010, Kupiec sent an office-growth model for AY's Las Vegas office. Prior to leaving G&E in 2011, Kupiec sent G&E property listing and management agreements to his personal AOL account.

On January 10, 2011, Krugman sent over two confidentiality agreement templates that she acquired through her time at G&E to Steve Dils, a Managing Director at AY, upon his request. Thakar emailed Krugman a copy of G&E's Policy Manual. Krugman helped create the AY "Sales Professional Policies and Procedures Handbook." Krugman sent the finalized handbook to Rose for his review on February 24, 2012.

The Nevada Commercial Group ("NCG") was an independent Reno commercial real estate brokerage that was affiliated with G&E through a contractual affiliate agreement ("Affiliate Agreement"). John Pinjuv was NCG's Principal and is currently the Managing Director of AY's Reno affiliate, Western Alliance Commercial Inc. ("WAC"). In the course of bankruptcy, G&E expressly rejected the NCG-G&E Affiliate Agreement as an executory contract on January 31, 2013. WAC is an independent Reno commercial brokerage that is affiliated with AY through a contractual affiliate agreement. WAC never had an affiliate agreement with G&E.

- 4 -

The NCG Affiliate Agreement provided that "Broker will not participate, on its own behalf or on behalf of any other Person, directly or indirectly, by oral or written contract or otherwise, in any other network or organization of commercial real estate brokers which shares referrals of any real estate transactions or services, or any market information among members, which services or sharing of information is similar to that provided by [G&E] or its affiliates without the prior written consent of [G&E]." It further provided that any proprietary information G&E shared with NCG remained G&E's "sole and exclusive property," and any information NCG accessed over G&E's eNet were G&E's "confidential proprietary information and trade secrets." NCG also executed a Confidentiality Agreement with G&E, which required NCG to maintain confidential and trade secret information, including "strategic plans or initiatives," in "strict confidence."

The Affiliate Agreement's Cooperative Marketing Program required G&E to "establish and maintain a program of national marketing initiatives" for which NCG was to pay an annual "Marketing Initiatives Contribution" of $50,000 to G&E. The Affiliate Agreement provided that G&E would "use *reasonable efforts* to establish and maintain . . . a Corporate Marketing Program and Referral Program." It also stated that G&E retained the right to modify the Marketing Program at any time "in [G&E's] sole and absolute discretion."

On January 3, 2012, Kupiec introduced Rose, Webb, and Thakar to Pinjuv by email. Rose met Pinjuv in Las Vegas to discuss forming a relationship between NCG and AY. On January 31, 2012, Rose offered Pinjuv a two-year affiliate relationship with AY. On February 13, 2012, after additional communications with Rose and Krugman, Krugman, copying Rose, sent Pinjuv a draft AY affiliation agreement. The original draft agreement listed NCG as the affiliated party; however, Pinjuv's counsel and Krugman advised him to form a new entity all together. Pinjuv incorporated WAC on February 15, 2012 while NCG was still under the Affiliate Agreement with G&E. Pinjuv signed a licensing agreement with AY on February 27, 2012. On March 5, 2012, NCG notified G&E that it intended to terminate its affiliation with G&E.

The Affiliate Agreement allowed NCG to terminate the contract on two-days' notice if G&E was unable to license its brand and service marks. G&E included its brand and service marks as part of the bankruptcy asset sale announced on March 2, 2012. The Affiliate Agreement also

contained a "Termination by Expiration" provision, which allowed NCG to terminate the Agreement at the end of the term with 150 days' notice. When NCG terminated its contract with G&E in March 2012, it elected to rely on the Termination by Expiration provision.

AY acquired a significant number of documents that were created by G&E personnel, and which were produced by AY in discovery during the course of the litigation. NCG produced a significant number of documents containing G&E's logo.

### b. Material Disputed Facts

The parties first dispute the amount of damages with respect to each of Plaintiffs' claim.

#### i.  AY's theft of Trade Secrets

The parties dispute whether the documents produced by the AY defendants are trade secrets, including whether the information was generally known or readily ascertainable, and whether G&E derived independent economic value from the information not being generally known. Additionally, they dispute whether the AY Defendants, Rose, and Kupiec used or disclosed the documents.

#### ii.  NCG and Pinjuv's Theft of Trade Secrets

The parties dispute whether the documents produced by NCG during litigation were the property of NCG. The parties further dispute whether the information was generally known or readily ascertainable, and whether G&E derived independent economic value from the information not being generally known.

#### iii.  Aiding and Abetting Krugman's Breach

The parties dispute whether the AY Defendants and Rose knowingly participated in Krugman's breach of her fiduciary duty to G&E, including whether they encouraged her to share confidential information, whether they participated in her solicitation of G&E personnel, and the extent to which they insisted she represent AY in litigation adverse to G&E.

#### iv.  NCG's Breach of Contract

The parties dispute whether NCG shared confidential information with AY as well the timeline of when any confidential information was shared. Separately, the parties dispute whether G&E materially breached the provisions of the Affiliate Agreement.

v.   Kupiec's Breach of Contract

The parties dispute whether the information that Kupiec shared, as well any information Kupiec failed to return, was trade secret or confidential information, or whether it was instead publicly known. The parties also dispute whether Kupiec directly solicited anyone at G&E and whether Kupiec proximately caused G&E personnel to join AY.

vi.   AY's Tortious Interference with Contract

The parties dispute whether the AY Defendants encouraged or induced Kupiec to leave G&E and bring confidential information and G&E personnel with him. Separately, they dispute whether the AY Defendants encouraged Krugman to bring over and share confidential information and recruit G&E personnel in violation of her employment contract.

vii.   Conspiracy

The parties dispute whether Defendants conspired with one another to divert G&E transactions and commissions, including whether these commissions ever belonged to G&E.

## III.   DISCUSSION

AY Defendants, including Kupiec, Rose; NCG, and Pinjuv move for summary judgment on all the claims asserted by Plaintiffs. Plaintiffs move for summary judgment on all their claims as well. The Court will address the Defendants' threshold arguments first and then assess the arguments as to the underlying claims.

### a.   Judicial Estoppel Does Not Bar the Instant Action

The AY Defendants argue they are entitled to summary judgment because none of the causes of action now asserted were scheduled as assets in the bankruptcy proceeding and Plaintiffs cannot pursue claims that they never acquired.

The Court finds that the debtor in this case, G&E's, failure to schedule the instant causes of actions in the bankruptcy proceeding does not prevent the Plaintiff-Trustees from bringing the current lawsuit. The general rule that bars a plaintiff-debtor from later bringing a lawsuit based on a cause of action omitted from their bankruptcy schedule does not necessarily apply to different parties, such as trustees of the estate who later assert a claim that the debtor failed to disclose. Ah Quin v. Cnty. of Kauai Dep't of Transp., 733 F.3d 267, 271 (9th Cir. 2013) ("[i]f a plaintiff-debtor

omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and obtains a discharge (or plan confirmation), judicial estoppel bars the action."). The Ninth Circuit has not squarely addressed this issue, but In re An-Tze Cheng, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004) recognized that "a position taken by a trustee in litigation that is inconsistent with an earlier position taken by the debtor in litigation to which the trustee is not party, normally is not an inconsistency that warrants imposition of judicial estoppel." Federal courts within this circuit have routinely recognized this distinction as well. See, e.g., Copelan v. Techtronics Indus. Co., 95 F. Supp. 3d 1230 (S.D. Cal. 2015); Lupian v. Cent. Valley Residential Builders, L.P., No. 10CV2270-LAB WVG, 2014 WL 465445, at *7 (S.D. Cal. Feb. 5, 2014) ('the only basis on which judicial estoppel can be applied . . . is if the trustee was complicit in [the debtor's] alleged deception such that it can be accused of taking inconsistent positions. There is no firm evidence of that, and certainly not enough to grant summary judgment to Defendants.").

These opinions have relied on the persuasive reasoning from decisions in the Seventh, Tenth, Eleventh, and Fifth Circuits. See, e.g., Biesek v. Soo Line R. Co., 440 F.3d 410 (7th Cir. 2006) (Easterbrook, J.) ("Decisions that have relied on judicial estoppel assume that the tort claim belongs to the debtor. Only then is one person on both sides of the same issue."); In re Riazuddin, 363 B.R. 177 (B.A.P. 10th Cir. 2007) (finding that even if the debtors could be judicially estopped, there was no basis to apply judicial estoppel to trustee where she never took an inconsistent position); Parker v. Wendy's International Inc., 365 F.3d 1268 (11th Cir. 2004) (similar); Reed v. City of Arlington, 650 F.3d 571, 579 (5th Cir. 2011) (similar).

The Court finds that the traditional justification for judicial estoppel does not apply to the instant action where the trustee is bringing a claim that the debtor failed to disclose. The purpose of judicial estoppel is not served where the initial party is not in privity with the party who is asserting the purported "inconsistent" position. G&E's bankruptcy schedules were drafted and filed by G&E's own outside counsel and G&E's in-house attorney. Although Plaintiffs hired Michael Rispoli, G&E's former Chief Financial Officer who participated in the bankruptcy proceedings, this did not occur until after the bankruptcy court approved the sale of G&E's assets. See In re An-Tze Cheng, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004) ("it would be extraordinary for

the trustee in the garden-variety bankruptcy to be estopped on account of something the debtor did for its own account during the case."). Therefore, summary judgment is not warranted for Defendants based on judicial estoppel.

### b. Standing to Bring Claims

Defendants argue that Plaintiffs generally lack standing because the Court previously found in its Order on the Motion to Dismiss that Plaintiffs did not have standing to bring claims based on post-petition conduct. Having the benefit of the full record at summary judgment, the Court now clarifies its prior ruling on standing.

#### i.  Asset Purchase Agreement

First, the Court finds that some but not all post-petition conduct is actionable by virtue of the Asset Purchase Agreement. G&E sold its assets under the APA to BGC pursuant to 11 U.S.C. § 363(b)(1) which provides that debtors "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 does not define the phrase "property of the estate;" therefore the Court "look[s] to the definitions of 'property of the estate' set forth in other provision of the [Bankruptcy Code]. Matter of Castleman, 75 F.4th 1052 (9th Cir. 2023). 11 U.S.C. § 541(a)(1) defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case." In re Schmitz, 270 F.3d 1254, 1256–57 (9th Cir. 2001) (citing 11 U.S.C. § 541(a)(1)). Assets of the estate include any of the debtor's existing causes of action, which generally must accrue pre-petition to constitute part of the estate. Cusano v. Klein, 264 F.3d 936, 945 (9th Cir. 2001); In re Ryerson, 739 F.2d 1423 (9th Cir. 1984). However, property of the estate also includes any claim that is "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property.'" Segal v. Rochelle, 382 U.S. 375, 380 (1966).

Here, the Amended Asset Purchase Agreement, which was approved by the Bankruptcy Court for Southern District of New York provides: "each Seller agrees to sell, . . . and hereby sells, . . . to Buyer, and Buyer agrees to purchase, and hereby purchases at the Closing, . . . all of Sellers' right, title and interest in, to and under the Acquired Assets *existing as of the Closing regardless*

*of whether any of such Acquired Assets existed before, on or after the commencement of the Chapter 11 Case.*" ECF No. 624-4 at 6 (emphasis added). Plaintiffs ignore the terms "existing as of the Closing" and read this contract provision as providing an unlimited ability to maintain all claims that accrued post-petition. Defendants seek to avoid the parties' contract language all together and argue that Plaintiffs' claims are strictly limited to those that accrued pre-petition. [1]

The Court finds that Plaintiffs acquired interests in all of G&E's causes of action that existed as of the Closing Date of the Asset Purchase Agreement, April 13, 2012. It is undisputed that the closing occurred when BGC purchased the Acquired Assets pursuant to the APA on April 13, 2012.[2] It is also undisputed that the March 27, 2012, Bankruptcy Court Order granting the sale of debtor's assets approved this language in the APA without any modifications. Moreover, in approving the sale, the Bankruptcy Court necessarily determined that the property being sold (i.e. the Acquired Assets) was in fact owned by the debtor, G&E. See March 27, 2012 Bankruptcy Court Order, ECF No. 624-5 at 12 ("a bankruptcy court may not approve the sale of 'property of the estate' without first determining whether the debtor in fact owned the property.") (citing In re Clark, 266 B.R. 163 (B.A.P. 9th Cir. 2001) (holding that the threshold question, is "[the] property still property of the estate, must . . . be decided" before it can be sold free and clear under section 363(f)). The Court further notes that the debtor, G&E, consented to the sale of assets which existed after the petition was filed and as of the closing. Indeed, the plain language implies that this term was an integral part of the consideration for the sale. The Court therefore finds that any legal claims which were fully accrued by the time of Closing are sufficiently rooted in the pre-bankruptcy past and did not impact G&E's ability make an unencumbered fresh start.

ii.   Section 541(a)(7)

Plaintiffs argue that they may bring any cause of action that accrues post-petition under the

---

[1] Defendants do not meaningfully respond to the APA language and instead repeatedly cite to the Court's prior order (and the cases cited in that order) on the motion to dismiss from 2018 in which the Court found that Plaintiffs could not bring any claims that accrued post-petition. However, this language in the APA was not before the Court on the 2018 Motion to Dismiss.

[2] See April 13, 2012 2d Am. APA, at art. VIII, pp. 34, 37, 40–41 (defining "Acquired Assets" to include, in relevant part, "all claims . . . and Causes of Action" and G&E's "Intellectual Property Assets" and broadly defining "Causes of Action" and "Intellectual Property Assets").

theory that it is acquired property of the estate. The debtor has an identity that is distinct from the estate that was created when it filed its bankruptcy petition. In re Doemling, 127 B.R. 954, 955 (W.D. PA 1991). Therefore, any post-petition causes of action that accrue to the debtor personally do not become property of the estate. See id. (finding that cause of action based on personal injury tort committed against debtor after petition was filed was property of the debtor and not the estate). However, the Court acknowledges that § 541(a)(7) permits the estate itself to acquire causes of action that accrued post-petition if the cause of action is "(1) created with or by property of the estate; (2) acquired in the estate's normal course of business; or (3) otherwise be traceable to or arise out of any prepetition interest included in the bankruptcy estate." MacKenzie v. Neidorf (In re Neidorf), 534 B.R. 369, 371–72 (B.A.P. 9th Cir. 2015).

Accordingly, Plaintiffs as trustees of the estate cannot acquire interest in legal causes of action that accrued as to G&E after the Closing, but Plaintiffs have standing to bring claims that arise out of or are created by the property of the estate—the purchased assets—that they acquired through the bankruptcy sale. Such causes of action are the after-acquired property of the estate because any recovery resulting from the claims compensates the estate for injuries to its own property. Therefore, in analyzing Plaintiffs' standing to bring each claim, the Court will assess whether the cause of action arises out of the estate that Plaintiffs acquired through the bankruptcy sale. Plaintiffs have standing to pursue such a claim even if it accrued after the petition was filed and after the Closing.

### iii.   The NCG Affiliate Agreement

Notwithstanding the foregoing, the deadline for accrual of claims based on the NCG Affiliate Agreement is necessarily earlier because the Affiliate Agreement is an executory contract. "An executory contract is one on which performance remains due to some extent on both sides. More precisely, a contract is executory if the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." In re Robert L Helms Construction & Development Co., Inc., 139 F.3d 702, 705 (9th Cir. 1998). "When the debtor secures rejection of a non-assumed executory contract under § 365(g)(1), the date of breach is the day immediately prior to the filing

of the bankruptcy petition." In re Aslan, 909 F.2d 367, 371 (9th Cir. 1990).

The undisputed facts at summary judgment confirm that G&E rejected the G&E-NCG Affiliate Agreement on January 31, 2013. The Court incorporates by reference its reasoning from the 2018 Order on the Motion to Dismiss and finds that that the rejection of the Affiliate Agreement, which was as an executory contract, constituted a material breach by the Plaintiffs backdated to the day before the petition was filed. In re Aslan, 909 F.2d at 371. Plaintiffs may not sue for any alleged post-petition breach of the Affiliate Agreement because G&E had already breached the agreement itself no later than the day before the filing of the petition. See Bradley v. Nevada C. O. R. Ry., 178 P. 906, 908-09 (Nev. 1919) ("[T]he party who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform.").

Plaintiffs therefore have standing to bring claims arising from the breach of the Affiliate Agreement only to the extent those claims accrued on or before February 19, 2012. This applies to the breach of contract claim against NCG; the tortious interference with contract claim against Pinjuv; and the portion of the tortious interference with contract claim against the AY Defendants that is based on the Affiliate Agreement.

To summarize, Plaintiffs may bring causes of action that accrued on or before the closing date, April 13, 2012. Plaintiffs may bring causes of action that accrued post-closing only if the claim meets the test for estate property outlined in In re Neidorf (e.g. arises out of or is created by estate property). Finally, Plaintiffs may only bring claims based on a breach of the Affiliate Agreement if the claim accrued on or before February 19, 2012.

### c. Plaintiffs' Claims are not Barred under Res Judicata

Defendants argue that the prior New York state court judgment against Plaintiffs bar the instant suit under res judicata, or claim preclusion. "A federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City School Dist. Bd. Of Educ., 465 U.S. 75, 81 (1984). The Court therefore looks to New York law to determine the preclusive effect. To establish claim preclusion under New York law, "a party must show: (1) a final judgment on the merits, (2) identity or privity of parties, and (3) identity of claims in the two actions." Paramount

<u>Pictures Corp. v. Allianz Risk Transfer AG</u>, 31 N.Y.3d 64, 73 (2018). Defendants and Plaintiffs dispute whether each of these elements are met. The Court need not reach all three elements because, as explained below, the Court does not find that there is identity of claims.

Under New York law, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'" <u>Id.</u> "To ascertain whether two actions spring from the same 'transaction' or 'claim,' courts look to 'whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" <u>Id.</u>

Plaintiffs attempted to bring an action in New York state court that would allow them to litigate all the individual affiliate conspiracies at the same time in the same venue, but the New York court rejected this; dismissing AY-Nevada and several other regional affiliates for lack of personal jurisdiction. It found that the complaint "wholly failed to allege that the activity of AY-New York was to the benefit of any of the other AY regional affiliates; that AY-New York was acting at the direction or under the control of the AY regional affiliates; or that such entities were aware of the effects of any activity on their part in New York." <u>BGC Partners, Inc. v. Avison Young (Canada) Inc.</u>, 5 N.Y.S.3d 327, at *6 (N.Y. Sup. 2014).

The Court finds that the facts underlying the Nevada conspiracy in this case are separate and distinct from the facts underlying the conspiracy litigated in New York. Although Plaintiffs have alleged that the various affiliates entered into agreements with common defendants—Mark Rose/ and AY-USA—the claims in the New York case appear to have focused on the conduct between Mark Rose, AY-USA, and AY-New York; and after AY-NV's dismissal, did not involve allegations related to the Nevada conduct or defendants. Here, the TAC asserts conduct among Rose, Kupiec, and Pinjuv; and the relevant conduct all occurred in Nevada. There are no allegations that the actions in Nevada were connected to, influenced by, or affected any of the other regional affiliates; nor that the Nevada defendants were aware of the other affiliate actions, including any actions in New York. The actions in Nevada arose out of a distinct series of transactions.

Second, as evidenced by the New York court judgment, trying the claims together in one jurisdiction does not constitute a "convenient trial unit." <u>Paramount</u>, 31 N.Y.3d at 78. Nor does it "conform with the parties' expectation." <u>Id.</u> Parties do not expect that they will be hailed into a foreign jurisdiction where there is an absence of minimum contacts and where none of the alleged tortious harm occurred.

Finally, the primary purposes of res judicata in New York— "to ensure finality, prevent vexatious litigation and promote judicial economy" are not implicated here. Plaintiffs are not attempting to get a second bite at the apple. They tried to consolidate all the actions in one proceeding; when AY-Nevada was dismissed from the New York case for lack of personal jurisdiction, they filed this action less than four months later in a forum where they could properly exercise jurisdiction over the Nevada defendants. <u>BGC Partners,</u> 5 N.Y.S.3d at *8 ("BGC is not without a remedy, but must pursue it in a more appropriate forum"); <u>Xiao Yang Chen v. Fischer,</u> 6 N.Y.3d 94 (2005) ("unfairness may result if the doctrine is applied too harshly; thus "[i]n properly seeking to deny a litigant two 'days in court,' courts must be careful not to deprive [the litigant] of one."). Plaintiffs' claims are therefore not precluded under res judicata.[3]

### d.  Expert Testimony on Damages

Before turning Plaintiffs' substantive claims, the Court briefly addresses the parties' motions on expert testimony and its relation to the issue of damages. In their motions for summary judgment, Defendants argue that Plaintiffs have adduced no admissible evidence of damages for each of their claims. Defendants expand on these arguments in their motion to exclude the testimony of Plaintiffs' expert, Christopher Spadea. Defendants challenge Spadea's Supplemental Report dated October 17, 2022. Plaintiffs have also moved to exclude portions of Defendants' Rebuttal Expert, Carlyn Irwin's, testimony as well.

---

[3] Defendants also assert that the D.C. Superior Court's summary judgment decision which found that certain categories of documents were not trade secrets collaterally estopped Plaintiffs from litigating that issue here based on the same set of documents. Plaintiffs accurately note that this decision has since been vacated and reversed. Under D.C. law, "Reversal of a decision renders it invalid, and application of collateral estoppel clearly should not be based upon an invalid decision." <u>Murray v. Goodwin</u>, 852 A.2d 957, 959 (D.C. 2004). Therefore, Plaintiffs' claims are not barred under collateral estoppel either.

Under the Federal Rules of Evidence 702 and Daubert, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

"The district court judge must ensure that all admitted expert testimony is both relevant and reliable." Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1232 (9th Cir. 2017). "The focus of the district court's analysis must be solely on principles and methodology, not on the conclusions that they generate," and the court's task "is to analyze not what the experts say, but what basis they have for saying it." Id. (emphasis added). The district court may consider "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." Id.; see also Grodzitsky v. Am. Honda Motor Co., 957 F.3d 979, 984-85 (9th Cir. 2020).

"Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." Elosu v. Middlefork Ranch Inc., 26 F.4th 1017, 1024 (9th Cir. 2022). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1044 (9th Cir. 2014) (internal citation omitted).

The Court has considered the parties' respective objections to their opponents' expert witness and finds that both experts are qualified and have used widely accepted methodologies in coming to their conclusions on damages.

The Court finds that the majority of Defendants' objections to Spadea's testimony go to the weight and credibility of his analysis and not to its admissibility. See Alaska Rent-A-Car, 738 F.3d at 969 (9th Cir. 2013) (holding that damages challenges based on the choice of comparator

- 15 -

company and use of the national rather than Alaska market as a baseline went to weight of the testimony and its credibility, not its admissibility); Mattel, Inc. v. MGA Ent., Inc., 782 F. Supp. 2d 911, 1046 (C.D. Cal. 2011) (denying motion to exclude even though certain trade secrets originally considered within the calculation were no longer deemed trade secrets).

With respect to Spadea's cost-to-recreate methodology, the Court finds that Spadea reasonably relied on individuals with extensive experience in commercial real estate. Defendants acknowledged during oral argument that there is no readily available repository that provides information on the number of hours or costs involved in creating various commercial real estate documents. The Court also finds it significant that the market-based method served as the ultimate measure of damages and the cost-to-create methodology was used to "test" the market-based approach. Although some of the assumptions underlying the cost-to-recreate method appear to the Court to be atypical, the Court does not find that it is "unreliable nonsense." City of Pomona, 750 F.3d at 1044. Rather this the type of "shaky but admissible evidence" that "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Id. (quoting Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010)).

As to Defendants' expert, Irwin, the Court finds that most of Plaintiffs' objections mirror those of Defendants insofar as they challenge Irwin's choices to rely on certain baseline assumptions in reaching her conclusions. The Court agrees with Plaintiffs that the scope of Irwin's testimony must not exceed that of Spadea's. However, objections of this nature will necessarily depend on the actual scope of Spadea's live testimony at trial. Plaintiffs may object to Irwin's rebuttal testimony if it exceeds the scope of their own expert's testimony. Plaintiffs may also object to expert testimony that is based on improper legal conclusions or is outside of Irwin's expertise.

The Court finds that both parties have submitted admissible expert testimony and therefore denies both motions to exclude without prejudice. The Court further finds that the competing expert testimony has established a genuine issue of material fact on damages; therefore, summary judgment is not warranted for either party on this issue with respect to the underlying claims.

### e.  Theft of Trade Secrets – AY Defendants

The Court finds that BGC acquired interest in the underlying information that is alleged to

be a trade secret. <u>See</u> April 13, 2012, 2d Am. APA, at art. VIII, pp. 34, 37, 40–41 (defining "Acquired Assets" to include, in relevant part, G&E's "Intellectual Property Assets" and broadly defining "Intellectual Property Assets"). Accordingly, any misappropriation of this property is created by and arises out of assets that BGC acquired from the bankruptcy sale. Plaintiffs therefore have standing to assert their trade secret claim based on conduct that occurred post-Closing.

Under the NUSTA, a "trade secret" is defined as "(a) information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction or code. NRS § 600A.030(5). Under the NUSTA, to establish that the information is a trade secret, a Plaintiff must allege the asserted trade secret (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain economic value from its disclosure or use; and (2) is a subject of efforts that are reasonable under the circumstances to maintain its secrecy. <u>Id.</u> "Whether information is a trade secret generally is a question of fact." <u>Finkel v. Cashman Pro., Inc.</u>, 270 P.3d 1259, 1264 (Nev. 2012).

Defendants argue that none of Plaintiff's information constitutes a protectable trade secret. Plaintiffs fully dispute this contention as to every single document. Plaintiffs alternatively argue that the Court need not do a document-by-document analysis because Defendants stole G&E's entire "platform." Plaintiffs assert the platform is protectable regardless of whether any of the individual components constitute trade secrets.

Although the Court acknowledges that combinations of information can constitute a trade secret even if some of the individual components are publicly known, the Court rejects Plaintiffs' attempt to effectively add an additional trade secret to their list. Plaintiffs are now arguing for the first time after years of discovery that G&E's entire platform is a protectable combination or compilation trade secret. The Court finds that this is in direct contravention of Judge Youchah's order on discovery sanctions, which held that the August 12, 2022 trade secret list constituted "the entirety of the trade secrets they claim were misappropriated by Defendants" and "absolutely no other information, additions, edits, changes or modifications of any kind [were] to be made to the

trade secret list." ECF No. 615 at 7. That list does not assert the existence of any type of "platform" trade secret. Plaintiffs' TAC never alleged that the misappropriated trade secrets were part of a platform, combination, or compilation.[4] Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292-93 (9th Cir. 2000) (plaintiff cannot allege one theory of liability in the complaint and "turn around and surprise the [defendant] at the summary judgment stage" with a different theory of liability). As such, the Court will undertake a category-by-category analysis.

i.  Categories of Documents for which Summary Judgment is Denied

There are material factual disputes regarding whether the following nine categories of documents are trade secrets: Documents for which Use/Disclosure is Contested; Key Hire Financial Analysis Spreadsheets; Salespersons Policies and Procedures Manual; Brokers' Personal Client Lists and Deal Lists; Operational Materials; and the allegedly "Stale" Documents.

1. *Documents for which Use/Disclosure is Contested*

Defendants argue that summary judgment is warranted in their favor on thirty-seven documents that were valued by Plaintiff's expert, Spadea, and are included in the trade secret list. Defendants assert Plaintiffs cannot establish "misappropriation" for any of these documents because there is no evidence that any AY director, officer, or employee ever saw these documents or used them. Additionally, none of these thirty-seven documents were included in the expert report of Laurence Lieb, Plaintiffs' forensic expert tasked with analyzing whether certain documents were used or disclosed. Defendants further argue that bates labels showing that the documents were in AY's possession are insufficient to show that the AY Defendants or Rose "used or disclosed the trade secret." Plaintiffs dispute each argument and attach an appendix providing factual support related to use and disclosure for each of these documents.

UTSA defines "misappropriation" as: "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade

---

[4] The Court notes that the parties have characterized the categories of documents differently from one another. The Court generally follows Defendants organizational approach because they divided the trade secret list into more precise categories.

secret was: (I) Derived from or through a person who had used improper means to acquire it; (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use. NRS § 600A.030.2(b)-(c). "Improper means" includes theft, misrepresentation, and the willful breach or inducement to of a breach of a duty to maintain secrecy or of a duty imposed by common law, statute, contract, or license. NRS § 600A.030(1).

The Court has reviewed Plaintiffs' Appendix 1 and finds that Plaintiffs have provided sufficient evidence that raises genuine issues of material fact as to whether this category of documents was used or disclosed by the AY Defendants. Plaintiffs identify emails that show several of these documents were sent to an AY executive or employee. For example, Neil Resnick, a former employee of G&E and Managing Director of AY-Los Angeles, sent the G&E University training manual to all members of the "AY University Committee" for their consideration. Plaintiffs also submit another email that was sent one year later, containing the new "AY University" manual, which resembles the original G&E University manual. Plaintiffs point to the substantial similarity between several other documents—confidential offering memorandums, proposals for brokerage services, property-management proposals, management agreements, lease renewal proposal, broker opinions of value & broker price opinions. This combined with the fact that AY produced these documents in discovery, and therefore had access to them, is sufficient evidence to create a genuine issue of disputed fact that AY used these G&E's documents to create their own. See Frantz v. Johnson, 116 Nev. 455, 999 P.2d 351 (2000) (finding adequate circumstantial evidence to establish misappropriation at trial); 91 Am. Jur. Proof of Facts 3d 95 ("A plaintiff can rely on circumstantial evidence to prove misappropriation since direct evidence is often not available. This evidence must demonstrate that the misappropriating party had *access* to the secret and the secret and the defendant's design *share similar features.* The question of whether a trade secret has been misappropriated in a given case is a question of fact for the jury to decide.") (emphasis added).

Plaintiffs also point to metadata associated with other documents that shows the documents were created at G&E and then modified later while at AY. For example, the metadata associated

1

2

3

with Krugman's files shows that Krugman interacted with these documents at AY. Additionally, emails submitted by Plaintiffs show that AY's IT personnel helped Krugman reorganize her documents from G&E so she could more easily use them.

4

5

6

7

8

9

Assuming the disputed facts in the non-moving party, Plaintiffs' favor, the Court finds that Plaintiffs have submitted sufficient rebuttal evidence to withstand summary judgment as to whether the AY Defendants used or disclosed this set of documents. The only exception is Defendants' exhibits 29, 30, and 40 because Plaintiffs have provided no circumstantial evidence of use or disclosure and only cite to Sheinkop's testimony about the value of the documents. Therefore, summary judgment is denied as to the Defendants on this category of documents.[5]

10

### 2. Key Hire Financial Analysis Spreadsheets

11

12

13

The parties dispute whether the information contained in the Key Hire Financial Analysis Spreadsheets were generally known or readily ascertainable by proper means. These spreadsheets contain revenue assumptions and formulas.

14

15

16

17

18

19

20

Former G&E employee, Hiren Thakar, testified that he created these spreadsheets at G&E and could have easily recreated them at AY. Thakar stated that he created the formula with pre-existing knowledge; the formula is simply "math;" and the original spreadsheet may have been created at any of the prior firms he worked for. However, Plaintiff's witness, Alison Lewis, Newmark's CAO, and Michael Rispoli, Plaintiffs' 30(b)(6) witness on trade secrets, both testified that company's process in developing the formulas and spreadsheets is an iterative process that takes time to develop and is the product of experience, as well as trial and error.

21

22

23

24

25

26

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could find that portions of these spreadsheets are not readily ascertainable. Although trade secret law does not prevent an employee from using their talent and expertise elsewhere, Plaintiffs' testimony nonetheless creates an issue of fact as to whether the formulas were developed by and specific to G&E. United States v. Nosal, 844 F.3d 1024, 1042 (9th Cir. 2016) ("The fact that some

27

28

---

[5] The Court notes it is only making a finding as to the "misappropriation" element with respect to these documents. Defendants may be entitled to summary judgment on some of the documents in this category based on the Court's finding that there is no genuine issue of fact as to whether the document constitutes a trade secret.

1   or all of the components of the trade secret are well-known does not preclude protection for a

2   secret combination, compilation, or integration of the individual elements."). Although Defendants

3   dispute Lewis's testimony because she did not work for G&E and was not involved with creating

4   the documents at issue, Lewis did not purport to testify on the process of creating the exact spread

5   sheets at issue. Instead, she testified on the general process that companies go through to create a

6   spreadsheet such as this one. Testimony on this topic is within her personal knowledge as a

7   commercial real estate professional.

8       Summary judgment is therefore denied on the Key Hire Financial Analysis Spreadsheets.

9   This includes Barton Hyde's and Debra Sinclair's Key Hire Financial Analysis spreadsheets, as

10  well as the Hyde Business case.[6]

11              3.   *Salesperson Policies and Procedures Manual*

12      Defendants argue that G&E's Salesperson's Policies and Procedures Manual is not a trade

13  secret. They assert that Plaintiff has filed this manual publicly in a separate court case and Rispoli

14  testified that he was unaware of efforts taken by Newmark to have the document taken down.

15  Plaintiffs note that the publicly-filed document was Newmark's policy manual, not G&E's. Lewis

16  further testified that the 199-page manual was a "comprehensive playbook on how G&E's business

17  operated" and "took a tremendous amount of time" to create. Lewis and Rispoli also testified that

18  the manual was updated over the years as G&E's business became more sophisticated and this

19  document would be extremely valuable to competitors.

20      Internal company manuals such as these qualify as compilation trade secrets where the

21  compilation of information is valuable and reasonable efforts were taken to maintain its secrecy.

22  See In re Worlds of Wonder Sec. Litig., 147 F.R.D. 214 (N.D. Cal. 1992). First, Plaintiffs provide

23  evidence that G&E took reasonable measure to keep all its documents (including the manual)

24  secret by imposing password and computer log-off requirements, controlling office access,

25

26      [6] The "Hyde Business Case" is an AY power point presentation prepared in July 12 related to Hyde's hiring.
    Defendants assert it is not a trade secret because it includes basic Internal Rate of Return calculations, and the
27  information could be acquired through general knowledge. Plaintiffs make the same argument here as they do with
    respect to the Key Hire Spreadsheets. Summary judgment is therefore denied for the same reasons discussed in
28  reference to the Key Hire Spreadsheets.

requiring personnel and affiliates to enter into confidentiality agreements, and limiting access to internal access to information (e.g. brokers could not access one another's file folders without permission). MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993) (finding company took reasonable steps to protect its trade secret information by requiring employees to sign confidentiality agreements respecting its trade secrets). Moreover, as discussed above, even if specific information in the manual, such as information about G&E's history, would not on its own qualify as a trade secret, Plaintiffs have created a genuine issue of fact as to whether the unique compilation of information—the Salesperson's Manual as a whole—was not generally known. See Nosal, 844 F.3d at 1042. Finally, Rispoli and Lewis's testimony raises a triable issue as to whether G&E derived independent economic value from the Manual. Summary judgment is accordingly denied as to Defendants on the Salesperson's Policies Manual.

### 4. Brokers' Personal Client Lists and Deal Lists

Defendants next argue they are entitled to summary judgment on documents with the real estate broker's personal record of completed deals ("deal lists") and the broker's client lists. Defendants assert that the broker's personal client lists are not difficult to compile and deal lists are not secret in the real estate industry where information about transactions is published in the business press. Defendants independently argue that Plaintiffs offer no evidence that the active listing and management agreements Kupiec sent to himself were misappropriated or related to the AY Defendants.[7] Plaintiffs assert that all the documents in this category are trade secrets. Plaintiffs point to testimony from David Falk, the president of Newmark's tri-state region, who testified that these lists belong to the employer, that he would not be able to take these lists with them and they are not publicly available. Lewis also testified that client lists are owned by the firm, not the broker.

The Court finds that there are genuine issues of fact as to whether the deal lists and client lists are trade secrets. Customer lists are commonly found to be protectable trade secrets where the company derives economic value from the list and effort has been expended into developing the list. See MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993). Defendants

---

[7] The Court has already addressed this argument as it relates to this document. See *supra* Section V.f.i.1.

do not cite any evidence in the record to support their contention that "it is not difficult" to compile the client lists. Moreover, Defendants' assertion that real estate professionals often have their deals publicized does not entitle Defendants to summary judgment where Defendants have not identified any publication in which the specific information on these deal lists was shared. By contrast, Plaintiffs have submitted testimony that these types of lists are not generally known because employees know they may not use these lists outside of their employment with their company. Summary judgment is denied with respect to all the client lists and deal lists. Frantz v. Johnson, 999 P.2d 351, 358 (2000) ("The determination of whether corporate information, such as customer and pricing information, is a trade secret is a question for the finder of fact").

5. *Operational Materials*

Defendants assert the thirty documents within this category are non-secret and standard form templates that contain nothing beyond industry knowledge. Defendants further argue that none of the documents in this category represent any special information that derived value from being secret. Defendants point to the historical operating statements, EBITDA calculations for G&E, and a universal transaction form with blanks for clients to enter their information as examples. Defendants also cite Rispoli's deposition where he testified a particular G&E employee handbook was not a trade secret.[8] Plaintiffs provide an appendix with counter-factual support for each of these documents.

The Court has reviewed Plaintiffs' Appendix 4 and finds that Plaintiffs have provided sufficient evidence to withstand summary judgment on this category of documents. First, Defendants do not undispute provided evidence that these documents were in fact "widely shared." Instead, the vast majority of documents appear to have been internally distributed to groups of G&E executives and employees and were often designated "For Internal Use Only." See United States v. Chung, 659 F.3d 815, 825–26 (9th Cir. 2011) (noting that "oral and written understandings of confidentiality" can qualify as "reasonable measures" to keep information confidential). See Nevada Independent v. Whitley, 506 P.3d 1037, 1044 (Nev. 2022) ("It is well-

---

[8] The Court notes that Rispoli's testimony on the handbooks is different than his testimony on the "Salesperson Policies & Procedures Manual" which he claimed was a trade secret in its entirety.

established that a confidential disclosure of a trade secret to an employee does not negate the disclosed information's status as a trade secret."). And as previously discussed, Plaintiffs have submitted evidence that G&E took reasonable measures with respect to all its documents.

Plaintiffs have also raised a triable issued as to whether the documents constituted trade secret information. Many of these documents, such as the training manuals, marketing strategies, personnel evaluation processes, deal tracking forms, referral policies, acceptable use policies, and commission collection policies, contained G&E's plans, business concepts, know-how, and strategy. Plaintiffs' witnesses' have created a question of fact on whether the documents were generally known or readily ascertainable because they uniformly stated that the compilation of information within the individual documents themselves could not be easily duplicated without considerable time, effort, or expense. For example, the G&E University training manual is a 400-page document, developed over 23 years, and characterized by Plaintiffs as "the most comprehensive skills-development program in the industry." Even though some of the documents in this category are templates, templates can also qualify as trade secrets. See, e.g., Aerodynamics Inc. v. Ceasars Ent. Operating Co., No. 2:15-CV-01344-JAD, 2015 WL 5679843, at *9, *11 (D. Nev. Sept. 24, 2015) (finding that a budget "cost template" qualified as a trade secret under Nevada law). Again, Rispoli and Sheinkop testified that G&E spent considerable time and resources developing and refining these templates; and that these templates gave G&E an advantage over new U.S. market participants.[9]

The Court finds that Plaintiffs have put forth sufficient evidence to raise a material triable issue as to whether the information in the documents in this category was generally known, whether the documents were subject to reasonable measures of secrecy, and whether the documents derived independent economic value for G&E from not being generally known. The Court denies summary judgment as to every document in this category.

### 6.  *"Stale" Documents*

Defendants argue that they are entitled to summary judgment on nineteen separate

---

[9] Defendants dispute this testimony as lacking foundation, which the Court rejects for the same reasons already discussed in relation to Lewis's testimony above.

documents that they have classified as "stale" because they assert these documents were badly outdated on their face by the time the relevant brokers changed firms and therefore Plaintiffs cannot establish value. Plaintiffs attach Appendix 5 which individually counters why each of these 19 exhibits are (or were not) stale at the time they were misappropriated. Plaintiffs counter that several of these documents show that they were valuable *when taken* from G&E. For example, exhibit 73 is a 2010 email from Kupiec to Rose containing G&E's annual Las Vegas operating statements for the past ten years. Kupiec sent this information to AY to help AY decide whether to open a Las Vegas office. Plaintiffs also point to Exhibit 52, which is the second half of the G&E training manual. Plaintiffs note that Defendants have provided no evidence that this training manual "went stale." As evidenced by one of the G&E training manuals, which appears to have been used to develop the AY training manual, a document can be "old" and still relevant and useful to the person who acquired it. The Court cannot make this determination based on the face of these documents; especially where Defendants fail to mark arguments specific to the documents and instead assert the entire category is stale. Whether the documents are useful is a question of fact for the jury. Therefore, summary judgment is denied as to every document within this category.

### 7. Category 2 Documents

Finally, the AY Defendants argue that they are entitled to summary judgment on the "Category 2 Documents" because Plaintiff's expert did not include these documents in his expert valuation and the jury would be left to "speculation or guesswork in determining the amount of damages award." Plaintiffs respond that Spadea *did* place a value on these documents because although he did not include these documents in his cost-to-recreate analysis, he covered them under his reasonable-royalty analysis. The cost-to-recreate calculation took a sample of the trade secrets at issue and was used to test the reasonable royalty rate analysis (i.e. the market-based approach). This analysis looked at the value of the entire license, which is not necessarily the raw number of documents. Because the reasonably royalty analysis estimated the value of a hypothetical license using comparator licenses, the jury would not be left to speculation or guesswork simply because certain individual documents were left out of the cost-to-recreate calculation. The Court therefore denies summary judgment for this category of documents.

1

2
       ii. Categories of Documents for which Summary Judgment is

        Warranted

3

4
   The Court finds that there are no genuine issues of material fact as to some of the

5
documents in the following six categories: Documents Owned By, and Contracts with, G&E's

Clients; Leases and Lease Renewal Information; Broker Opinions of Value prepared for Third

6
Parties; Marketing Proposals Shared with Clients without an NDA; Confidentiality Agreement

7
Template that Krugman Forwarded/Used, and G&E Property/Tenant Action Request. Defendants

8
put forward evidence that the information in the documents in each of these four categories was

9
generally known or ascertainable through proper means. The undisputed evidence is that these

10
documents were shared with third parties outside of the company.

11
   Plaintiffs fail to offer evidence that these documents were either designated confidential or

12
shared under a confidentiality agreement. Instead, they argue that limited disclosure of documents

13
to clients does not deprive the entire collection of documents from trade secret protection and argue

14
that although these documents may not constitute trade secrets by themselves, they are a

15
protectable trade secret when considering the combination of all of the documents together.

16
   First, while disclosures to employees do not deprive a document of trade secret protection,

17
disclosures to third parties, without designating the document as confidential, generally will.

18
Walker v. Univ. Books, Inc., 602 F.2d 859, 865 (9th Cir. 1979) ("a substantial element of secrecy

19
must exist, so that, except by the use of improper means, there would be difficulty in acquiring the

20
information."); Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161 (9th Cir. 1998) (finding

21
reasonable measures taken where company included a confidentiality provision in each of its sales

22
or lease agreements with customers).

23
   Plaintiffs attempt to recategorize many of these client- and vendor-facing transactional

24
documents as "templates" but there is a meaningful distinction between a template that is

25
developed and shared internally, on the one hand, and a transactional document or marketing

26
proposal that is routinely shared with outside parties under no confidentiality provision or

27
designation. Plaintiffs repeatedly, and conclusory, state that "limited disclosure" does not negate

28
trade secret status. This assertion is belied by the large number of marketing proposals, lease

agreements, broker opinions of value that were prepared for various third parties and that are part of this category.

Second, unlike the G&E Policy Manual, which the Court has found may qualify as a compilation trade secret even though aspects of it may be generally known, Plaintiffs do not provide evidence that any of the above individual categories of documents actually existed as a compilation. Moreover, the Court has already found that Plaintiffs may not assert a trade secret claim based on the "G&E Platform" combination trade secret that was not previously pled or disclosed to Defendants. Because Plaintiffs' only viable argument as to each of these categories of documents is based on them being protectable in a compilation form, the Court finds that they have failed to provide evidence to create a genuine issue of fact as to whether the documents are trade secrets. Therefore, Defendants are entitled to summary judgment on these four categories of documents.

However, the Court denies summary judgment on Defendants' exhibits 60, 67, 38, 68, 41, and 72. These documents each contained a confidentiality provision and therefore factual issues remain as to whether the information was readily ascertainable and whether G&E took reasonable steps to ensure secrecy.

### f.   Theft of Trade Secrets – NCG and Pinjuv

The Court now assesses Defendants NCG and Pinjuvs' motion for summary judgment as it relates to Plaintiffs' trade secret claim.

### i.   Misappropriation

Defendants NCG and Pinjuv assert that they are entitled to summary judgment because Plaintiffs have presented no evidence of misappropriation. Plaintiffs' 30(b)(6) witness, Graubard, identified only three documents that NCG accessed under the G&E Affiliate Program and transferred to the new entity, WAC. Defendants assert there is no evidence that Pinjuv shared any of these three documents with any other person or accessed the documents after NCG terminated its affiliation with G&E. Defendants further argue that there is no evidence any of these three documents were in AY's possession. Former Chief Information Technology Officer for AY, Hanna, testified that AY does not current and never has had any access to NCG or WAC's

document server of its cloud hosted storage.

The Court finds that Plaintiffs have raised a genuine issue of material fact related to whether NCG and Pinjuv misappropriated the documents by improper means. Plaintiffs point out that when Graubard identified the three trade secret documents at issue, he expressly stated that "there may be others."  Plaintiffs further explain that Graubard was not designated to testify on the topic of trade secrets and the phrase "trade secrets" was never used in NCG and Pinjuv's counsel's question. Plaintiffs note that the documents at issue were produced by NCG, Pinjuv, and WAC during discovery and Pinjuv testified that he was aware of the Affiliate Agreement provisions, which required NCG not to disclose G&E's confidential documents and return all confidential documents upon terminating its affiliation with G&E. Additionally, Plaintiffs forensic expert, Lieb, opined based on the documents and metadata he reviewed, that "it was reasonable to conclude that . . . Pinjuv and WAC had possession of, and utilized, [G&E] documents and information after affiliation with [AY]." Lieb described over forty G&E confidential or trade secret documents that remained within NCG and WAC's possession after NCG terminated its affiliation with G&E and affiliated with AY. Lieb also opined that an IT professional uploaded the NCG emails into the email server for AY once NCG personnel began doing business as WAC. The testimony of Frederito, NCG and WAC's IT consultant, corroborates this opinion. Pinjuv further testified he did not ask G&E to remove NCG's G&E email access after WAC affiliated with AY.

Furthermore, it is important to note that Plaintiffs are asserting NCG and Pinjuv misappropriated the information on this claim; not AY. Therefore, contrary to Defendants' arguments, Plaintiffs do not need to establish that NCG or Pinjuv disclosed information to AY, or that AY had access to NCG's/WAC's servers, to succeed on their trade secrets claim against NCG and Pinjuv. Further, the Court accepts Graubard's express reservation that "there may be others" in addition to the three examples he cited and finds that Plaintiffs' opposition does not contradict this testimony. The Court also deems it significant that Graubard was not Plaintiffs' designated witness on the topic of trade secrets. Fed. R. Civ. P. 30(b)(6) ("the named organization must designate one or more [individuals] who consent to testify on its behalf; and it may set out the matters on which each person designated will testify"). With respect to misappropriation, it is

undisputed that the provisions of the confidentiality agreement would make it improper to acquire and retain any trade secrets upon termination of the Affiliate Agreement. "Improper means" includes breach of a duty imposed by contract or license, NRS § 600A.030(1), and Pinjuv, NCG, and WAC were on notice of this provision. As noted, Plaintiffs' forensic expert has opined that over forty documents remained with NCG and WAC after the Affiliate Agreement was terminated and stated that WAC indiscriminately uploaded all the NCG's emails to the new AY email account. The Court therefore denies summary judgment on misappropriation grounds.

ii.   Whether the Information Constitutes a Trade Secret

The parties dispute the number of trade secrets that were misappropriated. They also disagree on whether the documents at issue qualify as trade secrets. NCG and Pinjuv argue that Plaintiffs have only adduced evidence of three trade secrets within its possession, the same three documents that Graubard identified. Plaintiffs respond that NCG and Pinjuv misappropriated over fifty trade secrets. NCG and Pinjuv assert that Plaintiffs have conceded a trade secret argument based on any additional documents. Alternatively, NCG and Pinjuv argue that the vast majority of documents were the property of NCG, not G&E. NCG also expressly adopts and incorporates by reference the AY Defendants' arguments with respect to Plaintiffs' trade secret claim.

*1.   Three Documents Identified by Graubard*

The Court first addresses the three documents identified by Graubard: Exhibit M, N, and O. Exhibit M is a summary of topics discussed in an affiliate leadership call in March 2010. Defendants assert this contained a high-level synopsis of largely public information about G&E and its affiliates. They cite Graubard's testimony who acknowledged there were public components to the document but could not distinguish between what was private versus public. Exhibit N is a summary of an Affiliate Principal Call, which Defendants state is similar to information Exhibit M. Graubard did not know who was on the affiliate call and did not mark the document with any confidentiality designation. Exhibit O is a summary of an Affiliate Leadership Team Meeting from April 2010. Defendants assert this information is similar to Exhibits M and N. Defendants also state that it did not contain any confidentiality or "internal use" designation.

The Court finds that each of these documents is substantially similar to several of the

- 29 -

"operational material" documents which the Court has already addressed and for which it has denied summary judgment. See, e.g., AY Defendants' Exhibits 51, 55, 57, 91, 93. The Court adopts and incorporates by reference its reasoning with respect to those documents. The Court further notes that there are triable issues of secrecy as to whether G&E took reasonable measures to protect the documents' secrecy. Exhibit M and N were both distributed only internally and labelled "For Internal Use Only." See Chung, 659 F.3d at 825–26. Genuine issues related to secrecy remain for Exhibit O as well because although it was not marked confidential, it was nonetheless subject to a Confidentiality Agreement, which was executed as part of the Affiliate Agreement. See Peak Computer, 991 F.2d at 521. The agreement required NCG to maintain confidential and trade secret information, including "strategic plans or initiatives," in "strict confidence." ECF No. 662-1 at 109. Further, there is no evidence that the exhibits were distributed to anyone other than G&E Affiliates and Plaintiffs have put forward evidence that each Affiliate was required to sign its own agreement which included a confidentiality provision. See id; Whitley, 506 P.3d at 1044. A reasonable juror could therefore find that G&E took reasonable measures to protect the document's secrecy as well.

The Court further finds genuine disputes of fact as to whether the information contained in each of the exhibits was generally known. Graubard testified that the information was confidential, and the documents appear to contain sensitive information regarding G&E's business strategy. Nav N Go Kft. v. Mio Tech. USA, Ltd., 2009 WL 10693414, at *21 (D. Nev. June 11, 2009) (finding information relating to plaintiff's business model, including the pricing of licenses, the reporting of sales, the payment of royalties appeared "to qualify as valuable trade secrets). Therefore, summary judgment is denied as to these three documents.

### 2.   Remaining Documents

The Court addresses Defendants' ownership argument first. As noted, NCG and Pinjuv argue that the vast majority of documents were not G&E documents at all. Rather they were prepared by and were the property of, NCG, WAC, and their respective brokers and clients. Although the documents contained a G&E logo, NCG argues that it was required to put G&E tradename on its materials as part of its Affiliate Agreement. Plaintiffs respond by citing to the

Affiliate Agreement, which states that the proprietary information G&E shared with NCG remained G&E's "sole and exclusive property." The Affiliate Agreement also provides that information NCG and Pinjuv accessed over G&E's eNet were G&E's "confidential proprietary information and trade secrets." Plaintiffs also point to the confidentiality agreement that NCG was required to execute. This required NCG, upon terminating the Affiliate Agreement, to immediately return all proprietary information, including trade-secret information, to G&E.

Because Defendants have not provided the Court with an undisputed list of documents which they claim were owned by NCG and not G&E, the Court cannot discern on summary judgment the extent of the documents that fall into this category (i.e. those that were created by NCG with G&E's logo versus those which were prepared by G&E and accessed from G&E's eNet). Therefore, the Court denies summary judgment on this ground.

While NCG and Pinjuv incorporate the AY Defendants' arguments as to the remaining documents, the parties have not identified the scope of the overlap between the documents included in the AY Defendants' motion for summary judgment on Plaintiffs' trade secrets claim and the documents which Plaintiffs assert NCG and Pinjuv misappropriated. The Court has compared the bates numbers referenced in the AY Defendants motion for summary judgment with the underlying bates numbers associated with the Appendix A exhibit numbers that Plaintiff cite in their opposition to NCG and Pinjuv's motion. The Court has already addressed A-36, A-77, A-80, A-81, A-83, A-90, A-91, A-92, A-94, A-98, A-99, A-101, A-116, A-121, A-122, and A-128. The Court expressly adopts and incorporates by reference its prior findings and reasoning from *supra* Section V.e with respect to these documents. The Court addresses the remaining documents now.

a. Day-to-Day Operational Information

This category consists of A-41 through A-49. The Court has already addressed A-46, A-47, and A-48 in its section discussing the three documents identified by Graubard. The remaining documents in this category are substantially similar in that they consist of documents submitted in advance of the Affiliate Calls; summaries of Affiliate Call meetings; monthly G&E business updates provided to the Affiliates; and a real estate market analysis. Therefore, the Court incorporates by reference its findings and reasoning from *supra* Section V.f.ii.1 and denies

summary judgment as to the remaining documents in this category.

### b.  Forms and Templates

This category consists of A-68, 93, 95-97, 100-114, 123, 124. For the reasons stated in the section on operational materials, *supra* Section V.f.i.5, which the Court incorporates by reference herein, the Court denies summary judgment on A-68, A-95-A-97, A-100, A-108-111. A-68 is a lease agreement with the notation "private" at the top. A-95, A-97, A-108 through A-111 are all Confidential Offering Memorandums, which contain confidentiality provisions. A-96 and A-100 are also Confidential Offering Memoranda Though A-96 and A-91 do not contain the same confidentiality language as the aforementioned memos they are nonetheless designated as "confidential" which raises a triable issue of fact as to whether G&E shared these with an expectation of privacy and therefore took measures to protect the documents secrecy.

However, for the reasons stated in *supra* V.g.ii, which the Court incorporates by reference herein, the Court grants summary judgment on A-93, A-101 through 107, A-112 through A-114, A-123, and A-124. A-93 and A-123 are lease-related agreements and communications prepared for third parties which do not contain any confidentiality provisions. A-102 through A-107, A-112, and A-113 are all broker opinions of value prepared for third parties. A-101, A-114, and A-124 are all marketing/listing proposals prepared for outside, third parties. None of these documents were designated as confidential or private.

### c.  Transactional Documents

This category of documents includes A-82, 84, 85, 86, 87, 88, 89, 93, 95-97, 100-114, 123, 124. The Court has already addressed 93, 95-97, 100-114, 123, 124. As to the remaining documents, the Court grants summary judgment on A-82, A-84, A-85, A-88, and A-89. A-82 and A-85 are marketing proposals created for third parties. A-84, A-88, and A-89 are all broker opinions of value also prepared for third parties. None of these documents contain any type of confidentiality provision or designation. However, the Court denies summary judgment for A-86 and A- 87. A-86 is a Confidential Preliminary Pricing of Single Loan prepared for a third party but designated as "confidential." A-87 is an asset valuation template which Plaintiffs assert G&E developed and appears to be an internal document not shared with third parties.

1

2

#### d.   Client Information

There are only two documents in this category, A-128 and A-131. Although the Court has previously denied summary judgment on both these documents, the Court considers NCG and Pinjuv's specific arguments as to each of these documents and grants summary judgment for Defendants on both. A-128 and A-131 are lists of attorneys and firms in Reno prepared by NCG's marketing coordinator for one of NCG's brokers. It is undisputed that this document was prepared by an NCG employee for another NCG employee. Plaintiffs put forward no evidence that this spreadsheet was proprietary information or data of G&E, was "developed by or for G&E," or "purchased by or for G&E." Plaintiffs also fail to offer any evidence that the information contained in the spreadsheet, the contact information of Reno law firms, was gathered using G&E propriety information. Therefore, it was not subject to the Affiliate Agreements provisions and summary judgment is granted for Defendants on these two documents.

#### g.   Aiding and Abetting – AY Defendants Only

A claim for aiding and abetting the breach of a fiduciary duty requires the following four elements: (1) a fiduciary relationship exists, (2) the fiduciary breached the fiduciary relationship, (3) the third party knowingly participated in the breach, and (4) the breach of the fiduciary relationship resulted in damages. In re Amerco Derivative Litig., 252 P.3d 681, 702 (2011).

First, the Court finds that Plaintiffs may bring an aiding and abetting a breach of fiduciary duty in the context of a client-attorney relationship. Defendants argue that aiding and abetting in this context is not cognizable under Nevada law and Plaintiffs must bring this instead as a legal malpractice claim against Krugman. Plaintiffs dispute this, and both parties cite the same case, Stalk v. Mushkin, 199 P.3d 838 (Nev. 2009), as support for their argument. Stalk recognizes that legal malpractice claims arise from breaches of both contractual and fiduciary duties. Stalk therefore supports Plaintiffs position that aiding and abetting the breach of a fiduciary relationship can arise from an attorney-client relationship. Although Stalk characterized a breach of fiduciary claim arising out this type of relationship as a legal malpractice suit, Stalk did so only in the context of determining the applicable statute of limitations. Finding that this cause of action was properly characterized as a legal malpractice claim, the court held that the legal malpractice statute of

limitations would apply. <u>Stalk</u> did not involve an aiding and abetting claim, nor did it hold that individuals could not bring this form of aiding and abetting claim.[10] Plaintiffs' claim is cognizable.

Second, there are material disputed facts regarding whether the AY Defendants and Rose knowingly participated in the breach. Plaintiffs' 30(b)(6) witness, Graubard, stated Plaintiffs have no evidence that anybody at AY encouraged Krugman to bring information over from G&E. Krugman also testified that no one at AY asked her to bring any documents with her from G&E, and no one at AY asked her to share or review documents that she brought with her from G&E. Plaintiffs, on the other hand, note that Rose knew of Krugman's fiduciary obligations to G&E because Rose was G&E's CEO during the time that Krugman was in-house counsel. Plaintiffs submit emails which suggest that Webb approved of Krugman's efforts in recruiting G&E brokers and employees. Plaintiffs also cite emails and deposition testimony, which demonstrates that Rose and others at AY received legal advice from Krugman with respect to (1) recruiting Kupiec and others from G&E and (2) litigation adverse to G&E. Another email cited by Plaintiffs shows that Krugman asked Rose whether someone else should handle the G&E litigation "under the circumstances." Although this email does not, as Plaintiffs represent, establish that Rose "insisted" she handle the matter, the evidence suggests that she nonetheless continued to handle the G&E litigation despite her question to Rose. Plaintiffs also point to emails which show that Hanna, AY's Chief IT Officer, assisted Krugman in organizing her G&E files on AY's network.

As the foregoing demonstrates, Rose or AY Defendants did not need to encourage Krugman to bring over confidential documents in order to have nonetheless participated in the breach through other means. A reasonable juror could find based on the evidence submitted that the AY Defendants and Rose knowingly participated in Krugman's breach. Summary judgment is therefore denied on this claim.

### h.  Breach of Contract – NCG

#### i.  <u>Standing</u>

NCG assert that Plaintiffs lack standing to bring their breach of contract claim because

---

[10] Plaintiffs further submit evidence that Krugman was not only in house counsel, but also a Vice President of the company and therefore may have owed G&E duties separate and apart from her duties as senior counsel.

1   none of the alleged conduct underlying Plaintiffs' claim occurred prior to petition. As previously

2   noted, the rejection of the Affiliate Agreement, which was as an executory contract, constituted a

3   material breach by the Plaintiffs backdated to the day before the petition was filed, February 19,

4   2012. In re Aslan, 909 F.2d at 371. Plaintiffs' breach of contract claim must have accrued on or

5   before February 19, 2012, and may not assert this claim based on post-petition conduct.

6       Courts look to state law to determine when a cause of action accrues. Cusano, 264 F.3d at

7   947. In Nevada, a claim "accrues when the wrong occurs and a party sustains injuries for which

8   relief could be sought." Petersen v. Bruen, 792 P.2d 18, 20 (1990). The elements of a breach of

9   contract claim in Nevada are: "(1) formation of a valid contract; (2) performance or excuse of

10  performance by plaintiff; (3) material breach by the defendant; and (4) damages"). Padilla Constr.

11  Co. of Nevada v. Big-D Constr. Corp., 386 P.3d 982 (Nev. 2016).

12      It is undisputed that Pinjuv did not sign a licensing agreement with AY until after the

13  bankruptcy petition was filed, on February 27, 2012, and did not notify G&E that it would be

14  terminating the contract until March 2012. Notwithstanding, Plaintiffs identify evidence that NCG

15  breached the Affiliate Agreement prior to February 19, 2012. This includes the timeline of when

16  NCG breached its obligations not to retain or disclose G&E's proprietary information, which the

17  Court discusses in greater detail below; as well as when damages from this breach occurred.

18      Because there are genuine issues of material fact as to whether NCG breached the

19  agreement and damages resulted on or before February 19, 2012, summary judgment is denied as

20  it relates to Plaintiffs' standing to bring this claim.

21              ii.   Merits

22      Plaintiff's breach of contract claim against NCG is based on three theories: (1) NCG

23  allegedly entered into a licensing agreement with AY to engage in direct competition with the

24  Plaintiffs in breach of the non-competition clause in the Affiliate Agreement; (2) NCG took and

25  disclosed G&E's trade secrets to AY in violation of the Affiliate Agreement and Confidentiality

26  Agreement; and (3) NCG allegedly took and disclosed G&E's confidential information to AY in

27  violation of the Agreements. Additionally, Defendants argue that NCG could not have breached

28  its agreement because G&E materially breached their own obligations under the contract. The

Court addresses each argument in turn.

### 1.  Non-Competition Clause

The Court grants summary judgment for Defendants to the extent that the breach of contract claim is based on NCG's breach of the Affiliate Agreement's non-compete clause.

The following facts are undisputed. NCG signed a valid contract with G&E which provided that "Broker will not participate, on its own behalf or on behalf of any other Person, directly or indirectly, by oral or written contract or otherwise, in any other network or organization of commercial real estate brokers which shares referrals of any real estate transactions or services, or any market information among members, which services or sharing of information is similar to that provided by [G&E] or its affiliates without the prior written consent of [G&E]." The Affiliate Agreement was between NCG and G&E; not Pinjuv and G&E. Pinjuv never had a non-compete clause in any personal capacity with G&E or the Plaintiffs. NCG never entered into a licensing agreement with AY. Up to the time that NCG ceased operating, NCG was always an affiliate with G&E. The new entity, WAC, never had an agreement or contract with G&E or the Plaintiffs. It therefore follows that NCG could not have breached the non-compete clause because WAC—a non-party to the Affiliate Agreement—is the entity that executed the AY Licensing Agreement.

Plaintiffs do not put forward evidence sufficient to rebut these basic facts. Instead, Plaintiffs argue that WAC was NCG's successor and therefore stands in its shoes as a party to the Affiliate Agreement. Plaintiffs assert that equitable limitations, which Nevada courts recognize in certain contexts, the "de factor merger doctrine" and "mere continuation" doctrine, should apply to find liability for NCG. In support, Plaintiffs cite emails communications between Pinjuv and Rose where Pinjuv discussed the transition of NCG into a new company that would be an affiliate of AY. Plaintiffs also point to emails and a draft agreement showing that Pinjuv had intended the licensing agreement to be between NCG and AY, but Pinjuv's counsel and Krugman advised him to form a new entity all together. But Pinjuv's subjective motivations prior to forming WAC do not alter any of the foregoing facts. Critically, Plaintiffs do not cite any evidence that NCG sold its assets to WAC or that any corporate transaction occurred between the two LLCs.

The Court also concludes that neither the "de facto merger" nor "mere continuation"

doctrines apply to current facts. The de facto merger doctrine is an "equitable remedy designed to address patent injustice in situations where the governing statute does not provide a remedy even though the merger statutes intended for a remedy to exist." <u>Peddie v. Spot Devices, Inc.</u>, 427 P.3d 125 (Nev. 2018). Plaintiffs are not seeking a remedy under any merger statute. Further, Nevada courts have expressly applied the de facto merger doctrine in two contexts only, neither of which are present here. The first context is successor liability for debts, explaining although "when one corporation sells all of its assets to another corporation the purchaser is not liable for the debts of the seller," exceptions to this rule may apply, including the de factor merger exception. <u>Lamb v. Leroy Corp.</u>, 454 P.2d 24 (1969); <u>MOH Mgmt., LLC v. Michelangelo Leasing, Inc.</u>, 437 P.3d 1054 (2019); <u>Vill. Builders 96, L.P. v. U.S. Lab'ys, Inc.</u>, 112 P.3d 1082 (2005). The second and only other situation in which the doctrine has been applied is in the context of dissent to a merger, including mergers resulting from "debt-to-equity transactions." <u>Peddie</u>, 427 P.3d at *3.

The mere continuation doctrine is similarly inapplicable. First, the Nevada Supreme Court has only applied the mere continuation doctrine in the context of successor liability for debts that the predecessor accrued, <u>Vill. Builders 96, L.P. v. U.S. Lab'ys, Inc.</u>, 112 P.3d 1082 (2005)—a factual scenario not present here. Second, a plaintiff must meet the following two requirements to justify bringing a sale of assets within the purview of the mere continuation exception to the general rule: (1) only one corporation remains after the transfer of assets; and (2) there is an identity of stock, stockholders, and directors between the two corporations." <u>Vill. Builders</u>, 112 P.3d at 1090–91. Plaintiffs fail to meet the first element because they have presented no evidence of a transaction between the companies.

Additionally, both doctrines function to impute already-existing liability from a predecessor entity onto the successor entity. But here, Plaintiffs cannot prove that NCG ever breached its Affiliate Agreement to begin with. Thus, even if WAC was NCG's successor, there would be no liability to transfer from NCG to WAC.

The Court therefore grants summary judgment in favor of NCG on the breach of contract claim to the extent it is based on NCG's violation of the Affiliate Agreement's non-compete clause. ///

1

2  *2.   Disclosure of Trade Secret and Confidential Information*

3       However, the Court finds that there are genuine issues of material fact regarding whether,

4  on or before February 19, 2012, NCG took and disclosed G&E's trade secrets and confidential

5  information in violation of the Affiliate Agreement.

6       NCG first asserts that Plaintiffs put forward no evidence showing that any of this alleged

7  conduct took place before the petition. NCG then reiterates the same arguments it made in relation

8  to the "misappropriation" element of the trade secrets claim, stating that Plaintiffs have no

9  evidence that NCG transmitted any confidential or proprietary information to AY. Plaintiffs

10 respond and argue that it is reasonable to infer that NCG began transferring its files to WAC before,

11 or soon after, WAC's incorporation on February 15, 2012. Plaintiffs also cite Defendants' 30(b)(6)

12 testimony in which Pinjuv stated that as early as February 17, 2012, they were trying to "get a head

13 start preparing for the conversion" to AY and was working to "prepare stuff to continue business

14 under the new license with WAC." Plaintiffs then reiterate the same arguments that they asserted

15 in opposition to Defendants motion on the issue of misappropriation, namely the opinion of their

16 forensic expert, who opined that "it was reasonable to conclude that . . . Pinjuv and WAC had

17 possession of, and utilized, [G&E] documents and information after affiliation with [AY]" and

18 stated that IT staff uploaded NCG emails into an AY email server once NCG personnel began

19 doing business as WAC. Importantly, Lieb also described examples of documents that originated

20 at G&E and were transferred to WAC and AY.

21      Most of Lieb's testimony speaks directly to NCG's use of the documents *after* the

22 affiliation with AY, which did not occur until February 27, 2012. However, a reasonable juror

23 could find based on Lieb's opinion that NCG retained and used documents, including some that

24 ended up at AY, combined with Pinjuv's testimony that NCG was "getting a head start" on

25 preparing for the conversion, that NCG began transferring some of these documents for use at

26 WAC prior to or on February 19, 2012. Summary judgment is therefore denied on these grounds.

27      iii.   Whether G&E Materially Breached the Contract

28      Separately, NCG argues that it could not have breached the Affiliate Agreement because

G&E materially breached the Affiliate Agreement first. First, NCG states that G&E breached its

obligation to run the "Corporate Marketing Program" for the affiliates. Second, NCG points to language in the Affiliate Agreement, which allowed NCG to terminate the contract on two days' notice if G&E was no longer able to license its brand and service marks. Third, NCG asserts that G&E's express rejection of NCG's Affiliate Agreement in bankruptcy also excused NCG from performance. Plaintiffs dispute that they failed to perform under the contract and further argue that if any breaches did occur, they were not material and therefore did not excuse NCG's own performance. The Court addresses each argument in turn.

### 1. Marketing Program

The Affiliate Agreement required G&E to establish and maintain a program of national marketing initiatives for which NCG was to pay an annual "Marketing Initiatives Contribution of $50,000 to G&E." Defendants state that G&E abandoned the program as its business plunged towards bankruptcy. Pinjuv testified that for the last six months of 2011, the services disappeared completely and NCG could not get a "straight answer" about the affiliate program. Jim Jones, the designated affiliate liaison was fired or "disappeared" and NCG had no one to talk to. Plaintiffs' 30(b)(6) witness, Graubard, testified that he had no knowledge whether G&E continued to spend any money to maintain the program leading up to and after they declared bankruptcy.

The Court finds that Plaintiffs' evidence raises material issues of fact respecting G&E's breach of this provision. The Affiliate Agreement provided G&E would "use *reasonable efforts* to establish and maintain . . . a Corporate Marketing Program and Referral Program" and G&E had the right to modify the Marketing Program at any time "in [G&E's] sole and absolute discretion." Further, Pinjuv testified that the $50,000 fee was "just a fee to – basically the fee to use their name" and G&E provided NCG with the benefit of using its trademark, logos, brand recognition, and resources at all relevant times. Pinjuv's testimony creates a triable issue of fact as to the materiality of the marketing program and any breach that resulted from "abandoning" it.

### 2. Contract Cancellation and Rejection of Contract

Defendants point to the two-day cancellation provision in the Affiliate Agreement and argue that when G&E announced that it would be transferring all its intellectual property, brand and marks to a third party through bankruptcy proceedings, it definitively announced its intent to

breach the Affiliate Agreement. NCG argues it was not required to continue performing after this announcement of intent to sell trademarks because it signified it would be impossible for G&E to continue to provide affiliates access to the marks. As support, Defendants cite the testimony of Plaintiffs' 30(b)(6) witness, who stated that the trademark licensing provision was material to the parties' agreement. According to NCG, G&E's announcement amounted to an anticipatory breach and discharged NCG's obligations under the contract. Defendants further argue that at the very latest, Plaintiffs' rejection on January 31, 2013, constituted a material breach.

The Court is not persuaded that the two day cancellation provision or G&E's rejection of the contract in 2013 entitle NCG to summary judgment on their breach of contract claim. NCG did not terminate the Agreement based on this clause, it instead relied upon the "Termination by Expiration" provision which allows the party to terminate the Agreement at the end of the term with 150 days' notice. Although G&E's trademarks were material to the contract, the Court has already found that factual issues remain as to whether NCG breached prior to the petition date. For these same reasons, G&E's rejection of the contract on January 31, 2013, is also irrelevant. Further, that the contract contains an *option* to forfeit once certain conditions are met does not necessarily mean that G&E was in breach of the contract when those conditions occurred. Defendants do not cite any evidence or law that suggests otherwise.

Because genuine factual issues remain on the materiality and timing of any G&E breach of the agreement; the Court denies summary judgment on the breach of contract claim against NCG.

### i.   Breach of Contract – Kupiec

#### i.   Standing

Kupiec argues that Plaintiffs do not have standing to bring a breach of contract claim against him because all the alleged conduct occurred post-petition and thus the claim never became part of the estate. Plaintiffs argue that much of Kupiec's conduct occurred prior to the filing of the bankruptcy petition and any post-petition misconduct remains actionable under the language of the APA and § 541(a)(7). The Court notes that Kupiec's employment agreement was not an executory contract. Plaintiffs also do not argue that agreement vested in the estate as a non-executory contract. Therefore, for the reasons previously discussed, the Court finds that Plaintiffs

have standing to assert this claim to the extent that it accrued on or before April 13, 2012.

Here, Defendants acknowledge that two of the three individuals who Kupiec allegedly solicited left G&E before April 2012. Dworkin joined on AY on March 2, 2012. Sinclair joined AY on March 19, 2012. Hyde joined in August 2012 but there's evidence that Kupiec was taking steps to recruit him in early 2012. There is also ample evidence that Kupiec was sharing potentially confidential information, and therefore violating the confidentiality provision of the agreement, with AY as early as 2010. Moreover, any breach based on a failure to return documents necessarily would have occurred soon after Kupiec's termination in 2011.

The Court finds that Plaintiffs have offered evidence that creates a dispute of fact as whether the cause of action accrued on or before the Closing date, April 12, 2012. Summary judgment is therefore denied as it relates to Plaintiffs' standing to bring this claim.

ii.   Merits

The breach of contract claim against Kupiec is based on three theories: (1) Kupiec solicited former G&E employees; (2) Kupiec disclosed confidential information to AY; and (3) Kupiec failed to return confidential information – all actions in violation of the agreement with G&E.

### 1.   Breach of non-solicitation clause

It is undisputed that Kupiec's G&E agreement contained a non-solicitation agreement, which prohibited him, "for a period of one year following his date of termination," from "soliciting (directly) for employment any employees or independent contracts of G&E. ECF No. 629-94.

The Court finds genuine factual issues remain as to whether Kupiec "directly" solicited anyone to work for AY. On the one hand, Sinclair, Hyde, and Dworkin, all deny that Kupiec was the one who contacted them about employment at AY-Nevada. However, Kupiec sent a memorandum to Rose and Webb at AY on October 8, 2010, which detailed plans to establish an AY office in Las Vegas; these plans included recruiting eleven G&E personnel that Kupiec identified by name, including Hyde, from G&E's Las Vegas officer. Plaintiffs also submit emails, dated March 12, 2012, where Kupiec describes his efforts in directly recruiting David Scherer, Michael Kammerling, and Nelson Tressler; all G&E personnel. In these emails, Kupiec forwards Rose signed term sheets, which he secured from all three individuals. Kupiec also discusses his

plans to meet with Scherer for drinks in order to, in the words of Rose, "redirect him back to [AY]." On February 7, 2012, Kupiec informed Rose that he had been texting Tressler. Although Scherer, Kammerling, and Tressler did not ultimately join AY, the conduct raises a genuine dispute of fact regarding whether Kupiec breached the non-solicitation clause. Further, the proposed term sheet that Kupiec secured from Scherer included Hyde as one of the employees that Scherer would agree to bring over from G&E. Summary judgment is denied with respect to the non-solicitation clause.

### 2.   Disclosure of G&E's Confidential Information

With respect to the confidentiality provision, it is undisputed that the same agreement prohibited Kupiec from "disclos[ing] to any person or entity, or use, other than in connection with Company's business, any confidential information that you develop or otherwise acquire in the court of your employment with [G&E]." ECF No. 629-94. It is further undisputed that Kupiec shared information with AY including an Office Revenue Growth Model on October 26, 2010, and a memo on October 11, 2010, with the revenue production figures for the G&E brokers that Kupiec suggested hiring. Kupiec also sent G&E Las Vegas's historical operating agreements and a list of active listings and management agreements for the G&E Las Vegas office.

The Court finds that there are genuine issues of fact as to whether this information was acquired during his time at G&E or from before (when he was employed with a different company) and whether the information was actually "confidential." Plaintiffs' 30(b)(6) witness, Graubard, testified that he did not know what of this information was acquired during the course of Kupiec's employment at G&E or during his prior employment. He also could not say whether these particular brokerage commission figures for the individual brokers were generally known. However, Plaintiffs point out that Graubard identified the broker commissions as "confidential information" multiple times during his deposition. Plaintiffs likewise note that Defendants fail to address the Office Growth Model, which Graubard also identified as confidential. Summary judgement is therefore denied as it relates to the disclosure of information.

### 3.   Failure to Return Confidential Information

The Court similarly finds that there are genuine factual issues regarding whether Kupiec failed to return confidential information. It is undisputed that the employment agreement required,

1   Kupiec, "upon termination," to "deliver to [G&E] any and all confidential information about G&E

2   and/or its clients that [he] possessed," as well as "any and all [G&E] property." Kupiec denies

3   saving anything from his work computer to take with him to AY. Additionally, Kupiec remained

4   the Broker of Record for G&E after he moved to AY and Graubard was unaware of a specific

5   request by G&E demanding return of documents. However, Kupiec acknowledges he sent certain

6   documents to his personal AOL account and provides no evidence that he returned these

7   documents to G&E. Plaintiffs' computer forensics expert, Lieb, identified metadata indicating that

8   at least twelve G&E documents produced by AY in this litigation were in Kupiec's possession,

9   custody, and control after his transition to AY. Additionally, it is unclear what if any impact

10  Kupiec's retention as a broker of record would have on the terms of his employment agreement.

11  There is likewise a factual dispute as to whether the information Kupiec allegedly failed to return

12  was "confidential." Summary judgment is denied as it relates to the failure to return documents.

### iii. Causation and Damages

14       Finally, the Court finds that there are triable issues of fact related to causation and damages

15  on this claim. Defendants assert that they are entitled to summary judgment because Plaintiff

16  cannot adduce evidence that Dworkin, Sinclair, and Hyde would not have left G&E regardless of

17  Kupiec's solicitation.  Defendants also assert that Plaintiffs were not damaged by the disclosure or

18  retention of confidential information. The Court finds that determining the employees' motivations

19  for leaving G&E is a question of fact. Additionally, Plaintiffs' expert witness on damages valued

20  the breach of contract damages at $139,038. Therefore, the issue of causation and damages is

21  disputed, and summary judgment is denied on these grounds.

### j. Tortious Interference of Contract – Pinjuv

23       In an action for intentional interference with contractual relations, a plaintiff must

24  establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3)

25  intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption

26  of the contract; and (5) resulting damage. J.J. Indus., LLC v. Bennett, 71 P.3d 1264, 1267 (2003).

27       The Court finds that Pinjuv is entitled to summary judgment as a matter of law on Plaintiff's

28  tortious interference with contract claim. It is well settled that a party cannot, as a matter of law,

tortiously interfere with its own contract. <u>Bartsas Realty, Inc. v. Nash</u>, 402 P.2d 650 (1965) ("defendants' breach of their own contract with the plaintiff is not a tort"). Plaintiffs have failed to submit evidence raising a dispute of fact as to whether Pinjuv is personally liable for allegedly causing or inducing NCG to breach its contract with G&E.

Plaintiffs argue this rule does not apply. Plaintiff's theory is that Pinjuv was acting outside the scope of the agency and not in the principal's interest because he exposed NCG to liability when he terminated the contract.

But a party nearly always exposes its company to liability when it breaches a contract. Plaintiffs have also failed to identify any evidence suggesting that Pinjuv was motivated by malice towards G&E or that he was only standing to benefit himself (as opposed to his company) by breaching the contract. <u>C.f.</u> <u>Las Vegas Sun, Inc. v. Adelson</u>, 2022 WL 876937, at *13 (D. Nev. Mar. 23, 2022) (permitting tortious interference claim to proceed when plaintiffs provided sufficient evidence that defendant interfered with his newspaper company's contract to enrich his personal column in a different publication). The Court finds that this argument, without more, is insufficient as applied to the facts of this case. Defendant Pinjuv is entitled to summary judgment on this claim and Plaintiffs' motion for summary judgment on this claim is denied.

### k.  Tortious Interference with Contract –AY defendants and Rose

Plaintiffs assert this claim against the AY Defendants and Rose based on three theories: (1) Defendants tortiously interfered with NCG's contract; (2) tortiously interfered with Kupiec's employment contract; and (3) tortiously interfered with Krugman's employment contract.[11]

#### i.   Interference with NCG's Affiliate Agreement

The Court grants summary judgment to the extent this claim is based on a breach of the Affiliate Agreement. As noted, Plaintiffs may only assert a breach of contract claim against NCG based on the Affiliate Agreement's confidentiality provision. However, Plaintiffs have failed to offer any evidence that the AY Defendants took intentional acts to interfere with this specific

---

[11] In their Opposition, Plaintiffs raise a fourth theory, that Defendants also interfered with other G&E personnel's contracts, such as Sinclair and Hyde. But Plaintiffs never alleged this in their TAC and the Court declines to consider this new theory at summary judgment.

provision. All the evidence submitted relates to the non-compete clause, which the Court found NCG could not have breached. For example, Plaintiffs cite Pinjuv's meeting with Rose to discuss forming a relationship with AY and Krugman's email to Pinjuv with the draft AY Affiliate Agreement. Although this evidence suggests that the AY Defendants knew about and facilitated the breach of the non-compete clause, it does not suggest that these defendants encouraged Pinjuv to share confidential information. The Courts grants summary judgment on these grounds.

### ii.   Interference with Kupiec's employment contract

The Court finds that there is a genuine issue of material fact regarding whether the AY Defendants and Rose took intentional acts designed to disrupt the employment contract.[12] Kupiec denies soliciting G&E personnel, and Sinclair, Dworkin, and Hyde all deny being solicited by Kupiec. On the other hand, Plaintiffs provide emails between Kupiec, Rose, and Thakar showing AY and Rose were actively recruiting Kupiec in 2010. In another email between Kupiec, Rose, and Webb, Kupiec states "many are looking to me for guidance. I must be careful because of the direct non-solicitation clause contained in my Employment Agreement, but I believe many are prepared to follow my lead." In this same email, Kupiec asks Rose for a revised term sheet. Rose forwards the email to Webb and Krugman and writes "we are pressing Grubb folks everywhere." Rose forwarded a group of AY executives an email chain titled "Grubbs earnings are out. Holy $hit" and commented "Just enjoy the ride and an opportunity to hire from this mess" and instructed his colleagues "FYI. Let's get going." When Kupiec sent his October 8, 2010, memorandum, which identified eleven G&E brokers that he would recruit to AY, Webb responded "this is exactly what I had hoped for" and asked Kupiec to provide estimated revenue for the G&E personnel identified in the memo, which Kupiec did. Similarly, when Kupiec emailed the Office Growth Model, Webb responded "This is terrific."[13] Kupiec also emailed Thakar a spreadsheet of G&E

---

[12] Defendants incorporate their argument from the breach of contract claim and state that the tortious interference claim also fails because there is no evidence to support Plaintiff's underlying breach of contract action against Kupiec. However, the Court has already found that there are disputes of material fact on the breach of contract claim and therefore rejects this argument.

[13] As noted, there are genuine disputes of fact regarding whether the revenue figures and model were based on confidential or trade secret financial information.

clients that Sinclair planned to solicit once she moved to AY. This raises a question as to Kupiec's solicitation of Sinclair and/or his coordination with the AY Defendants in their recruitment of Sinclair. The hiring proposal for Sinclair, which was presented to the AY Compensation Committee, used information from this spreadsheet.

In sum, it is undisputed that Rose was aware of Kupiec's contract and there is ample evidence creating a triable issue of fact regarding whether Rose and other senior management at AY, including Webb and Thakar, were working with Kupiec to recruit G&E personnel and attain confidential information.[14] The Court therefore denies summary judgment on the tortious interference claim as it relates to Kupiec's employment contract.[15]

### iii.   Interference with Krugman's employment contract

First, the Court finds that Plaintiffs have failed to offer evidence creating a genuine dispute of fact as whether the AY Defendants and Rose intentionally acted to interfere with the non-solicitation clause of her agreement. Plaintiffs submit January 2011 emails showing that Krugman contacted Kupiec and also emailed Rose informing him that Kupiec "says hi" and that she had emailed Webb "to see if she can call [Kupiec] back and help with getting him on board." However, in the very next email, Rose expressly declines Krugman's offer to assist, which directly undermines Plaintiffs' tortious interference claim.[16]

However, the Court finds there are disputed facts as to whether the AY Defendants and Rose took intentional acts to disrupt the confidentiality provisions of Krugman's contract.

---

[14] Moreover, all of this conduct occurred in March 2012, so this cause of action would have accrued by the time the assets were acquired under the APA.

[15] Because of NUSTA preemption, Plaintiffs may not recover damages for any sharing of confidential information that is found to be a trade secret at trial. Frantz v. Johnson, 116 Nev. 455, 999 P.2d 351 (2000) (finding district court erred in awarding damages based on multiple common law claims that arose out of the misappropriation of trade secrets but noting that a plaintiff may be able to assert a tortious interference with contract claim that "does not depend on the information being deemed a trade secret"). As there are factual disputes related to whether the information is a trade secret or merely "confidential," the Court does not find that the claim is preempted at this stage.

[16] The Court notes that it found the email between Krugman and Webb in which Webb told Krugman she may reach out to Kupiec was relevant to the aiding and abetting claim. First, Krugman again noted in that email chain that Rose had told her not to reach out to Kupiec. Second, Webb's passive consent to Krugman's solicitation does not rise to the level of an intentional act to disrupt her contract. This highlights the subtle yet important distinction between "aiding and abetting" and tortious interference.

Defendants reiterate their arguments from the aiding and abetting claim, asserting that no one at AY encouraged Krugman to bring over confidential information. However, on January 10, 2011, Krugman sent over two confidentiality agreement templates that she acquired through her time at G&E to Steve Dils, a Managing Director at AY, *upon his request*. Krugman also helped create the AY "Sales Professional Policies and Procedures Handbook," which appears to be modeled after the G&E Policies and Procedures Manual, which Thakar personally sent her a copy of. Krugman sent he sent the finalized handbook to Rose for his review on February 24, 2012; strongly implying that AY leadership tasked her with this assignment.

The Court denies summary judgment as it relates to Krugman's employment agreement. However, because of NUSTA preemption, Plaintiffs may not recover damages on this claim should the above information be deemed a trade secret at trial. See Frantz, 999 P.2d at 357-58. The Court notes that it has already found that the Confidentiality Agreement templates are not trade secrets.

### l.   Conspiracy – AY Defendants

An actionable civil conspiracy "consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." Consol. Generator-Nevada, Inc. v. Cummins Engine Co., 971 P.2d 1251, 1256 (Nev. 1998). In Nevada, "civil conspiracy liability may attach where two or more persons undertake some concerted action with the intent to commit an unlawful objective, not necessarily a tort." Cadle Co. v. Woods & Erickson, LLP, 345 P.3d 1049, 1052 (Nev. 2015). Plaintiffs argue that Defendants conspired to tortiously interfere with G&E's contracts, including its employment agreements and the Affiliate Agreement, and conspired to tortiously interfere with prospective economic advantage by diverting transactions and property-management engagements from G&E to AY. The Court will address each argument in turn.

### i.   Tortious Interference with Contract

The Court grants summary judgment for Defendants on the conspiracy claim to the extent it is based on tortious interference with contract. In its 2018 Order on the Motion to Dismiss, which the Court incorporates by reference herein, the Court declined to permit co-conspirator liability based only upon underlying contract violations where there was no tortious breach of the implied

covenant of good faith and fair dealing. See Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 461 (Cal. 1994) (declining to permit a claim for conspiracy to interfere with contract). Plaintiffs have not offered any evidence that Defendants tortiously breached the implied covenant of good faith and fair dealing.[17]

### ii.  Wrongful Diversion of Pending Transactions

Defendants assert that Plaintiffs do not have any evidence of underlying agreements for the allegedly diverted commissions. However, the Court finds genuine issues of fact remain as to whether G&E had agreements with these properties. Plaintiffs produce significant documentation and other evidence of an existing G&E agreement for each of the properties. This includes an amendment for Copper Point; a lease expiration notification for Yee Advanced Orthopedics; lease agreements for units at 100 N. Green Valley Parkway (the same building as Axis Diagnostics); management agreements for Stetson Ranch, Rainbow Springs Shopping Center, and Stetson Ranch; and a notice of termination email for the Samrose Center.

Plaintiffs also produce evidence that Sinclair and Hyde were working with the AY Defendants to bring these properties with them to AY. For example, Sinclair sent Kupiec an email with a spreadsheet of properties that she was "75% sure she could bring with her to AY." Stetson Ranch, Rainbow Springs Center, Samrose Center, and Copper Point were all on this list. Kupiec forwarded this email to Thakar. The information in this spreadsheet was later used in the proposal for hiring Sinclair. AY did in fact hire Sinclair. Plaintiffs also cite emails from Hyde to Axis Diagnosis, which he sent in preparation for transferring the deal while still at G&E. Defendants fail to individually challenge this evidence. Summary judgment is denied as to Plaintiffs' conspiracy claim to the extent that it is based on the wrongful diversion of pending transactions.

### m.  Conspiracy – NCG and Pinjuv

Plaintiffs argue that NCG and Pinjuv conspired with the other Defendants to tortiously

---

[17] In their TAC, Plaintiffs had alleged that Defendants conspired to fraudulently conceal transactions as they left G&E. The Court finds no genuine issue of fact as to this allegation. Plaintiffs' 30(b)(6) witness testified that Plaintiffs do not have evidence to support this allegation and Plaintiffs have provided no other evidence of fraudulent concealment. The Court therefore grants summary judgment for Defendants on the conspiracy claim to the extent it is based on fraudulent concealment.

interfered with the NCG Affiliate Agreement and to wrongfully divert transactions from G&E.[18]

### i. Tortious Interference

For the same reasons discussed above, the Court grants summary judgment for Defendants to the extent that it is derivative of Plaintiffs' tortious interference claim. The Court will not permit a conspiracy claim based on underlying contract violation to proceed where there is no evidence that Defendants breached the implied covenant of good faith and fair dealing. This applies to Plaintiffs' claim that NCG and Pinjuv conspired to steal G&E's confidential information; this act is an "unlawful objective" only by virtue of the contract. Further, as previously discussed, Pinjuv is not liable for tortiously interfering with his own contract. Applied Equip. Corp., 869 P.2d at 459 ("Because a party to a contract owes no tort duty to refrain from interference with its performance, he or she cannot be bootstrapped into tort liability by the pejorative plea of conspiracy.").

### i. Wrongful Diversion of Pending Transactions

However, the Court finds that factual issues remain as to whether NCG and Pinjuv conspired to wrongfully divert transactions from G&E. Pinjuv signed an AY listing agreement for the Andersen Carl Trust on February 24, 2012 while NCG was still a G&E Affiliate. Additionally, while NCG was still affiliated G&E, Pinjuv emailed Rose on February 23 and 25, 2012, and informed him that his staff were starting to tell their clients about the change in affiliation to AY. Plaintiffs also submit emails from March 5 and March 9 which show that NCG was actively transferring all its listings to AY. In a footnote, Defendants argue that Rispoli's testimony regarding the Andersen Carl Trust is inadmissible because Rispoli read it verbatim from an outline, which resulted in Court sanctions. But although Judge Youchah granted in part Defendants' motion for sanctions because of Rispoli's ill preparation, Judge Youchah did not preclude any

---

[18] In their Third Amended Complaint, Plaintiffs had also alleged that Defendants NCG and Pinjuv conspired to fraudulently concealed transactions and played a role in facilitating the transition of G&E Las Vegas brokers to AY's Las Vegas office. As with the conspiracy claim against the AY Defendants, Plaintiffs have failed to offer any evidence that NCG or Pinjuv *fraudulently* concealed pending transactions. The Court grants summary judgment in favor of Defendants as it relates to this aspect of the conspiracy claim. The Court finds no genuine issue of material fact as to this allegation. Pinjuv testified that he had no involvement in helping bring G&E Vegas brokers over to AY's Vegas office. Plaintiffs do not dispute this testimony and argue that this aspect of their conspiracy claim does not apply to Pinjuv or NCG. Therefore, summary judgment is granted for NCG and Pinjuv on this basis as well.

specific testimony or evidence. <u>Great Am. Ins. Co. of New York v. Vegas Const. Co.</u>, 251 F.R.D. 534, 543 (D. Nev. 2008) ("sanctions that preclude a party from introducing evidence are typically reserved only for flagrant discovery abuses.") Defendants also conclusory state that "G&E did not have general rights to NCG's commissions," but they do not cite any evidence in the record to support this and therefore the Court does not consider this factual assertion. The Court denies summary judgment on Plaintiffs' conspiracy claim as it relates to Pinjuv and NCG's alleged wrongful diversion of pending transactions.

## IV. Plaintiffs' Motion for Summary Judgment

As evidenced by the Court's summary of the disputed facts in this case, *supra* Section II, as well as the foregoing discussion, there are genuine factual disputes on some of Plaintiffs' claims and some have been dismissed.[19] The Court has considered the arguments and evidence presented in Plaintiffs' motion and finds that factual issues remain on key elements of each of Plaintiffs' causes of action. The Court further does not find that Plaintiff is entitled to summary judgment on any of its claims when weighing the evidence in favor of the non-moving party, Defendants. Therefore, the Court denies Plaintiffs' motion in its entirety.

## I. CONCLUSION

**IT IS THEREFORE ORDERED** that The Unopposed Motions for Leave to File Reply Brief Exceeding Page Limits [ECF Nos. 680, 681, 682, 703] are all **GRANTED.**

**IT IS FURTHER ORDERD** The Joint Stipulation for Extension of Time [ECF No. 715] and Motion to Extend Dispositive Motion Deadline [ECF No. 640] is GRANTED nunc pro tunc.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Supplemental Authority in Support of Plaintiffs' Opposition to the Motion for Summary Judgment [ECF No. 714] is **DENIED**.

**IT IS FURTHER ORDERED** that AY Defendants, Rose, and Kupiec's MSJ [ECF No. 637] is **GRANTED** in part and **DENIED** in part.

- Summary judgment is granted on the trade secrets claim in favor of the AY Defendants'

---

[19] Except for Plaintiffs' tortious interference cause of action against Pinjuv, which the Court grants in Pinjuv's, not Plaintiffs', favor.

on the following documents: Defendants Exhibits 63, 25, 26, 27, 28, 29, 69, 30, 31, 32, 33, 34, 35, 70, 40, and 42. Summary judgment is denied as to all other documents.

- The Court grants summary judgment in favor of the AY Defendants' on the tortious interference claim to the extent it is based on a breach of the NCG Affiliate Agreement. Summary judgment is denied as to the other bases for this claim.

- The Court denies summary judgment on Plaintiffs' conspiracy claim as to the AY Defendants to the extent that it is based on wrongful diversion of pending transactions from G&E. Summary judgment is granted on this claim in favor of the AY Defendants, Rose, and Kupiec in all other respects.

**IT IS FURTHER ORDERED** that Defendant Pinjuv and Nevada Commercial Group MSJ [ECF No. 629] is **GRANTED** in part and **DENIED** in part.

- Summary judgment is granted on the trade secrets claim in favor of NCG and Pinjuv on the following documents: A-82, A-84, A-85, A-88, and A-89, A-93, A-101 through 107, A-112 through A-114, A-123, A-124, A-128 and A-131. Summary judgment is denied as to all other documents.

- The Court grants summary judgment in favor of NCG on the breach of contract claim to the extent it is based on a breach of the agreement's non-compete clause. Summary judgment is denied as to the other bases for this claim.

- The Court grants summary judgment in favor of Pinjuv on the tortious interference with contract claim.

- The Court denies summary judgment on Plaintiffs' conspiracy claim as to NCG and Pinjuv to the extent it is based on conspiring to wrongfully divert pending transactions from G&E. Summary judgment is granted on this claim in favor of NCG and Pinjuv in all other respects.

**IT IS FURTHER ORDERED** that Plaintiff's MSJ [ECF No. 624] is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Expert Testimony [ECF No. 644] is DENIED.

1

2          **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony [ECF

3      No. 654] is DENIED.

4          **IT IS FURTHER ORDERED** Defendants Request for Judicial Notice [ECF No. 633] is

5      GRANTED as these documents are court records filed in the underlying bankruptcy case.

6          **DATED:** March 31, 2024.

7

8                                                    _____

9                                                    **RICHARD F. BOULWARE, II**
                                                     **UNITED STATES DISTRICT JUDGE**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28